# Exhibit A

THE "TRIBUNAL DE GRANDE INSTANCE" - HIGH COURT - OF PARIS, FRANCE

CLERK OF THE COURT'S OFFICE
CIVIL MATTERS

FILING N° 194
OF 7 DECEMBER 2000

# ENFORCEABLE COPY OF AN
# ARBITRATION AWARD

## HANDED DOWN IN THE DISPUTE
## BETWEEN

COMMISIMPEX S.A. (Brazzaville)

and

REPUBLIC OF THE CONGO AND CAISSE CONGOLAISE D'AMORTISSEMENT

Maître BREMOND Christian

N° R038



336

# THE FRENCH REPUBLIC

## IN THE NAME OF THE FRENCH PEOPLE

The President of the "Tribunal de Grande Instance" - High Court - of Paris, France, in his court order handed down on 12 December 2000, rendered the following arbitration award enforceable :

## FILING DEED

In the year 2000 on 7 December 2000, Maître BREMOND Christian appeared before me, the undersigned Clerk of the Court, at the Clerk of the Court's Office of the High Court of Paris, France, and personally deposited with me the original copy of an arbitration award handed down by Messrs Charles CHOUCROY, Jean-Michel DARROIS and André BRUYNEEL for filing in the minute book of the Clerk of the Court's Office in conformity with articles 1477 and 1500 of the French New Code of Civil Procedure

Said award ruling with respect to the dispute between

COMMISIMPEX S.A. (Brazzaville) and the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT (Republic of the Congo)

And signed with me, Clerk of the Court, after the document was read out.

Signed Mrs COUTENS and Maître BREMOND Christian

1st ROLE



ICC
International Chamber of Commerce
The world business organization

International Court of Arbitration

# AWARD
# SENTENCE

ICC International Court of Arbitration
38 Cours Albert 1er, F-75008 Paris



338

hand-written words : I, the undersigned, Maître Christian Bremond, Avocat à la Cour - barrister , in my capacity of representative of the COMMISIMPEX S.A. company, hereby request acknowledgement by the courts of the enforceability of the present award sentence and request the issue of a copy of said award sentence bearing the formal words rendering it enforceable. Signed in Paris, France on 7 December 2000. (signature)

# INTERNATIONAL COURT OF ARBITRATION

## CASE 9899/AC/DB

COMMISIMPEX S.A. (Brazzaville)

vs

REPUBLIC OF THE CONGO AND CAISSE CONGOLAISE
D'AMORTISSEMENT
(Republic of the Congo)

This document is an authentic copy of the original Final Award rendered in conformity with the rules of the ICC International Court of Arbitration.



339

## ICC ARBITRATION N0 9899 AC/DB

### Commisimpex S.A. (Brazzaville)
vs
### Republic of the Congo and Caisse Congolaise d'Amortissement

### FINAL ARBITRATION AWARD

In the case of

> COMMISIMPEX, a "société anonyme" - public limited company - governed by the laws of the Republic of the Congo, entered in the analytical register kept by the Clerk of the Court of the Commercial Court of Brazzaville under the number 80 B 833, with its registered office at Brazzaville, Boulevard Lyautey, BP 2082, the Republic of the Congo,

> hereinafter "COMMISIMPEX"
> plaintiff

> represented by Messrs Maître Christian BREMOND and Daniel du PUCH, Barristers (the VAISSE, LARDIN & Associés firm), located at 51 Avenue Montaigne, F-75008 Paris, in accordance with the power of attorney dated 12 March 1998,

and of

> 1) the REPUBLIC OF THE CONGO (represented by the Minister of Finance and the Budget) whose address for service shall be that of the second defendant,

> hereinafter the "REPUBLIC OF THE CONGO"
> first defendant

> 2) CAISSE CONGOLAISE D'AMORTISSEMENT, with its registered office at Brazzaville, BP 2090, the Republic of the Congo,

> hereinafter "the CAISSE"
> second defendant

> together "the defendants"

> represented by Messrs Jean-Pierre VIGNAUD and Jean-Yves GARAUD, Barristers (the CLEARY, GOTTLIEB, STEEN & HAMILTON firm)

stamp on left : certified true copy        stamp on right : International Chamber of Commerce
PARIS 6/12/2000                            International Court of Arbitration
(illegible) A. GRIGERA NAON
General Secretary



340

## ICC ARBITRATION N0 9899 AC/DB

### Commisimpex S.A. (Brazzaville)
#### vs
### Republic of the Congo and Caisse Congolaise d'Amortissement

### FINAL ARBITRATION AWARD

In the case of

> COMMISIMPEX, a "société anonyme" - public limited company - governed by the laws of the Republic of the Congo, entered in the analytical register kept by the Clerk of the Court of the Commercial Court of Brazzaville under the number 80 B 833, with its registered office at Brazzaville, Boulevard Lyautey, BP 2082, the Republic of the Congo,

> hereinafter "COMMISIMPEX"
> plaintiff

> represented by Messrs Maître Christian BREMOND and Daniel du PUCH, Barristers (the VAISSE, LARDIN & Associés firm), located at 51 Avenue Montaigne, F-75008 Paris, in accordance with the power of attorney dated 12 March 1998,

and of

> 1) the REPUBLIC OF THE CONGO (represented by the Minister of Finance and the Budget) whose address for service shall be that of the second defendant,

> hereinafter the "REPUBLIC OF THE CONGO"
> first defendant

> 2) CAISSE CONGOLAISE D'AMORTISSEMENT, with its registered office at Brazzaville, BP 2090, the Republic of the Congo,

> hereinafter "the CAISSE"
> second defendant

> together "the defendants"

> represented by Messrs Jean-Pierre VIGNAUD and Jean-Yves GARAUD, Barristers (the CLEARY, GOTTLIEB, STEEN & HAMILTON firm)

stamp on left : certified true copy       stamp on right : International Chamber of Commerce
PARIS 6/12/2000                           International Court of Arbitration
(illegible) A. GRIGERA NAON
General Secretary



341

located at 41 Avenue de Friedland, F-75008 Paris, in accordance with a power of attorney dated 24 April 1998.

Considering the request for arbitration made by COMMISIMPEX on 13 March 1998 to the Secretariat of the International Court of Arbitration of the International Chamber of Commerce.

Considering the statement of case in response by the defendants of 12 June 1998;

Considering the "acte de mission" (terms of reference ) of 27 July 1998;

Considering the five statements of case exchanged and filed by the parties ("written statement of case" of 30 September 1998; "statement of case in response" of 15 December 1998; "statement of case in rejoinder" of 5 January 1999; "statement of case in response and request for stay of judgment" of 26 February 1999 and "statement of case concerning plea of stay of judgment" of 19 March 1999");

Considering the files properly produced by the parties backing up these various statements of case (plaintiff : 84 exhibits; defendants : 22 exhibits);

Whereas during the hearings of 8 April and 6 May 1999, the lawyers for the parties made their pleadings, rejoinders and responses to the questions posed by the arbitration tribunal;

Considering the minutes of these hearings;

Considering the tables, calculations, notes and reference numbers and letters handed over by the parties, on their own initiative or at the request of the arbitration tribunal;

Considering the interim award of 28 June 1999;

Considering the procedural court order of 21 September 1999;

Considering the expert's report of 14 April 2000;

Considering the "written summarising statement of case after interim award and expert appraisal" of the plaintiff (17 May 2000);

Considering the "written summarising statement of case in response after interim award and expert appraisal" of the defendants (16 June 2000);

Considering the complementary exhibits produced by the parties (plaintiff : exhibits 84-1 and 84-2 to 98; defendants : exhibits 23 to 36);
Whereas, during the hearing of 27 June 2000, the lawyers for the parties made their pleadings, rejoinders and their responses to the questions posed by the arbitration tribunal;

Considering the reference numbers and letters of these pleadings;

2



342

Considering the end of discussions and the beginning of deliberations decided at the end of this hearing;

Considering the minutes of said hearing;

The undersigned arbitrators :

- Mr Charles CHOUCROY, Barrister with the "Conseil d'Etat" and the "Cour de Cassation" - Supreme Court - of France, 14 Rue Rosa Bonheur, F-75015 Paris, arbitrator designated by the defendant and confirmed by the Arbitration Court during its session of 3 June 1998;

- Mr Jean-Michel DARROIS, Barrister with the Appeal Court of Paris, 67 Avenue Victor Hugo, F-75016 Paris, arbitrator designated by the defendants and confirmed by the Arbitration Court during its session of 3 June 1998;

- Mr André BRUYNEEL, Professor at the Université Libre - Free University - of Brussels and Barrister on the Brussels Bar, designated on 10 June 1998 by the Arbitration Court as President of the Arbitration Tribunal;

after deliberating

unanimously handed down the following award :

## I    THE MAIN POINT OF THE DISPUTE: ARBITRATION CLAUSE

1.1    The dispute concerns the failure to pay - not contested - promissory notes subscribed by the second defendant and endorsed by the first defendant on 20 November 1992, issued in conformity with Heads of Agreement n° 566 signed in Brazzaville on 14 October 1992 between the REPUBLIC OF THE CONGO (Minister of the Economy, Finance and the Plan) and the COMMISIMPEX company. Pursuant to this moratory, the debts of the REPUBLIC OF THE CONGO with respect to COMMISIMPEX, arising from various work and supplies contracts allocated to COMMISIMPEX, were drawn up as follows at 31 October 1992, i.e.

| | | |
|---|---|---|
| A. | 50,592,081.53 | FF |
| B. | 21,201,872.76 | pounds sterling |
| C. | 34,521,293.24 | US dollars |
| D. | 1,426,623,801 | CFA francs. |

The due dates for the 956 promissory notes - still held by COMMISIMPEX - go from 30 January 1993 to 30 December 2002.

The REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT were issued with a summons to pay on 7 October 1996. Talks then took place between the parties but they did not succeed in settling their dispute on a friendly basis.


Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Elysées
75008 PARIS
Tél. 01 42 89 40 70

3

**343**

I.2    The request for arbitration of 13 March 1998 was based on the arbitration clause stipulated (article 10) in the abovementioned Heads of Agreement ("the dispute shall be settled by one or several arbitrators designated in conformity with the arbitration rules of the International Chamber of Commerce (Paris) ruling in first and final instance"), and on the arbitration clause set out at the end of the letters of commitment and pledge issued on 3 March 1993 by the REPUBLIC OF THE CONGO ("all disputes arising from the present contract shall be definitively settled in accordance with the Rules for Conciliation and Arbitration of the International Chamber of Commerce by one or several arbitrators in conformity with said Rules. The place of arbitration shall be Paris (France) and the language of arbitration shall be the French language").

No challenge to the foregoing was made by the defendants in their statement in response of 12 June 1998, nor in the "terms of reference", nor in their subsequent statements.

The arbitrators are therefore competent.

## II.   CLAIMS AND ALLEGATIONS OF THE PARTIES

II.1    The plaintiff bases its case

i)    on Heads of Agreement n° 566 of 14 October 1992 between itself and the REPUBLIC OF THE CONGO, setting its claims at the amounts A to D as set out in subsection I above;

ii)   on the promissory notes (series P) subscribed in total for these same amounts, in conformity with the abovementioned heads of agreement by CAISSE CONGOLAISE D'AMORTISSEMENT and endorsed by the Minister of the Economy, Finance and the Plan;

iii)  on the promissory notes (series I) issued with respect to the 10% interest provided for under the abovementioned heads of agreement, and

iv)   on the letters of commitment and the letters of pledge signed on 3 March 1993 by the Minister of the Economy, Finance and the Budget.

According to the plaintiff, the REPUBLIC OF THE CONGO to date has not made any payment of the abovementioned amounts, which caused it first of all to carry out several attachments for precautionary purposes in France on claims of the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT with respect to third parties and, secondly, to file its request for arbitration.

COMMISIMPEX then requested the arbitration tribunal to hold "the allegations and claims of the COMMISIMPEX company" well-founded and consequently,



344

"to order CAISSE CONGOLAISE D'AMORTISSEMENT and REPUBLIC OF THE CONGO jointly and severally to pay COMMISIMPEX the amount of the promissory notes subscribed or endorsed by themselves on 20 November 1992, which came to maturity on 28 February 1998, i.e.

- 45,213,169 FF representing the amount of notes in French francs (FF) of the P and I series, and
- 30,851,008 USD representing the amount of notes in US dollars (USD) of the P and I series, and
- 19,007,703 GBP representing the amount of notes in pounds sterling (GBP) of the P and I series, and
- 1,274,945,971 XAF representing the amount of notes in CFA francs (XAF) of the P and I series,

And to hold that each of the notes reaching maturity shall bear interest at the contractual rate of 10.5% per annum as of the corresponding due date set out in the lists of promissory notes appended to the present request, with annual capitalisation of said interest in conformity with article 1154 of the French Civil Code, as of the date of the present request, and

to hold that there is event of default for the claim represented by the promissory notes of series P, maturing subsequently to 28 February 1998, and

To order CAISSE CONGOLAISE D'AMORTISSEMENT and the REPUBLIC OF THE CONGO jointly and severally to pay the COMMISIMPEX company the entire nominal amount of each promissory note in principal, not yet reaching maturity, after 28 February 1998, that is to say the following amounts of :
- 24,452,89 FF
and
- 16,685,293 USD
and
- 10,247,572 GBP
and
- 689,534,856 XAF francs (CFA)

and to order them jointly and severally to pay the following amounts, i.e.
- 6,011,313 FF
and
- 4,101,201 USD
and
- 2,519,196 GBP
and
- 169,510,647 XAF francs (CFA)

as compensation for prejudice caused to the COMMISIMPEX company;



To order CAISSE CONGOLAISE D'AMORTISSEMENT and the REPUBLIC OF THE CONGO jointly and severally to pay the COMMISIMPEX company the sum of 1 million US dollars as compensation for fees and expenses committed for the present arbitration proceedings and precautionary measures; and

To order them jointly and severally to pay the entire arbitration fees, including the fees and expenses of the arbitrators and also administrative fees; and

To order temporary enforcement of any arbitration award to be handed down notwithstanding any and all action and/or appeal, no guarantee by COMMISIMPEX being required".

The total amount of the abovementioned claims thus came in principal to 5,677,321 FF, to 52,637,501 US dollars, to 31,774,471 pounds sterling and to 2,133,991,474 CFA francs, without prejudice to the abovementioned interest.

In its amplifying summarising statement of case of 17 May 2000, the plaintiff reactualised as follows the amount of its abovementioned claims (with no change to the surplus of its claims for procedural and arbitration compensation, or to temporary enforcement of the award), i.e.

"To order CAISSE CONGOLAISE D'AMORTISSEMENT and the REPUBLIC OF THE CONGO jointly and severally to pay the COMMISIMPEX company the amount of the promissory notes subscribed or endorsed by them on 20 November 1992 reaching maturity on 1 July 2000, i.e.

- 61,395,599 FF representing the amount of notes in French francs (FF) of the P and I series, and

- 41,892,427 USD representing the amount of notes in US dollars (USD) of the P and I series, and

- 25,789,358 GBP representing the amount of notes in pounds sterling (GBP) of the P and I series, and

- 1,731,267,454 XAF representing the amount of notes in CFA francs (XAF) of the P and I series,

And to hold that each of the notes reaching maturity at 1 July 2000 shall bear interest at the contractual rate of 10.5% per annum for the amount and, as of the corresponding due date set out in the lists of promissory notes appended to the present statement of case (disclosures 35 to 38), with annual capitalisation of said interest in conformity with article 1154 of the French Civil Code, as of 13 March 1998, and

to hold that there is event of default for the claim represented by the aggregate amount of all of the promissory notes of the P series, reaching maturity subsequently to 30 June 2000, and

6



346

To order CAISSE CONGOLAISE D'AMORTISSEMENT and the REPUBLIC OF THE CONGO jointly and severally to pay the COMMISIMPEX company the entire aggregate amount of each promissory note of the P series not yet reaching maturity beyond 30 June 2000, that is to say the following amounts of :

- 12,648,020 FF
and
- 8,630,323 USD
and
- 5,300,468 GBP
and
- 356,655,960 XAF francs (CFA)

with interest at the legal rate with annual capitalisation as of 1 July 2001 until complete payment, and

and to order them jointly and severally to pay the following amounts, i.e.

- 1,633,703 FF
and
- 1,114,750 USD
and
- 684,644 GBP
and
- 46,068,060 XAF francs (CFA)

as compensation for the prejudice, in particular financial prejudice, caused to the COMMISIMPEX company.

II.2    In their statement in response of 12 June 1998, the defendants claim

i)    that the letter sent by the Minister of Finance on 7 March 1998 cannot be interpreted as an acknowledgement of debt and constitutes an offer, which was refused by COMMISIMPEX and which, consequently, has become null and void;

ii)    that the heads of agreement of 14 October 1992 - and consequently the promissory notes and commitments arising from it - are null and void and not binding;

iii)    that COMMISIMPEX does not provide any proof of the claims arising from execution of public contracts allegedly financed by it.

On these bases, the REPUBLIC OF THE CONGO and the CAISSE request the Arbitration Tribunal to:



347

- "officially record that the proposal of 7 March 1998 is null and void; and

- officially record the nullity of Heads of Agreement n° 566 of 14 October 1992 and of the promissory notes and letters of commitment of 3 March 1993; and

- to hold that the plaintiff does not show proof of the claims for which it requests payment";

and, consequently, to

- "dismiss all of COMMISIMPEX's claims; and

- to order COMMISIMPEX to pay 1 million US dollars in compensation for costs committed by the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT; and

- to order COMMISIMPEX to pay all of the arbitration fees".

Furthermore, the defendants claim, specify or request, in their statement of case in rejoinder of 15 December 1998

i)  that at the date on which Heads of Agreement n° 566 was concluded, they "were not the debtors of COMMISIMPEX for the principal", this apparently giving rise to nullity of the promissory notes for lack of cause;

ii) "that they hereby inform the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT that they reserve the right to take action against COMMISIMPEX to obtain reimbursement of any and all amounts which may have been unduly paid";

iii) that their consent, on signature of Heads of Agreement n° 566, was tainted due on the one hand to mistake and on the other to fraud on the part of the plaintiff, thus apparently giving rise to the nullity of said heads of agreement.

In their amplifying summarising statement of case in rejoinder, the defendants reformulated their pleadings as follows :

"Consequently to the foregoing, the Arbitration Tribunal is requested

(1) Concerning the claim for payment of the notes of the P and I series which came to maturity on 1 July 2000

Principally

- To rule that Heads of Agreement n° 566 is null and void, as are the corresponding promissory notes issued under said Heads of Agreement



8

348

n° 566, and as are the letters of commitment and letters of pledge signed by the REPUBLIC OF THE CONGO on 3 March 1993; and

- To officially acknowledge that any debts that the REPUBLIC OF THE CONGO may have had with respect to COMMISIMPEX for the disputed public works contracts are time barred; and

- Consequently, to order COMMISIMPEX to pay the REPUBLIC OF THE CONGO the sum of 203,523,810 FF; and

<u>Subsidiarily</u>

- To hold and judge that Heads of Agreement n° 566, the purpose of which is mainly to consolidate a set of pre-existing debts, cannot have resulted in burdening the defendants with a debt of a greater amount than the pre-existing debts; and

- To reduce the amount of Heads of Agreement n° 566 to that of the acknowledged pre-existing debts, if applicable, as being valid, which shall not exceed the sum of 114,559,926.60 FF in principal; and

- To hold that the letters of pledge, in any case, are null and void, and to deduce from this fact that COMMISIMPEX could only be, if applicable, an unsecured creditor; and

- To also hold that the promissory notes, letters of commitment and letters of pledge, issued with no underlying claim, are null and void; and

<u>On an even more subsidiary basis</u>

- To hold and judge that all of the promissory notes reaching maturity before 13 March 1995 are subject to the three-year time bar, taking account of failure to present them and to draw up protests; and

- Consequently, to hold and judge that the REPUBLIC OF THE CONGO is thus free from its obligations with respect to COMMISIMPEX under the corresponding letters of commitment.

<u>(2) Considering the request to the court to hand down an adverse decision jointly against the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT</u>

<u>Principally</u>

- To hold and judge that pursuant to the nullity of Heads of Agreement n° 566, only the REPUBLIC OF THE CONGO could, if applicable, be the debtor of COMMISIMPEX under the pre-existing debts;



9

349

Subsidiarily

- To hold and judge that pursuant to the reduction of the amount consolidated by Heads of Agreement n° 566, the defendants could only be bound to pay the promissory notes for the amount as thus reduced;

Even more subsidiarily

- To hold and judge that the defendants may only be jointly and severally bound with respect to the promissory notes which are not time barred, as CAISSE CONGOLAISE D'AMORTISSEMENT is not a party to Heads of Agreement n° 566.

(3) Concerning the claim for event of default of the promissory notes of the P series which have not yet reached maturity

- To hold and judge that article 1188 of the French Civil Code on which COMMISIMPEX bases its claim for event of default, does not apply in the case at hand as the letters of pledge are null and void;

- And, consequently, to dismiss COMMISIMPEX's claim for event of default.

(4) Concerning COMMISIMPEX's claim for damages

- To dismiss COMMISIMPEX's claim for damages.

(VIII)  Concerning arbitration costs

- To dismiss COMMISIMPEX's claim; and

- To order COMMISIMPEX to pay the defendants the sum of 1 million US dollars to reimburse costs committed by them in the present arbitration proceedings, and also to order it to pay arbitration costs such as the latter are defined by article 31 of the Arbitration Regulation of the ICC."

## III.    ASSIGNMENT OF THE ARBITRATION TRIBUNAL

III.1    In accordance with section 6 of the "terms of reference" signed on 27 July 1998 ("terms of reference" mainly set up during the meeting of 7 July 1998 between the arbitrators and the parties' legal advisers), the Arbitration Tribunal's assignment is as follows, i.e.

- after studying the pleadings, rejoinders and items of evidence of the parties,

- after hearing the legal advisers of the latter,



350

-   and after any and all other acts of procedure or investigation which it shall deem necessary,

to rule on the following disputed points, i.e.

A -   Does the plaintiff have the capacity to take legal action and is its representation valid ? What are the procedural consequences of the decisions that the Arbitration Tribunal shall take with respect to these two questions ?

B -   Are the defendants, whether jointly and severally or not, the debtors in principal of COMMISIMPEX, and on what basis (public contracts, heads of agreements and/or promissory notes and/or letters of commitment and of pledge) and for what amounts ?

C -   In the case of an affirmative response to question B, are the defendants, whether jointly and severally or not, the debtors of COMMISIMPEX for interest (with or without capitalisation), and for what amounts ?

D -   In the case of an affirmative response to question B, and taking account of the response to question C, are the defendants bound, whether jointly and severally or not, to repair other prejudice caused by them to COMMISIMPEX ?

E -   It is necessary, moreover, in all cases, to rule with respect to the claims for procedural compensation made on the one hand by the plaintiff and on the other by the defendants.

F -   It is necessary, finally, in conformity with article 31.3 of the ICC Arbitration Regulations, to exactly determine the arbitration costs and to decide upon which of the parties payment is incumbent or in what proportion, if it is shared among them.

III.2   The Arbitration Tribunal must also rule with respect to the request to obtain a stay of decision made by the defendants, subsequently to the "terms of reference", in their statement of case of 26 February 1999; according to the plaintiff (statement of case of 19 March 1999, this request is neither admissible nor well-founded.

## IV.   PLACE, LANGUAGE AND PROCEDURE OF THE ARBITRATION

In accordance with sections 7 and 8 of the "terms of reference"

1.   The place of arbitration shall be Paris, France.

2.   The language of arbitration shall be the French language.



11

**351**

3.  The arbitration shall be subject to the Arbitration Regulations of the International Chamber of Commerce, to the "terms of reference" and to the mandatory provisions of the French New Code of Civil Procedure (titles V and VI of book IV concerning private arbitration in international matters); the suppletory provisions of the French Civil Code shall apply in a subsidiary manner.

4.  The Arbitration Tribunal shall rule in law, as the parties did not agree that the arbitrators should rule as compounders.

5.  The arbitrators may make temporary and/or partial awards depending on the development of the arbitration.

## V.   LAW APPLYING TO THE MERITS

In accordance with section 9 of the "terms of reference", it is "French law which applies, without prejudice to issues for which the rules of French international private law could lead to the implementation of a foreign law".

## VI.   PROCEDURAL PLEAS

The defendants have contested COMMISIMPEX's capacity to take legal action (infra VI.1) and the validity of its representation (infra VI.2).

A final ruling was made with respect to these two pleas in the interim award of 28 June 1999, in the terms fully reproduced hereafter (VI.1 and VI.2).

"VI.1   According to the defendants, the COMMISIMPEX company has disappeared, mainly on the grounds that it ceased any and all business activities since the end of 1990 and no longer has any statutory or real registered office; consequently it is no longer able to take legal action within the meaning of article 117, paragraph 1 (in reality 2) of the French New Code of Civil Procedure. Said inexistence was apparently set out in a certificate of automatic removal from the register of commerce of Brazzaville, drawn up on 4 June 1998, taking effect at 11 September 1996, "after totally ceasing to exercise its business activities during 1995".

This challenge, however, must be assessed on three bases, i.e.

i)   the burden of proof is upon the defendants;

ii)  account must be taken of the de facto situation - sometimes creating undeniable cases of force majeure - in the Republic of the Congo (changes of government, administrative malfunction, consequences of the civil war of 1997 including looting of the registered office of COMMISIMPEX, the compulsory repatriation of its Chairman and the holding of meetings of the Board of Directors and the General Meeting in France);



12

352

iii)    Company law applying to COMMISIMPEX is Congolese company law, that is to say French company law as it existed at the date of the independence of the REPUBLIC OF THE CONGO, i.e. 15 August 1960 (thus mainly the French Act of 24 July 1867), to the exclusion of any and all subsequent French laws.  This solution - which is not contested - is made necessary by the French conflict of laws rule.

Under the rules of this Act of 24 July 1867 (as moreover in present-day French company law), a company which has properly and validly acquired legal entity status (which is not contested, no more than the statement of alteration entry of 2 August 1984) only disappears after it is wound up and its liquidation completed.  However, in the case at hand, it is neither shown nor even claimed that the shareholders of COMMISIMPEX took any decision whatsoever to dissolve the company, which is confirmed in no uncertain manner by the general meeting held in Paris before a "notaire" - lawyer and legal official - on 15 February 1999 (it being unnecessary to take account of the various minutes produced by the plaintiff for the period 1991 to 1998).

It is even an accepted fact, in French law, that "putting the company in mothballs " is not a cause for winding up (Cass. - French Sup. Court - Com. Sec. 17 January 1997, Bull. IV p.77 and Dalloz 1977 I.R. 311, remark J-Cl. Bousquet; see also Cass. Plén. 31 March 1995, Dalloz 1995 p. 321).

Furthermore, under the old rules of French company law (as, moreover, under the present-day rules), failure to accomplish the legal obligations of a "société anonyme", i.e. public limited company, does not cause it to disappear for all that.  In particular, removal from the register of commerce (where it has been properly and validly carried out in accordance with procedures provided for) does not in itself, in the ordinary law of companies, give rise to the disappearance of the legal entity; the legal entity of the company survives removal of the latter from the register of commerce (Cass. Com. Sec. 15 May 1986, Bull. V n° 163; 26 January 1993, Bull. IV n° 33).  The defendants, moreover, have specified that they only asserted removal from the register of commerce alleged by them insofar as said removal was a demonstration of the inexistence of COMMISIMPEX.

The various certificates and attestations produced concerning entry in the register of commerce of Brazzaville are therefore not relevant for the purpose of ruling on the plea concerning legal capacity put forward.  However, the Arbitration Tribunal will note that the three documents prior to the request for arbitration (therefore drawn up in tempore non suspecto) are consistent with respect to each other, and confirm the existence of COMMISIMPEX (i.e. the abstract from the register of commerce of 25 November 1996, the abstract from the register of commerce of 6 March 1998 and the certificate of 29 January 1998) whereas the three documents subsequent to the request for arbitration are affected by various forms of uncertainty (certificate of removal from the register of commerce of 4 June 1998, taking effect at 11 September 1996, concerning the ceasing of business activities in 1995, contrary, moreover, to the writings of the defendants in accordance with which "COMMISIMPEX ceased to exist as of the beginning of the 1990s"; attestations of 16 June 1998 - with no original copy being available - in accordance with which the abovementioned attestation of 29 January 1998 is merely the result of an error or unlawful behaviour on the part of the signatory Clerk of the Court).

13

353

The Arbitration Tribunal officially notes, moreover, that the existence of COMMISIMPEX had never been contested by the defendants before the beginning of the arbitration procedure (and even after the latter insofar as their statement in rejoinder of 12 June 1998 makes no mention of this and makes a claim against COMMISIMPEX) and that the plea was asserted for the first time at the hearing of 9 July 1998 before the judge in charge of enforcement of the High Court of Paris. This fact is completely consistent with the items of evidence produced by the parties concerning their relations between 1990 and the beginning of the arbitration procedure in 1998, whether with respect to the period prior to the termination of business activity in 1995 covered by the abovementioned certificate of removal from the register of commerce (period during which were signed, in particular, Heads of Agreement n° 566 and the promissory notes of 1992, and the letters of commitment and pledge of March 1993, as well as the two legal consultations drawn up by the highest magistrates in the country) or the subsequent period (failure to contest after the formal summons of 7 October 1996, memo from CAISSE CONGOLAISE D'AMORTISSEMENT of 15 January 1997 referring to COMMISIMPEX as a "company governed by Congolese law", negotiations in 1997-1998, letter of 7 March 1998 sent to the Banque Saradar bank by the Minister of Finance and the Budget, etc).

Finally, it being unnecessary to enter into the argument between the parties concerning the existence or the limits of a res judicata situation which would be binding on the arbitrators, the Tribunal notes the following in three French court decisions handed down in 1998-1999 in disputes, concerning attachment proceedings and summary proceedings, between the parties to the present arbitration, i.e.

a)      In his judgment of 30 July 1998, the judge in charge of enforcement of the High Court of Paris, to whom the plea of the inexistence of COMMISIMPEX was submitted, deemed, on the one hand, that the abovementioned attestations calling into question the validity of the abovementioned attestation of 29 January 1998 are "subject to uncertainty" and on the other hand that "the ending of business activities since 1995 ... does not reflect the actual situation of the company, with respect to which, moreover, the Congolese authorities have never - until July 1998 - contested the existence.

b)      In his judgment of 23 February 1999, another judge in charge of enforcement of the High Court of Paris, to whom the plea of the inexistence of COMMISIMPEX was once again submitted, deemed on the one hand that the abovementioned certificate of removal from the register of commerce was in contradiction with other items of evidence handed into Court and, on the other hand, that the termination of business activities since 1995 was not proven.

c)      In his court order of 16 March 1999, the President of the High Court of Paris, sitting in summary proceedings pursuant to a petition from the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT requesting him to order that the disputed promissory notes be held on an escrow account, decided that this was not necessary after mentioning the abovementioned judgment of 30 July 1998.



354

To sum up, the Arbitration Tribunal decides that the plaintiff had the requisite legal capacity to properly bring its request for arbitration and that, consequently, the plea is not founded.

"VI.2  According to the defendants, Mr Mohsen Hojeij (signatory of the power conferred on 12 March 1998 on Maîtres Brémond and du Puch to represent COMMISIMPEX in any and all legal, arbitration or other proceedings against the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT under the heads of agreement of 14 October 1992), did not, at the date on which the arbitration proceedings were brought, possess the requisite powers of legal representative of COMMISIMPEX and that, consequently, COMMISIMPEX did not bring the arbitration proceedings properly and validly (implementation of article 117, paragraph 2 (in reality 3) of the French New Code of Civil Procedure.

This challenge is based on various accusations, mainly concerning the authenticity and the registration by the Congolese authorities of various general meetings and Board of Directors' minutes produced by COMMISIMPEX for the 1991 to 1996 period; furthermore, the defendants assert, that even if these documents were authentic, the powers of attorney of Mr Mohsen Hojeij expired before the arbitration proceedings were brought.

These accusations are comprehensible (in particular insofar as they concern mistakes - material or otherwise - or registrations apparently not perfectly carried out by the competent Congolese service), but the Arbitration Tribunal deems that they are not sufficient to justify the systematic calling into question of the existence and scope of said minutes, on a basis mainly consisting of suspicion and hypotheses.

Above all, the Arbitration Tribunal deems that systematic examination of each of these accusations concerning documents of the 1991 to 1996 period is not necessary to enable it to reach a decision concerning the plea of invalid representation where, at the date of signing of the abovementioned power of attorney conferred, on 12 March 1998, Mr Mohsen Hojeij was in fact a director and the Chairman of COMMISIMPEX in accordance with the terms of the second resolution voted by the General Meeting held in Paris on 19 November 1997, pursuant to the civil war which had torn Brazzaville apart that year and its consequences (including the default minutes of June 1997) "The General Meeting of shareholders hereby decides to renew Mr Mohsen Hojeij's term of office as director for a period of three years, to end with the General Meeting called to approve the accounts of the business year ending December 31 2000".

The same General Meeting of 19 November 1997 also voted another resolution, the fifth, conferring express powers in connection with the present dispute.



**355**

"The shareholders' meeting hereby gives the Chairman of the Board of Directors the widest powers to continue attempts at reaching a friendly settlement concerning the debt of the Republic of the Congo acknowledged by Heads of Agreement n° 566 of 12 October 1992.

Should these negotiations fail, the shareholders hereby grant full powers to the Chairman to undertake in the name and on behalf of the company, any and all legal and/or arbitration action which he shall deem necessary within the framework of execution of Heads of Agreement n° 566 of 12 October 1992 against the Republic of the Congo."

The defendants assert that the abovementioned minutes of 19 November 1997 is obligatorily a falsified document. This claim is based on an argument asserting alleged non-conformity of signatures (the Arbitration Tribunal for its part deeming that there is a reasonable or sufficient appearance of conformity) and an argument asserting inconsistency (the Arbitration Tribunal deems that this accusation, even if it were well-founded, would not be determining and would not suffice to adversely affect the clear and precise scope of the two resolutions set out above).

In any case, even supposing that doubt subsists concerning these minutes of 19 November 1997, the Arbitration Tribunal notes that the Extraordinary General Meeting held in Paris before a "notaire" on 15 February 1999 voted the four following resolutions with respect, according to the case, of approval, confirmation, ratification or correction of a material error, i.e. :

i)    approval of the minutes of the Board of Directors' meeting held on 4 January 1999 (error brought up by the defendants concerning the minutes of the General Meeting of 19 November 1997; convening of an Extraordinary General Meeting to obtain confirmation of the appointments of directors made by the General Meeting of 19 November 1997 and the duration of these directorships);

ii)   ratification as required of renewal of the directorships by the General Meeting of 19 November 1997;

iii)  acknowledgement of the abovementioned error, the directorships renewed by the General Meeting of 19 November 1997 terminating with the General Meeting which shall be called to approve the accounts of the business year ended December 31 1999;

iv)   "The General Meeting hereby renews as required the powers conferred upon the Chairman of the Board of Directors by the General Meeting of 19 November 1997 (5th resolution), and renews its full approval of the steps taken by the Chairman since said date within the framework of the dispute between the Company, and the Republic of the Congo and Caisse Congolaise d'Amortissement, in particular the filing of a request for arbitration on 13 March 1998 before the International Chamber of Commerce.



16

356

It was in fact an accepted tenet of French law under the Act of 24 July 1867, that ratification by the General Meeting of a "société anonyme" removed any previous defects arising in particular from the lack of powers of the Board of Directors (Enc. Dalloz., Dr. Com., 1st edition, "Sociétés", V "Conseil d'administration" - Board of Directors- n° 74 et sequitur). It has even been held in law governing "sociétés à responsabilité limitée" - limited-liability companies - that a simple "meeting of associates" can be deemed to be a general meeting empowered to decide with respect to corporate business (Cass. Com. Sec. 7 January 1953, J.C.P. 1953-II-7728).

To sum up, the Arbitration Tribunal decides that proof of the inexactitude of the information in the minutes is not shown and that if required, the deed of 15 February 1999 would have covered the alleged irregularities."

## VII.   REQUEST FOR STAY OF DECISION

In its third statement of case ("statement of case in response and request for stay of decision" of 26 February 1999), the defendants for the first time made a "principal" request for a stay of decision "while awaiting a final decision of the Criminal Court pursuant to the complaint filed by the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT on 13 January 1999 for forgery, use of forgery, fraud and attempted fraud".

The plaintiff - who confirmed at the hearing of 6 May 1999 that it no longer contested the admissibility of this complaint - stated in its "statement of case concerning the plea for stay of decision" of 19 March 1999 that, in its opinion, the request for stay of decision was inadmissible and subsidiarily ill-founded.

The request to obtain a stay of decision was definitively dismissed by the interim award of 28 June1999 in the following terms, as fully reproduced hereafter (VII.1 and VII.2).

VII.1   The Arbitration Tribunal notes first of all that the request to obtain a stay of decision is not part of the points to be decided in conformity with section 6 of the "terms of reference" of 27 July 1998 and was brought subsequently, during the proceedings, in the third statement of case, abovementioned, of the defendants.  The Arbitration Tribunal also notes that the complaint was filed on 13 January 1999 with the Senior Examining Magistrate of the High Court of Paris, that is to say two days before the time-limit set by the arbitrators for handing in the statement of case in rejoinder and claim by COMMISIMPEX; furthermore, some of the accusations made in the complaint had already appeared in the previous writings of the defendants.

The request to obtain stay of decision is based on the traditional rule in domestic law (the purpose of which is to avoid conflict between two court decisions governed by the same domestic system) in accordance with which "civil proceedings follow criminal ones", expressed in French law in article 4 paragraph 2 of the French Code of Criminal Procedure ("However, stay of decision with respect to this action exercised before the civil court is ordered as long as a final ruling has not been given with respect to action brought by the Public Prosecutor, once the latter has begun").  Consequently, this



provision does not apply to international arbitration unless the "terms of reference" referred to said Code or to said provision, which is not the case here.

However, things would be otherwise if article 4 paragraph 2 of the French Code of Criminal Procedure were of an international public order nature, capable of making an award dismissing the request to obtain stay of decision subject to criticism under article 1502, 5th paragraph of the French New Code of Civil Procedure. However, French legal writers and case law do not see article 4 paragraph 2 abovementioned in such a light (Robert, "L'Arbitrage, Droit interne et droit international privé", 5th edition, n° 344, p. 296; Cass., Civ. Sec., 1st, 7 April 1998, Bull. I n° 139).

Furthermore, criminal decisions deemed to be res judicata in France are not binding on the Arbitration Tribunal where the dispute and the proceedings are governed by international arbitration.

With respect to procedure, the "terms of reference" provides for the implementation of the arbitration rules of the International Chamber of Commerce, the "terms of reference" and the mandatory provisions of the French New Code of Civil Procedure (titles V and VI of book IV concerning private arbitration in international matters). Consequently, it is those rules and the general rules of international arbitration which prevail; moreover, the "terms of reference" only refer to the suppletory provisions of the French New Code of Civil Procedure on a "subsidiary" basis.

Even if it were supposed - quod non - that article 1460 of the French New Code of Civil Procedure, i.e. the "NCPC", applied in the case at hand, it would require compliance with the "guiding principles of the trial as set out in articles 4 to 10, 11 (paragraph 1) and 13 to 21" of the Code; these principles contain neither the rule in accordance with which "civil proceedings follow criminal ones" nor the provisions of the Code concerning dilatory pleas (articles 108 to 111) or pleas to obtain the interruption of proceedings (articles 377 to 380-1).

It is, however, the very nature, the specificity and the originality of international arbitration which opposes automatic application of the rule to international arbitration.

Fouchard, Gaillard and Goldman ("Traité de l'arbitrage commercial international", Litec publishers, 1996 n° 1660) write as follows, "The question as to whether the rule in accordance with which "civil proceedings follow criminal ones" the implementation of which would be very dangerous in arbitration matters, in particular in the field of international arbitration, is a public order one, has been brought up but not finally resolved by case law (362). In Swiss law, the response has been negative (363)". As for Matthieu de Boisséson ("Le droit français dans l'arbitrage international (GLN-Joly, 1990 n° 775), he has the following opinion with respect to the criminal point of law plea, i.e. "An international arbitration procedure taking place on French territory is not an ordinary procedure. It is autonomous and international, it contains specific rules and it is carried out by arbitrators who are not the representatives of the legal order of a State. This reflection means, in my opinion, that if a criminal charge were filed by one of the parties or by a third party on French territory, once the arbitration procedure had begun, none of

358

the parties could assert the rule that "civil proceedings follow criminal ones" in order to request the interruption of the arbitration procedure".

The Arbitration Tribunal shares these opinions. Application of the traditional domestic rule is not only irreconcilable from the point of view of principle with the nature of international arbitration but, furthermore, it is likely to substantially affect the rapidity and efficiency thereof, due to both normal and dilatory, i.e. for the purposes of gaining time, use which may be made of it.

It is quite another thing for the arbitrators "to measure the effects of a (criminal investigation) on the operation of the arbitration, in particular, if for example documents which are essential to the arguments are the subject of incrimination" (de Boisséson, Op. and loc quoted), which makes it possible for the arbitrators, depending on the circumstances of the case, either to exercise their faculty (and not their obligation) to stay their decision or to consider that the acts and/or facts incriminated in the criminal case will not influence the outcome of the dispute in a determining manner, or to deem that they possess sufficient grounds for examining the case, in particular on the basis of article 20 of the Arbitration Rules of the ICC".

"VII.2   Subsidiarily, even if a doubt existed concerning the absence of an international public order aspect to the rule of article 4 paragraph 2 of the "CPN" (see, in particular observations under Paris, 24 January 1991, "Rev. arbitrage" 1992, 158, sub III) or concerning the prevalence of the general rules of international arbitration, steady French case law deems that it is up to the arbitrators to determine the conditions of implementation of the rule of article 4 paragraph 2 of the "CPN" (see, in particular the abovementioned decision and court order handed down in summary proceedings of 12 February 1996, "Rev. arbitrage" 1996, 135, 2nd case).  This power of appraisal is sovereign (Paris, 16 June 1994, "Rev. arbitrage" 1996, 128, 2st case; adde, in particular Paris, 30 March 1995 "Rev. arbitrage" 1996, 131, abovementioned observations in fine under Paris, 24 January 1991 and de Boisséson, opus quoted p. 792 and reference) : "As the arbitrators have decided that the criminal proceedings had no influence over the judgment of the case submitted to them, the conditions for the implementation of the rule in accordance with which "civil proceedings follow criminal ones" were not fulfilled. This appraisal, which concerns the merits of the case, escapes the control of the Court to which a request for avoidance is made".

When exercising this sovereign power of appraisal conferred upon them, the arbitrators have the possibility of staying their decision where they find or presume the existence of fraud, which would be grounds for such stay of decision.

It is in the light of these principles that it is necessary to examine any possible influence over the arbitration underway by the criminal proceedings.  To do so it is necessary to distinguish the two aspects of the complaint, i.e.  a) the accusations of forgery and use of forgery (infra a) and b) the accusations of fraud and attempted fraud (infra b).

a)     The accusations of forgery and use of forgery concern the ("statement in response and request for stay of decision" of 26 February 1999, p. 1) : "(i) an abstract from



the register of commerce allegedly dated 6 March 1998[1], (ii) certain minutes of the board meetings and of the general meetings and the presence sheets of said meetings forwarded for the purpose of backing up the statement of case, and (iii) an attestation from Mr Jean-Pierre Coutard, and minutes enclosed with said certificate".  The statement of case, however, shades these accusations of forgery by specifying subsequently that "an examination of these documents reveals that they can only be forged or falsified documents or, if they not been forged or falsified, documents for accommodation purposes".

Consequenttly,the documents mentioned concern the admissibility of the action under the two aspects discussed hereabove sub VI.

i)   the alleged inexistence of Commisimpex

The arbitrators have rejected this plea (supra VI.1) mainly on three grounds, i.e.

- the absence of winding up (and properly terminated liquidation) decided by the shareholders; the defendants have not claimed the contrary;

- the notarised minutes of the General Meeting of 15 February 1999; the authenticity of this deed is not contested;

- under the former rules of French company law, as under the present ones, failure to accomplish the legal obligations of a "société anonyme" does not cause it to disappear for all that, no more than to be removed from the register of commerce : the lack of authenticity of the documents concerned by the complaint would therefore not give rise to the inexistence of the plaintiff.

Furthermore, the arbitrators have pointed out that the various certificates and attestations produced are not relevant for the purpose of ruling with respect to the plea of legal capacity made; the lack of authenticity of the abstract from the register of commerce of 6 March 1998 (or indeed of the attestation of 29 January 1998) would therefore not give rise to the inexistence of the plaintiff either.

ii)   Alleged invalid representation of Commisimpex

The arbitrators have rejected this plea (supra VI.2), without basing themselves on the documents (period 1991 to 1996) set out in the complaint but of course on the minutes of the General Meeting of 19 November 1997, which it is claimed are a forgery. However, the arbitrators have specified that in the case of doubt concerning these minutes, the resolutions set out in the

---

[1] It should be pointed out that the abovementioned attestation of 29 January 1998 is not mentioned here, whereas it is in page 2 of the complaint.

SEAL DELAU...
30. Av. des C...-Élysées
7.. 3 P.... S
Tel. 01 42 89 40 70

360

notarised minutes of the General Meeting of 15 February 1999 would be enough to ensure validity of the disputed representation of Mr Mohsen Hojeij.

The result of the foregoing is that the authenticity or the lack of authenticity of the documents set out in the complaint (nor therefore their examination within the framework of the criminal proceedings underway) would not have any significant influence, a fortiori determining, on the validity and admissibility of the request for arbitration.

b)    The accusations of fraud and attempted fraud

In its "statement of case in response and request to stay the decision" of 26 February 1999, an examination of the ill-founded nature of Commisimpex's claim (pages 13 to 18) and the "nullity of Heads of Agreement n° 566 and the undertakings entered into for execution of Heads of Agreement n° 566 for lack of consent" (pages 19 to 21) contains repeated allegations of "procedural fraud", "multiple fraud constituting forgery and swindling, which Commisimpex has committed and is still committing" of "manoeuvring, intrigue and fraud, which was Commisimpex's daily bread" and of "an induced mistake", concluding (page 21) that "from the foregoing developments it is clear that the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT were the victims of fraud, which is characterised by the use by Commisimpex against them of fraudulent manoeuvring in order to obtain promissory notes without a cause".

The plaintiff[2] in its "statement of case concerning the plea of stay of decision" of 29 March 1999, responds to the accusations of fraud and attempted fraud mentioned in the complaint (described as "new procedural posturing"), by discussing the merits of the claims and defence arguments, deeming, moreover, that "the purpose of the complaint is to indirectly cause the arguments taking place before the Arbitration Tribunal to focus in fact on the alleged failure to execute the public contracts by Commisimpex and the quantum of payments made in this respect" (page 14), concluding that "it thus appears that the assessment of the allegations of alleged fraud - manifestly time barred - by the Criminal Court has no influence over the obligations entered into by the defendants, who placed their signatures on the promissory notes" (page 15).   The plaintiff also pleaded that the thesis of fraudulent misrepresentation was not based on any statement or fact actually distinct from the alleged error.

The Arbitration Tribunal itself will obtain the supplementary information and quantified analyses allowing it to take its decision, in full acknowledge of the facts, concerning the validity or nullity of Heads of Agreement n° 566 and the disputed promissory notes with the help of the expert's report mentioned sub IX; if necessary, the arbitrators will also have recourse to other means of examination allowed both by the general rules of international arbitration and by article 20 of the ICC Arbitration Regulations.   Furthermore, the Arbitration Tribunal shall not

---

[2]   After having pointed out, in particular, that said handover took place in November 1992, i.e. more than six years before the complaint was filed.

361

hesitate to take account of any and all new information (even if arising from the criminal investigation) submitted to it in adversary proceedings by the parties before the end of the discussions prior to the deliberation concerning the final award[*].

To sum up, the request for stay of decision is dismissed."

## VIII.   TEMPORARY ORDER

The interim award of 28 June 1999, on the basis of a first examination of the merits (pages 18 to 30), temporarily ordered the defendants to pay the plaintiff the sum of 15,000,000 US dollars in accordance with the terms hereafter fully reproduced, i.e.

"The Arbitration Tribunal deems (supra (VIII.1 to VIII.3)) that, as matters stand, the hypothesis of the existence of a net debt on the part of COMMISIMPEX with respect to the defendants is neither proven nor even credible, and that COMMISIMPEX was indeed the creditor of the defendants, both before Heads of Agreement n° 566 and on the basis of the latter. It remains that there is still some uncertainty as to the amount of these claims as soon as one leaves the negotiable instruments field (amount of the 956 unpaid promissory notes subscribed on 20 November 1992). This can only be determined by an expert's report (infra (IX)).

A temporary order is already justified for an amount representing a very small part of the totality of the claims (which come, for the principal alone, to more than 650 million FF or 110 million US dollars), and which cannot be seriously contested after examination of the file, in particular the exhibits - including the most recent one - handed in by the defendants.

With respect to the forgoing, the Arbitration Tribunal allows only the two amounts (5 and 10 million dollars) identified in the letter of 7 March 1998 from the Minister of Finance and the Budget to the Banque Saradar bank, proposed as the first payments which would have been made as of 1998 in the case of agreement to a new rescheduling agreement (this agreement would have concerned the time-limit for reimbursement and the rates, with no express reference to any reduction of the debt). It cannot reasonably be doubted as matters stand that at least the two abovementioned amounts constitute undeniably a due, in particular with regard to the circumstances which surrounded the drafting of the letter and the coherence between this letter and all of the other previous documents emanating from the defendants (cf supra (VIII.3 c)). Even in the context of urgent negotiation, the Minister could never have proposed payment in good faith of the two abovementioned amounts if he had not been certain that COMMISIMPEX was indeed the creditor of the Congolese State, for amounts greatly in excess thereof.

The total of 15 million dollars - which represents about 12.5% of the principal claimed by COMMISIMPEX and about one sixth of COMMISIMPEX's claims under Heads of Agreement n° 566 - remains, moreover, slight as compared to the total amount of the former promissory notes returned, according to the letter of 24 November 1992 (i.e. the equivalent of 49,398,963.78 US dollars) and much lower than the total of the new promissory notes subscribed in dollars for principal alone (34,521,293.24 US dollars) or to the payments scheduled by the defendants

---

[*]   Such new items of evidence were not submitted to the arbitration tribunal before the ending of discussions on 27 June 2000.

22



themselves for the years 1989 to 1991 alone (i.e. the equivalent in CFA francs of 30,834,399.24 US dollars).

This temporary order was handed down against the defendants jointly and severally, who, in their statements of claim have not contested their joint and several links.

The final award shall decide with respect to the temporary sum granted before ruling in law."

## IX.   EXPERT'S REPORT

The Arbitration Tribunal in its <u>interim award</u> of 28 June 1999 deemed that it could only rule with respect to the parties' claims, arguments in defence and allegations when it has been able to precisely determine the total amount of the claims between, on the one hand COMMISIMPEX and, on the other hand the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT, arising from the disputed contracts at 31 October 1992. The technical complexity of the allegations of the defendants concerning the contracts and payments, and also the lack of satisfactory conciliation concerning the former promissory notes (whether returned or nor), did not in fact make it possible to so determine in a satisfactory manner. Under these circumstances, the Arbitration Tribunal deemed that it was vital to have recourse to expert appraisal and consulted the parties beforehand on 7 September 1999, in conformity with article 20.4 of the Arbitration Rules of the ICC, concerning appointment of the expert, the detailed definition of the latter's assignment and advance payment of fees.

In its <u>procedural order</u> of 21 September 1999, the Arbitration Tribunal

1.     Decided to have recourse to an expert, whom it appointed in the person of Mr René RICOL, chartered accountant and auditor, and legal expert with the French Supreme Court, whose offices are at 135 Boulevard Haussmann, F-75008 Paris.

2. (and 4 to 12) Set out its detailed instructions with respect to the carrying out and supervision of the expert proceedings.

3.     Defined the expert's assignment as follows, without prejudice to the faculty for the Arbitration Tribunal to clarify, complete or extend said assignment subsequently, i.e.

   a)    Giving his technical opinion in order to enable the Arbitration Tribunal to determine, in the appropriate currencies, the exact, total updated amount of the claims between, on the one hand COMMISIMPEX and, on the other hand the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT at 31 October 1992, without taking account of Heads of Agreement n° 566 of 12 October 1992 and the discount which it incorporated.

   b)    The report set out sub a implies, in particular that the expert shall try to reconcile in a sure, clear and complete manner, the quantified data presented by the parties

23



363

after ruling from a technical point of view:

    i)    with respect to the allegations of the defendants in accordance with which:

        - several of the contracts and additional clauses at the origin of COMMISIMPEX's claims as set out in Heads of Agreement n° 566 were not executed, or were not completely executed, or were badly executed;

        - some of these contracts had no purpose (identical work);

    ii)    with respect to the allegations of the defendants in accordance with which COMMISIMPEX was paid several times for the same contracts or the same claims over the REPUBLIC OF THE CONGO;

    iii)    with respect to what became of the former promissory notes (paid, discounted, returned, not returned, "taken into account" or not in Heads of Agreement n° 566, etc.).

    c)    And if at 31 October 1992, reciprocal claims existed, giving his technical opinion in order to allow the Arbitration Tribunal to determine, on the one hand the exact, total updated amount of the claim of each of the parties over the other(s) and, on the other hand, the net amount after set-off of reciprocal claims.

The expert's report (54 pages and 2 appended volumes) was handed in on 14 April 2000.

## X.    SUBSEQUENT PROCEDURE

At the invitation of the Arbitration Tribunal, the parties then exchanged and handed in synthesised summing up pleadings replacing all previous writings (except with respect to pleas concerning procedure, concerning which the Arbitration Tribunal had ruled in the interim award : cf supra VI) : "the summarising and amplifying statements of case" of 17 May 2000 (plaintiff) and 16 June 2000 (defendants).

Furthermore, complementary exhibits were produced (exhibits 84-1 and 84-2 to 98 by the plaintiff, exhibits 23 to 36 by the defendants).

Discussions were ended and the case was prepared for deliberation at the end of the hearing (pleadings, rejoinders and replies to the questions of the Arbitration Tribunal) held on 27 June 2000.

24

364

## XI.   ON THE MERITS

### XI.A   PRIOR QUESTION; PLAN

#### XI.A.1   Should the non-negotiable instruments defence arguments be examined ?

This prior question is one of the disputed points specially mentioned in the "terms of reference" (sub 6, B) : on what bases (public contracts, heads of agreement and/or promissory notes and/or letters of commitment and pledge) are the defendants allegedly the debtors of COMMISIMPEX for the principal ?  This was decided by the underlined interim award of 28 June 1999 in the terms fully set out hereafter, and was no longer discussed or contested subsequently.

"The plaintiff bases its arguments on the negotiable instruments terrain[*] to obtain, principally, an adverse decision against the defendants on the basis of promissory notes P and I reaching maturity at the latest on 28 February 1998 (last due date prior to the request for arbitration), asserting, moreover, the irrevocable, unconditional undertaking entered into by the REPUBLIC OF THE CONGO in the letters of commitment (and the letters of pledge) of 3 March 1993.

On the other hand, the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT immediately based their arguments on non-negotiable instruments grounds, asserting the lack of a cause for the promissory notes and the nullity of Heads of Agreement n° 566.

In French law the rule that pleas are not binding does not apply in the relations between the drawer and the drawee of a bill of exchange or in the relations between the maker and the beneficiary of a promissory note.  The drawee of a bill of exchange may therefore assert the lack of a cause for the commercial paper against the drawer (Ripert and Roblot, "Traité de droit commercial", tome II, edition 12, n° 2045).  The solution is identical for the maker of a promissory note, who can assert failure to execute the obligation arising from the fundamental relationship or from payment already made against the beneficiary who is still the bearer thereof (Gavalda and Stoufflet, "Effets de commerce", 1998 edition, p. 164 and reference).

The legal relationship arising from the commercial paper and the former legal relationship known as the fundamental relationship are therefore separate from each other (Enc. Dalloz, "Droit commercial", V "Effets de commerce", n° 17 and reference).

The drawee or the maker may therefore, parallel to any negotiable instruments law arguments, assert pleas arising from the fundamental relationship against the drawer or the beneficiary who is still the bearer of the commercial paper.

Thus, arguments in defence based on negotiable instruments or outside negotiable instruments concerning the relations (initial or underlying) between parties must be examined by the Arbitration Tribunal, whether in the case of CAISSE CONGOLAISE D'AMORTISSEMENT (maker of the notes) or the REPUBLIC OF THE CONGO (in its capacity of endorser)".

---

[*] The non-negotiable instruments law arguments being, however, asserted on a subsidiary basis.



365

XI.A.2 <u>Plan</u>

It will follow up the disputed points still to be decided in accordance with the order set out in the "terms of reference" (supra III.1, B to F) and the following distinction : XI.B. Are the defendants the debtors of COMMISIMPEX for the principal ?; XI.C Other questions on the merits; XI.D Procedural compensation and arbitration fees.

## XI.B  ARE THE DEFENDANTS ("acte de mission" III.1, B) THE DEBTORS OF COMMISIMPEX FOR THE PRINCIPAL ?;

- jointly and severally or not ?

- on what basis, i.e. (public contracts, heads of agreement and/or promissory notes and/or letters of commitment and/or of pledge) ?

- for what amounts ?

XI.B.1 <u>First approach on the basis of the exhibits</u>

(<u>interim award</u> of 28 June 1999, VIII.1 and VIII.2, the terms of which are fully reproduced hereafter)

<u>"1°/ Examination of the exhibits produced concerning the alleged debts of the defendants with respect to COMMISIMPEX</u>

It is essential to give a precise chronological presentation hereafter of those of said exhibits produced which emanate from the defendants or which are a part of them. With respect to the foregoing, a distinction shall be made between Heads of Agreement n° 566 and execution thereof (infra a), the period prior to the heads of agreement (infra b), and the period subsequent to the latter (infra c).

a)  <u>Heads of agreement n° 566 and execution thereof</u>

In accordance with the preamble of Heads of Agreement n° 566 signed in Brazzaville on 14 October 1992 by the Minister of the Economy, Finance and the Plan (Mr Clément Mouamba) and COMMISIMPEX "outstanding debt with respect to work, after taking account of various payments made in favour of COMMISIMPEX and the discount of certain promissory notes, comes to (same amounts as those mentioned hereafter)". In accordance with article 1 of the heads of agreement "the total of the various debts at 31 October 1992 is drawn up in the original currency at the following amounts :

| | | |
|---|---|---|
| A. | 50,592,081.53 | FF (...) |
| B. | 21,201,872.76 | pounds sterling (...) |
| C. | 34,521,293.24 | US dollars (...) |
| D. | 1,426,623,801 | CFA francs (...)".[3] |

---

[3] These four amounts, in total, came to the equivalent of
86,832,448.52 US DOLLARS <u>OR</u> 49,285,800.03 GBP <u>OR</u> 459,343,644.94 FF <u>OR</u> 22,967,247.20 FCFA

26

366

Article 2 spreads out the payment of these debts over ten years, in 120 monthly instalments, the first of them to be paid on 30 January 1998; the interest rate is 10% (article 3); the debt in principal and in interest shall be given concrete form (article 5) by promissory notes subscribed by CAISSE CONGOLAISE D'AMORTISSEMENT and endorsed by the MINISTER OF THE ECONOMY, FINANCE AND THE PLAN.

The 956 promissory notes were subscribed and endorsed in Brazzaville, and then handed over to COMMISIMPEX on 20 November 1992.

The Minister of the Economy, Finance and the Plan (Mr Clément Mouamba) signed, and then handed over to COMMISIMPEX, on 3 March 1993, a letter of commitment and a letter of pledge for each series of promissory notes in the same currency, for the same due date. Each letter identifies the promissory notes concerned, due dates and amounts.

Each letter of commitment contains principally i) an irrevocable and unconditional commitment on the part of the REPUBLIC OF THE CONGO to pay at due date the total amount, in the currency in question, of the promissory notes as set out in the letter, ii) waiver of the possibility of asserting any plea based on any right whatsoever arising from the contract(s) at the origin of the making of the promissory notes, and iii) a declaration that the undertaking would be considered a commercial act, and that the Congolese State waived the possibility of asserting any form of immunity with respect to the courts and execution, that the letter is subject to French law and that any and all disputes would be decided by arbitration by the ICC.

Apart from the repetition of various stipulations as abovementioned in the letter of commitment, each letter of pledge contains, principally, the setting up of a pledge (followed by the terms and conditions thereof), i.e. "To guarantee unconditional payment of all promissory notes made in favour of the COMMISIMPEX S.A. company and all promissory notes made in favour of the COMMISIMPEX S.A. company endorsed in favour of any other place of business, bank or endorsee body or delegate, we hereby pledge and hand over by way of pledge, without dispossession, in favour of any and all beneficiary or endorsee, or place of business discounting the abovementioned promissory notes, all of our resources which are legally capable of being used as a basis for a pledge, for the nominal amount, costs and incidentals of the abovementioned promissory notes".

Pursuant to a legal consultation of 5 March 1993, the First President of the Supreme Court of the Congo[4] (Mr Lenga), after making express reference to Heads of Agreement n° 566 "determining the terms and conditions of payment of the outstanding debt between the Republic of the Congo and the Commisimpex company", gave the usual attestations concerning legal capacity, power and competence of the Congolese signatories of the heads of agreement and the promissory notes and confirmed as follows :

---

[4] For another case of a legal consultation given by this high judge, see the "Convention de Crédit et de Refinancement" of 26 February 1988 signed between the CCA, the Popular Republic of the Congo, certain banks and credit and financial institutions and the BNP bank, the representative:

367

"That the obligations of the Congolese State arising from signature of the heads of agreement and the making of the promissory notes constitute obligations of a commercial nature subject to private law and shall remain valid with respect to all of their provisions, shall be binding on the Congolese State and shall be acknowledged as valid in the Republic of the Congo.

Consequently, all of the conditions required under the Constitution, Legislation and Regulations in force have been duly carried out and the documents examined for the purpose of the present opinion include valid undertakings which are binding and enforceable in conformity with their provisions."

A second legal consultation, signed on 15 March 1993 by the First President and the two Presidents of the Supreme Court, confirmed the foregoing in a similar manner with respect to the aforementioned letters of commitment and pledge.

In his attestation of approval of 1 March 1993, the Minister of the Plan, Economy and Future Prospects (Mr Nguila Moungounga-Nkombo), after having made special reference to the contract and Heads of Agreement n° 566, had acknowledged the various commitments and obligations of the Congolese State. With respect to the contracts giving rise to Heads of Agreement n° 566, the Minister wrote that "all work concerning these markets has been fully completed and carried out in conformity with state-of-the-art building techniques and the standards thereof as delivered to the Contractor".

A letter from COMMISIMPEX to the Minister of Finance and the Budget (Mr Clément Mouamba) dated 24 November 1992, but handed over to the Minister in Paris or in Brazzaville on 3 March 1993, mentions the return "in the appendix, as agreed in article 7 of Heads of Agreement n° 566 signed on 14 October 1992, of all of the former promissory notes which were still in our possession, in accordance with the following list", for a total of 17,216,381 FF, 18,798,738 USD and 15,521,332[5] GBP.

Finally, in its letter of 11 March 1993 to CAISSE CONGOLAISE D'AMORTISSEMENT (received by the latter on 16 March 1993), COMMISIMPEX specified the discount incorporated in Heads of Agreement n° 566 and enclosed various documents for the execution of said heads of agreement. Appendix 1 to this letter is identified as follows : "1. Appendices 01 to 11 C, which show the calculations made by CAISSE CONGOLAISE D'AMORTISSEMENT - Messrs MABONZO, General Manager and NGUEKOUMOU, Director of Debt at the time".

---

[5] These three amounts represented in total the equivalent of

| | |
|---|---|
| USD | 49,398,963.78 |
| or £ | 28,038,682.46 |
| or FF | 261,320,514 |
| or FCFA | 13,066,025,700.09 |



28

368

b)     The period prior to Heads of Agreement n° 566

The amounts of the debts specified in Heads of Agreement n° 566 first of all, are not inconsistent with the amounts of the contracts and additional clauses (all co-signed by Colonel Denis Sassou-Nguesso, at the time Head of State and President of the Council of Ministers) mentioned in the abovementioned documents, sub a[6].

The "Memo for the attention of Comrade Minister of the Plan, Finance and the Economy", sent by CAISSE CONGOLAISE D'AMORTISSEMENT on 18 February 1989, makes reference to a total claim of 21,766,339,075 FCFA (to be updated with respect to interest), within the framework of the preparation of a heads of agreement, rapid signature of which was recommended by CAISSE.

A telex sent on 11 December 1989 by CAISSE (under the signature of its general manager, Mr Emile Mabonzo) to the Bank of Credit and Commerce International (BCCI) (Paris) estimates COMMISIMPEX's claims at 31 December 1988 at 21,080,000,000 FCFA, i.e. 421,600,000 FF.

Another telex from CAISSE CONGOLAISE D'AMORTISSEMENT sent to BCCI (Paris) on 13 January 1990 (under the signature of Mr Jean-Paul Engaye, new general manager) refers to the same abovementioned amount of 21,080,000,000 FCFA.

The "Memo for the distinguished attention of Minister of the Economy, Finance and the Plan", sent by CAISSE in June 1991 carries out actualisation at 31 May 1991 of the abovementioned amount, i.e. 27,208,404,401 FCFA. This document once again insists on concluding negotiations rapidly (on the one hand to avoid an increase in interest, and on the other hand because COMMISIMPEX is in litigation with BCCI), and makes reference to the instructions received from the Minister (obtaining a supplementary discount from COMMISIMPEX and an extension of the amortisation period).

This document was confirmed by another memo of June 1991, which, for information purposes, updated COMMISIMPEX's claim to 28,339,795,515 FCFA.

This latter amount is to be found again in the "Information memo for the very distinguished attention of the President of the High Council" of 18 June 1991 (memo signed by Mr Dzouma-Nguelet, its President), of the "Commission des biens mal acquis" - Committee for dishonestly acquired property - which, with respect to the contracts and additional clauses mentioned in the foregoing documents sub A, refers to a total FCFA claim of 28,339,795,515, for which the following payments had been scheduled :4,671,632,573 FCFA for 1988, 1,094,963,342 FCFA for 1989, 1,962,667,201 FCFA for 1990 and 946,035,732 FCFA for 1991[7]. The memo specified that "no payments have been made to COMMISIMPEX to date".

---

[6] It is to be noted that certain other contracts entrusted to COMMISIMPEX were terminated in 1991.

[7] The total of these amounts was equivalent to
FF         173,905,976.96
or USD      30,834,399.24

Gérard DELAHAYE
Huissier de Justice
30, Av. des Champs-Elysées
75008 PARIS
Tél. 01 42 89 40 70

369

The difference between the abovementioned total of 28,339,795,515 FCFA (updated at 31 October 1992 by COMMISIMPEX to 29,269,598,989 FCFA) and the total amount of the debts mentioned in Heads of Agreement n° 566 (FCFA 22,235,587,294) constitutes the (second) discount of about 25% repeatedly referred to by the parties during the discussions and explained by COMMISIMPEX to CAISSE in its abovementioned letter of 11 March 1993 concerning execution of Heads of Agreement n° 566.

c)      The period subsequent to Heads of Agreement n° 566

On 16 January 1997 (therefore subsequently to the first formal summons notified by the plaintiff) by a "Memo for the distinguished attention of the Minister of the Economy, Finance and the Plan" (at the time Mr Moungounga), the general manager of CAISSE CONGOLAISE D'AMORTISSEMENT (Mr Emmanuel Ngono) summarised the background of the debt and the consolidation of 1992, setting out the amounts stipulated in Heads of Agreement n° 566, set at 56.62 billion FCFA the outstanding debt and arrears at 31 October 1996, and suggested negotiating a new consolidation which would concern the interest rate and the period of redemption while suggesting "a gesture in favour of this (Congolese law) company".

Finally, still in the same vein, the letter sent on 7 March 1998 by the Minister of Finance (Mr Mathias Dzon) to the Banque Saradar bank representing COMMISIMPEX in the negotiations underway at the time, must be fully reproduced here, i.e.

"Gentlemen,

After examining our divergent positions during our meeting in Libreville, we wish to reiterate our proposal to you in order to settle the dispute between ourselves and your client COMMISIMPEX, that is to say

-       payment of 5 million dollars;
-       signature of another agreement based on new terms and conditions, concerning a longer time-limit for reimbursement and a reasonable interest rate;
-       payment on 30 December 1998 of the sum of 10 million dollars.

The new schedule of payment arising from this agreement should be scrupulously complied with by both parties, in particular the Congolese State.

This having been stated, we wish to point out to you that COMMISIMPEX's claim over the Congolese State concerns internal debt. This exceptional treatment which we are proposing to you really confers the nature of a privilege on it.

In the contrary case, we shall inform your client of the terms and conditions applying to internal debt, which we shall draw up by mutual agreement with the International Monetary Fund (IMF).



370

Counting on your understanding and thanking you for your availability, I remain, Yours Faithfully."

Although at this point it is not necessary to decide as to the nature of this letter (acknowledgement, non-accepted and therefore null and void offer, as the defendants claim and/or an extrajudicial admission, as the plaintiff asserts), it is sufficient to note that it was a "proposal" made within the framework of negotiations underway, entirely consistent with the other documents emanating from the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT for more than ten years.

## 2°/ Preliminary remarks

In none of the seventeen documents (or series of documents) produced, emanating from the defendants or with respect to which they are parties, does there appear any challenge whatsoever of the claims mentioned in Heads of Agreement n° 566, either from the point of view of their principal or their amounts.

Not only are these documents numerous but they cover a long period of time, both prior to, concomitant with and subsequent to Heads of Agreement n° 566; they express a unity and continuity of behaviour since the first contracts of the 1980s until March 1998.

These documents are consistent with each other and each one of them is consistent with Heads of Agreement n° 566 itself. The differences in figures are always capable of being explained, in particular by the discount of 1992, updating, interest and conversions.

The seventeen documents (or series of documents) abovementioned emanate, moreover, from persons/institutions having legal competence (the successive Ministers of Finance, in particular) and technical competence (CAISSE CONGOLAISE D'AMORTISSEMENT, a public corporation set up precisely for the purpose of, among other things, managing and ensuring the service of the debts of the Congolese State) despite the changes of regime, President, Minister and General Manager of CAISSE. In this respect, it should also be pointed out that the defendants have never contested the continuity of the Congolese State or the acknowledgement of its acts, contracts and debts.

It is also relevant to specify that one of the co-signatories of the disputed contracts presently exercises the duties of Head of State, that Heads of Agreement n° 566 was entered into in 1992 after the coming to power of the elected President Pascal Lissouba (with no denial or challenge of the contracts previously entered into and the debts arising from them), that none of the successive Ministers of Finance took a different attitude from that of his predecessors and that this also applies to the successive General Managers of CAISSE (some of whom, moreover, remained in office despite a change of President, Government or Minister of Finance).



None of the documents emanating from the REPUBLIC OF THE CONGO or CAISSE CONGOLAISE D'AMORTISSEMENT contains any challenge whatsoever of the validity or the figures, in particular during the period of almost six years stretching from the signing of Heads of Agreement n° 566 to the beginning of the arbitration.

Furthermore, the formal summonses sent as of September 1996 have not given rise to any written reaction placed in the file and, above all, to any challenge concerning the contracts, COMMISIMPEX's claims, Heads of Agreement n° 566 or the disputed promissory notes. However, the formal summonses of September 1996 and January 1997 hinted expressly at the actions which COMMISIMPEX would be obliged to take, in particular from the arbitration point of view, if a rapid settlement was not found.

Consequently, the Arbitration Tribunal deems that on the basis of the items of evidence which have been supplied to it (supra (1° and 2°)), there exists sufficient proof of the plaintiff's claims both from the negotiable instruments point of view (the dishonoured promissory notes) and from the non-negotiable instruments point of view (Heads of Agreement n° 566)."

XI.B.2.  Claims and defence arguments concerning the alleged claims in principal of COMMISIMPEX

The plaintiff requests the Court

-   1) to order the defendants jointly and severally to pay COMMISIMPEX "the amount of notes made or endorsed by them on 20 November 1992, which matured on[8] 1 July 2000", that is to say

    | FF | 61,395,599 | (notes in FF of the P and I series) |
    |-----|------------|--------------------------------------|
    | USD | 41,892,427 | (notes in US dollars of the P and I series) |
    | GBP | 25,789,358 | (notes in pounds sterling of the P and I series) |
    | XAF | 1,731,267,454 | (notes in CFA francs of the P and I series) |

-   and also, "after a decision of default of term of the claim represented by the aggregate amount of all of the promissory notes of the P series reaching maturity subsequently to 30 June 2000, to order the defendants jointly and severally to pay COMMISIMPEX the aggregate amount of these notes, that is to say

    | FF | 12,648,020 |
    |-----|------------|
    | USD | 8,630,323 |
    | GBP | 5,300,468 |
    | XAF | 356,655,960 |

---

[8] More precisely one should read "reaching maturity before 1 July 2000", consequently including those maturing on 30 June 2000.

C... DELAU...
Tr... ...
90, Av. d.. C... ...Élysées
75... P... .S
Tél. 01 42 89 ...0 70
372

The defendants assert the following defence arguments and/or claims against these claims :

- first ("(1) Principally"),

    "- May it please the Court ... to hold Heads of Agreement n° 566 null and void and also the promissory notes issued under said Heads of Agreement n° 566 and also the letters of commitment and letters of pledge signed by the REPUBLIC OF THE CONGO on 3 March 1993, and

    - To rule that any debts which the REPUBLIC OF THE CONGO may have had with respect to COMMISIMPEX under the disputed public works contracts are time-barred, and

    - Consequently, to order COMMISIMPEX to pay the REPUBLIC OF THE CONGO the sum of 203,523,810 FF";

- secondly ("(1) Subsidiarily" - partim), to reduce the amount of Heads of Agreement n° 566 and to hold the promissory notes, the letters of commitment and letters of pledge null and void;

- and, thirdly, ("(3)"), to dismiss COMMISIMPEX's claim to obtain event of default for the promissory notes not yet matured, after holding "that article 1188 of the French Civil Code does not apply in the case at hand taking account of the nullity of the letters of pledge".

Consequently, these defence arguments require an analysis of the public contracts at the origin of the alleged Congolese debts underlying Heads of Agreement n° 566 (infra XI.B.3).

XI.B.3   <u>Public contracts at the origin of the alleged Congolese debts underlying Heads of Agreement n° 566</u>

a)   The defendants have made various <u>allegations concerning the contracts themselves;</u> they did this for the first time in their statement of case in response of 15 December 1998 (their statement of case of 12 June 1998 did not yet make any reference to this).

The defendants claimed i) that several of the contracts and additional clauses at the origin of the COMMISIMPEX claims mentioned in Heads of Agreement n° 566 were not executed or were not completely executed or were badly executed, and ii) that some of these contracts had no purpose (identical work).

The Arbitration Tribunal, in its interim award of 28 June 1999, made the three following remarks with respect to this subject, i.e.

"-   First of all, some of the demonstrations attempted by the defendants, contract by contract, are incompatible with the proper completion of the works certificates (or final acceptance report) produced by the plaintiff and generally drafted in the following terms :



33

**373**

(...)
(adde the attestation of approval of 1 March 1993 concerning the first four contracts).

. Secondly, certain reasoning put forward by the defendants is based on an inexact interpretation of some of the abovementioned documents (thus, the official report of the final acceptance of the palm tree plantation Etoumbi-Kunda contract refers to the official report of the temporary acceptance of the construction work for the working-class suburb, whereas the defendants wrongfully concluded that the official report of the final acceptance only concerned said working-class suburb) or, further still, on topographical and geographical inexactitude (for example with respect to certain neighbourhoods which are different but partly share the same names ("M'pila") of Brazzaville).

. Thirdly, the defendants have not produced any determining exhibits concerning their allegations of work not being executed or badly executed, in particular no letter or document whatsoever containing a formal notice to execute, refusal of acceptance, acceptance with reserves, letter of protest or reserves subsequent to acceptance. The bailiff's report drawn up in 1998 concerning the terrible condition of the Etoumbi-Kunda palm tree plantations is of no assistance for its part, in appraising execution of work carried out and accepted more than ten years before."

The technical complexity of the allegations, reasoning and hypotheses of the defendants has, furthermore, led the Arbitration Tribunal to ask the expert "to give his opinion from the technical point of view concerning these allegations in accordance with which

- several contracts and additional clauses at the origin of COMMISIMPEX's claims as set out in Heads of Agreement n° 566 were not executed, or not completely executed or badly executed;

- some of these contracts were to no purpose (identical work)".

b)  The contracts at the origin of the alleged Congolese debts underlying Heads of Agreement n° 566 are as follows[9] :

1 (a) - Contract n° 009/86/G/PR-PCM-DMCE of 12 February 1986 concerning reconstruction and drainage work in M'pila.

2 (b) - Contract n° 015/86/G/PR-PCM-DMCE of 24 March 1986 concerning anti-erosion work on the "Camp Militaire du 15 Août" and additional clause n° 1 n° 55/86/AO/PR-PCM-DMCE of 8 July 1986.

3 (c) - Contract n° 53/86/AO/PR-PCM-DMCE of 1 July 1986 concerning the drainage, shoring-up and fitting-out work for the "Camp Militaire du 15 Août".

---

[9] In accordance with the numbering used by the plaintiff, but not without specifying each time the one used by the defendants in parenthesis.

34

374

4 (for information purposes : supra 2 partim and (b) partim) - Additional clause n° 55-86 abovementioned.

5 (d) - Additional clause n° 4 n° 54/86/AV/PR-PCM-DMCE and additional clause n° 5 n° 57/86/AV/PR-PCM-DMCE, both of which date from 8 July 1987, concerning the price review for reconstruction of the Etoumbi-Kunda palm tree plantations; additional clause n° 01 n° 107/84/PR-PCM-DMCE of 5 April 1984 and additional clause n° 03 n° 127/84/AV/PR-PCM-DMCE of 5 May 1984, both of them concerning the redevelopment of the Etoumbi-Kunda palm tree plantations.

6 (e) - Heads of agreement n° 461-0 of 27 June 1987 (terms and conditions of reimbursement by the Congolese State of the credit guarantee implemented by Commisimpex for the supply of deforestation and forest clearing equipment within the framework of the project for the development of the Etoumbi-Kunda palm tree plantations).

7 (f) - Contract 185/54/G/PR-PCM-DMCE of 25 June 1984 concerning the construction of two villages for workers in Mokeko.

8 (g) - Contract 83/85/AD/PR-PCM-DMCE of 24 June 1985 and additional clause n° 1 n° 56/86/AD/PR-PCM-DMCE of 8 July 1986 : work in the Kinsoundi, M'pila and Makélékélé ravines.

Except for the numbering, this list corresponds to that used in the expert's report (page 16, which specifies, furthermore, that[10] "the parties during the meeting of 21 December 1999 (appendix 3), expressed their agreement concerning the existence, number, date of signature, object and amount of the contracts")

c)     The expert's report (pages 18 to 26; the conclusions in pages 4-5 and 26) deals with the failure to execute or the total or partial execution of the contracts, distinguishing three categories, i.e.

- contracts which are not disputed or are no longer disputed with respect to execution : n°s 1, 2, 3 and 8;

- contracts which are disputed with respect to execution : n°s 5 and 6 (infra d and e) and 7 (this became pointless as of the moment the defendants' summarising statement of case no longer contains any challenge with respect to this subject);

- contracts which are disputed with respect to the accusation that identical work was carried out : n°s 2 and 3 (this became pointless as of the moment the defendants' summarising statement of case no longer contains any challenge on this subject).

d)     The defendants contest the actual realisation of a part of the work concerning the redevelopment of the Etoumbi-Kunda palm tree groves. This concerns (supra b, n°5) additional clauses n°s 1, 3, 4 and 5 to the contract n° 353/83/CT/PR-PCM-DMCE of 10

---

[10] Subject to the dispute linked to additional clause n° 57/86.



November 1983 entered into with the English company APV HALL INTERNATIONAL LIMITED, for whom COMMISIMPEX acted as a subcontractor. These additional clauses (with the exception of additional clause n° 5) were signed between the Congolese authorities and COMMISIMPEX, and in reality constitute direct contracts entered into with the plaintiff.

Additional clause n° 5 (taking account of the price revisions applying to the work covered by contract 353/83 and additional clause n° 2 to said contract).
No problem concerning execution of the contract has been asserted by the defendants[11].

Additional clauses n°s1 and 3 (entrusting COMMISIMPEX with the work required for the proper execution of various paragraphs of contract 353/83).

According to the defendants, this work was not fully carried out. According to the plaintiff, the work was fully carried out, this being shown in the minutes of the Interministerial Commission of 13 February 1988.

The scope of this essential document is clear for the Arbitration Tribunal :
- although the work was, as of a certain date, "redimensioned" on a basis of 2,000 hectares, all or part of the work (preparatory, it must be remembered) entrusted to COMMISIMPEX was however carried out;

- the official report mentions "work carried out by COMMISIMPEX" at the end of 1987 and under additional clauses n°s 1 and 3 for an amount of 8,536 billion FCFAs, which is greater than the total price (14 million GBP) provided for in the disputed additional clauses;

- no document or factual item which could limit the scope of the official report has been produced or presented by the defendants.

Finally, and even if it is assumed that all of the work was not carried out, the Arbitration Tribunal notes, like the expert, that the official report acknowledges that at the time COMMISIMPEX was the creditor of a balance of 1,486,441,948 FCFAs, corresponding to "the difference between work carried out and payments".

Additional clause n° 4 (taking account of the price revisions applying to work covered by additional clauses n°s 1 and 3 to contract n° 353/83).
According to the expert's report (page 18), this point is not contested. The defendants' summarising statement of case, however, mentions (page 56) execution of the work, in

---

[11] Concerning the other aspects, the expert noted that "the parties do not dispute the existence of additional clause A5 57/86 but they are not in agreement as to the beneficiaries of the promissory notes issued as remuneration for said additional clause"; he also pointed out that "there is no doubt about the fact that APV Hall has a debt towards Commisimpex"; he concluded his subsequent analysis in these terms : "it would appear that APV Hall has not abided by the undertaking it had entered into to refrain from negotiating the promissory notes, that the attestation of the Minister of the Economy of 1/3/1993 acknowledges the subrogation of Commisimpex and that consequently, it is necessary to take account of the promissory notes issued as remuneration for additional clause 5 57/86 in order to determine the debt of the Republic of the Congo towards Commisimpex".



376

relation however with work linked to additional clauses n°s 1 and 3.  Considering the abovementioned conclusion concerning said additional clauses n°s 1 and 3, this contestation must be set aside.

e)    The defendants also assert contestations concerning the validity of <u>Heads of Agreement n° 461</u>[12] of 27 June 1987, contestations which also concern other issues (promissory notes, amount of debts) and which are sometimes expressed in a rather uncertain manner ("it seems", etc.).

This heads of agreement entered into by the REPUBLIC OF THE CONGO and COMMISIMPEX has, as its purpose, the terms and conditions of reimbursement of the credit guarantee set up by COMMISIMPEX, through the BCCE, by the Congolese State, to allow the abovementioned APV Hull company to purchase deforestation and forest-clearing equipment within the framework of the project for the redevelopment of the Etoumbi-Kunda palm tree groves.

The defendants do not claim that this equipment was not purchased or paid for, but the minutes of the consultation meeting of 26 June 1987 "do not in any way whatsoever concern the forest-clearing or deforestation equipment".

This statement is contrary to the title and the content itself of the document (which several time expressly mentions this equipment), the content of Heads of Agreement n° 461 (dated from the following day and which refers to the abovementioned minutes) and to the Ministerial attestation of approval of 1 March 1993.

For its part, the expert's report (page 23) concludes that "disclosures 16 to 19 and 26 of Commisimpex are explicit with respect to the reasons which led the Republic of the Congo to acknowledge a debt with respect to Commisimpex in consideration for the guarantee issued in favour of AVP Hall" and that "consequently this Heads of Agreement must be used to determine the debt of the Republic of the Congo with respect to Commisimpex".

f)    <u>To sum up</u>, no allegations concerning the contracts themselves (partial or faulty execution, work done twice, etc.), can be upheld, because not only has any one them been proven by the defendants but, further still, a detailed analysis thereof does not make it possible to lend them any credence.

Consequently, the expert was right to use the following contracts (page 26 of the report) for the purposes of determining the claims among the parties.

---

[12] Confused (unless, which is more likely, it is a material error) on page 65 of their <u>summarising</u> statement of case with Heads of Agreement n° 566.

Gérard DELAUNAY
Traducteur
90, Av. des Champs Élysées
75008 PARIS
Tél. 01 42 89 40 70

377

| Contract | Date | Type | Currency | Amount |
|---|---|---|---|---|
| Contract 009/86/G | 12/2/86 | Mpila drainage (la congolaise) and Plateaux anti-erosion work in the "Camp militaire du 15 Août" | FF | 14,812,000 |
| Contract 015/86 | 24/3/86 | | FF | 18,868,500 |
| Contract 53/86 | 01/7/86 | fitting out of the "Camp du 15 Août" | FCFA | 1,204,934,500 |
| Additional clause n° 1 55/86 | 8/7/86 | contract 15/86/PR | FCFA | 230,914,400 |
| Additional clause n° 4 54/86 | 8/7/86 | contract 353/83 CT price revision relating to additional clauses 1 and 3 | £ | 2,751,344 |
| Additional clause n° 5 57/86 | 8/7/86 | contract 353/83 CT concerning price revision | £ | 7,889,359 |
| Additional clause n° 107/84 | 5/4/1984 | Etoumbi-Nkounda oil palm tree project n° 353/83/CT - Initial contract | £ | 5,638,000 |
| | | - Price supplement at 31/12/1987 | FCFA | 1,486,441,948 |
| Additional clause 3 n° 127/84 | 5/5/84 | Etoumbi-Nkounda oil palm tree project n° 353/83/CT | £ | 8,457,000 |
| Heads of Agreement n° 461 | 27/6/87 | terms and conditions of reimbursement of the credit guarantee implemented by Commisimpex | £ | 12,818,000 |
| Contract 185/841 | 25/6/84 | construction of 2 workers' villages at Mokéko | £ | 8,653,000 |
| Contract 83/85/ | 24/6/85 | ravines of Kinsoundi, M'pila and Makélékélé | USD | 5,450,534 |
| Additional clause 56/86 | 8/7/86 | contract 83/85/AO/PR, work at Makélékélé | FCFA | 377,456,228 |

The total amounts per currency of these contracts, on the date on which they were concluded, therefore without updating or interest, come to:

- FRF :        33,680,500
- FCFA :   2,299,747,076
- GBP :        46,206,703
- USD :         5,450,534

that is to say, for information purposes, a total of 572,205,082 FF (conversion on the basis of exchange rates at the end of 1986).



*378

### XI.B.4    Are Heads of Agreement n° 566 and its subsequent deeds null and void?

a)    The principal defence argument asserted by the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT against the claims to obtain an order from the Court ordering them to pay the principal consists in asserting that Heads of Agreement n° 566, and consequently its subsequent deeds (new promissory notes, letters of commitment and of pledge) are null and void, for two different reasons[13], i.e.

- on the one hand, the absence of a cause for the Heads of Agreement (summarising statement of case, pages 15 to 76) : this mainly concerns uncertainty - including the questions relating to execution of contracts already settled sub XI.B.3 - concerning the amount of the Congolese debts at 31 October 1992, as set out in the Heads of Agreement; and
- on the other hand, lack of consent (summarising statement of case, pages 77 to 83) : "fraud, or at the very least mistake").

Under the abovementioned contracts, numerous payments were made by the defendants in favour of Commisimpex, on the basis or otherwise, depending on the case, of the promissory notes made with respect to these contracts.

These promissory notes were the subject of a very detailed analysis of all of the exhibits, figures and allegations put forward by both parties within the framework of the arbitration and the expert's appraisal itself, in order to determine what had become of each one of these notes and then to rule from a technical point of view concerning the total updated amount of the claims between Commisimpex and the defendants at 31 October 1992 (without taking account of Heads of Agreement n° 566).

b)    Thus, the expert found (page 5) that the following were undeniable, i.e. "the debt constituted by the promissory notes for which proof of return had been shown by a letter from Commisimpex of 24 November 1992" (for the other debts and promissory notes, the expert does not give his opinion and submits the issue for the decision to be taken, if applicable, by the Arbitration Tribunal)[14].

This concerns former promissory notes made by CAISSE CONGOLAISE D'AMORTISSEMENT, dishonoured at the time of signature of Heads of Agreement n° 566, and which, according to article 7 thereof, were all to be returned by COMMISIMPEX.

The latter returned (under circumstances which still give rise to controversy and to which the Arbitration Tribunal will come back later on) only those promissory notes, the list of which is set out in a letter dated 24 November 1992, for the following amounts calculated and updated by the expert  :

---

[13] These accusations, pursuant to a reading of the items of evidence produced by the parties, had never been made prior to the arbitration proceedings.

[14] In accordance with the report (pages 7 and 50), as an undeniable debt must be added the abovementioned amount acknowledged on 13 February 1988 of FCFA, i.e. 1,486,441,998. However, the minutes of 1 March 1993 mentioned a slightly lower amount of FCFA, i.e. 1,426,623,801, shown in article 1 of Heads of Agreement n° 566, apparently not subject to updating or to discount, which the Tribunal shall take into consideration alone.



39

379

| not updated : | | updated at 31.X.92 | |
|---|---|---|---|
| - FF | 17,216,381 | - FF | 29,489,637 |
| - GBP | 15,521,332 | - GBP | 18,939,772 |
| - USD | 18,798,738 | - USD | 31,161,701 |
| total in FF* | 242,115,406 | total in FF* | 346,802,137 |
| + FCFA debt | 1,486,441,948 | + FCFA debt | 2,466,703,689 |
| | (= FF 229,728,839)* | | (= FF 49,334,074)* |
| general total in FF* | 271,844,245 | general total in FF* | 396,136,211 |

The comparison of these amounts of debt held to be undeniable by the expert with those set out in Heads of Agreement n° 566 (article 1), that is to say

| - FF | 50,592,081 |
|---|---|
| - GBP | 21,201,872 |
| - USD | 34,521,293 |
| - FCFA | 1,426,623,801 |
| total in FF* | 432,446,601 |
| or in FCFA* | 21,622,330,040 |

clearly already highlights the fact, prima facie, that it was nor abnormal, unreasonable or suspect for the REPUBLIC OF THE CONGO to mark its approval concerning the four abovementioned amounts (in FF, GBP, USD and FCFA) as set out in the Heads of Agreement. In fact

- the global difference between these amounts in the Heads of Agreement and the undeniable debts, according to the expert, is only about 8%;

- whereas the undeniable debts, according to the expert, constitute a minimum (i.e. debts limited to promissory notes returned in accordance with the Heads of Agreement, over and above the debt in FCFAs), without prejudice to the other debts calculated by the expert (i.e. in non-updated FF 147,007,813 or in updated FF 303,885,550, that is to say about 70% of the total of the four amounts in the Heads of Agreement), which the Tribunal shall decide, if applicable, to take into account in whole or in part.

---

* In accordance with the exchange rates at the end of October 1992, as used in the expert's report. All of the totals shown in FF in the present award are for information purposes only, in order to facilitate comparisons of the quantified data. It will be noted, moreover, that in the case of inconsistency between figures, the Arbitration Tribunal has used the figures calculated by itself and/or by the expert. The decimals, except in certain cases, have been omitted.

S LA COUR D'APPEL
rard DELAUNAY
Traducteur Assermenté
1, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70
380

c)   <u>Was there a lack of cause ?</u>

<u>1°/ Reminder of the principles</u>

The very notion of cause is still the subject of recurrent controversy. Two principal concepts of cause are still in conflict today, i.e. the one referred to as ("subjectivist") asserting the determining reason (which prevails for example in Belgian law and in several other laws inspired by the French civilist tradition) and, the ("objectivist") one asserting the cause-consideration (which prevails in French law with, however, certain important nuances and variants).

For Maury ("Essay on the role of the notion of equivalence in French civil law", thesis Toulouse, 1920; other studies), Ripert and Boulanger ("Traité de droit civil, II, n° 288 et sequitur), and Capitant ("De la cause des obligations", 3rd edition 1927), the cause required by articles 1108 and 1131 of the Civil Code is, at the moment the agreement is formed, the determining reason of the party undertaking to be bound; Capitant specifies that this determining reason must be entered in the contractual scope, whereas Ripert and Boulanger emphasise that the determining reason - in order to assess any absence of cause - must be sought in the organisation of the contract. Belgian legal writers and case law have unanimously accepted this conception (cf. Van Ommeslaghe, "Observations sur la théorie de la cause dans la jurisprudence et dans la doctrine moderne", note under Belgian Supreme Court, 1st Chamber, 13 November 1969, "Revue critique de jurisprudence belge", 1970 p. 328 et sequitur).

On the other hand, in the objectivist conception of the cause, there must exist equivalent consideration (for a complete description of the rules and the application thereof see "Encyclopédie Dalloz", Droit Civil, V° Cause, by Maury, and Ghestin, "Traite de Droit civil, Les obligation, Le contrat", LDGJ, published 1980, n° 643 et sequitur). However, furthermore, there must be a total absence of any serious consideration, the purely quantitative equivalence must not be total, certain qualitative aspects of the consideration may sometimes be taken into account, and certain "objectivist" authors acknowledge that the organisation of the contract may be reasonably taken into account in assessing the cause.

<u>2°/ The defendants' argument</u>

It appears that the defendants (cf. pages 73 to 76 of their summarising statement of case) deem that any negative difference which might exist among the total claims of COMMISIMPEX at the end of October 1992 and the debt of the REPUBLIC OF THE CONGO as expressed in article 1 of Heads of Agreement n° 566 constitute an absence of cause which is grounds for avoidance of the Heads of Agreement completely. They do not assert, however, at least expressly, that implementation of the cause should be made for each one of the claims of COMMISIMPEX arising from each one of the contracts in question.



*381

3°/ Discussion

An analysis of the cause of Heads of Agreement n° 566 depends closely on the very nature itself of this contract. It consists in the rearrangement of the balance of the debts of the REPUBLIC OF THE CONGO with respect to COMMISIMPEX (as the defendants have several times pointed out in their summarising statement of case, in particular on page 87). This bilateral agreement is simultaneously negotiated, novatory, global and for a lumpsum in nature with respect to i) the total amounts of claims per currency (article 1); ii) the rescheduling of the payments of "the debt" thus consolidated over ten years (articles 2 to 5); and iii) the substitution for all previous agreements (article 8). Heads of Agreement n° 566 thus puts an end to a process going back to 1984 (the first instalment for certain contracts concerned and the first difficulties of payment) and to at least 1989-1991 for the attempt to find a friendly settlement, no doubt desired by COMMISIMPEX but above all (mainly for reasons of reputation, stabilisation of the public debt and international credibility) by the REPUBLIC OF THE CONGO itself.

In the subjectivist conception (determining grounds or reason) of the cause, no lack of cause could be shown where the determining reason of the REPUBLIC OF THE CONGO (a reason moreover shared with COMMISIMPEX) was to obtain - through the negotiation and agreement of Heads of Agreement n° 566 - a substantial reduction of the global debt and, furthermore, rescheduling of payment of the latter until 2002 (that is to say until almost 20 years after the first public contracts concerned were signed). Such a determining reason is obviously sufficient and valid.

What is the situation, however, in the objectivist conception (equivalent consideration) ?

It would be inexact, considering the nature of Heads of Agreement n° 566 set out hereabove, not only to try to find the existence of a cause for each one of the debts arising from each one of the contracts, but also to try to find each time a quantitative consideration strictly identical to each one of these obligation or sub-obligations, artificially separated from the others.

It is thus on a global basis that this must be sought, the only one which respects the organisation of the contract ,which Heads of Agreement n° 566 is, and all of the economic, technical, financial relations (quantifiable or not) and others underlying said Heads of Agreement, and - moreover - entered into with a sovereign State and a company having said State's citizenship and set up in said State. In such a global search, a serious equivalent consideration exists, both from the quantitative point of view cf; supra b and, on a strictly complementary qualitative basis[15].

---

[15] Adding to detail, it may be pointed out that in the objectivist conception, the requirement of a cause is close to the issue of burdensome contract; however, the latter does not in principle make it possible to attack a novatory deed such as a consolidation agreement (adde. for the case of the transaction, see article 2052 of the Civil Code).

Girard DELAUNAY
Traducteur au près de
90, Av. des Champs Elysées
75008 PARIS
Tél. 01 42 89 40 70

42

382

The Arbitration Tribunal therefore decides that Heads of Agreement n° 566 of 14 October 1992 is not affected by any lack of cause, whatever conception is chosen for the analysis thereof.

d)      Is there mistake ?

1°/ Reminder of the principles

It is acknowledged with respect to various aspects relevant to an examination of the accusation made in the case at hand (cf. Enc. Dalloz, Droit civil, V° Erreur - (Mistake) – by Ghestin) that :

-   the mistake must concern the substance of the thing which is the subject of the agreement (n°s 20 to 22); the mistake therefore must have determined consent (n° 26) at the time the latter was given;

-   the mistake and the substantial character thereof are assessed with respect to facts (n°s 27 and 30), and must be proven by the party asserting it;

-   the mistake, even substantial mistake, must not be inexcusable, that is to say the consequence of a fault committed by the party requesting avoidance of the contract (n°s 82 and 84); this fault-based mistake will be less easily allowed

    (unless the mistake is held to be quite simply improbable) where it is made "by informed professionals in a field concerning their specialised activities" (n° 86); moreover, mistake caused or encouraged through the disloyal behaviour of the other party is excusable in principle (n°87);

-   finally, the mistake needs not necessarily be common to both parties (n° 89).

2°/ The defendants' arguments

The argument put forward by the defendants to back up their claim for nullity pursuant to fraud (page 78 of their summarising statement of case) consists in asserting that "the REPUBLIC OF THE CONGO (therefore) agreed to enter into Heads of Agreement n° 566 only because it believed that the claims of the plaintiff were well-founded, in other terms, in the existence of the debt with regard to COMMISIMPEX"[16].

3°/ Argument

The Arbitration Tribunal therefore must decide whether, on signing Heads of Agreement n° 566, the REPUBLIC OF THE CONGO made a substantial mistake, determining for its consent. After analysing the facts, it deems that this argument is not founded. Indeed,

---

[16] The defendants also refer to article 7 of the Heads of Agreement, with respect to return of all of the promissory notes previously made by CAISSE CONGOLAISE D'AMORTISSEMENT, within sixty days (see concerning this subject infra XI.B.5).

GRAND DELANNAY
Traducteur ...
30, Av. des C... ..élysées
750.. 3 F ..iS
Tél. 01 42 89 40 70

383

i)   The undeniable <u>minimal</u> debts as updated do not greatly differ from the amounts set out in Heads of Agreement n° 566. It would run counter to common sense to identify a substantial mistake in an instrument which, at the very least (cf. for the surplus supra b) corresponds to the detailed analyses carried out by the expert for at least 90%.

The defendants themselves confirm a contrario the foregoing approach insofar as they assert in their summarising statement of case (page 79, concerning the alleged fraud) that COMMISIMPEX "knew that the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT did not owe it <u>anything else</u> at the date of Heads of Agreement n° 566"; it is therefore clear for them that substantial mistake could only be conceived in the case of a fundamental difference, or at least a very considerable one, between the undeniable debt and the amounts set out in Heads of Agreement n° 566.

ii)  The absence of substantial error also results from the very nature of the disputed Heads of Agreement (supra 3°, pages 42 and 43). The negotiated global lumpsum based nature of a consolidation / rescheduling of debt agreement only makes it possible in exceptional cases to acknowledge substantial mistake on the part of one of the signatories.

iii) All of the documents prior to Heads of Agreement n° 566 emanating from the Congolese authorities, concerning debt with respect to COMMISIMPEX (supra XI.B.1, 1°, b, pages 29-30) agree in setting these debts, updated at 31 May 1991, at 28,339,795,515 FCFAs and, on 31 October 1992 at 29,269,598,989 FCFAs, which corresponds globally - after applying a discount of about 25% - to a total of 22,235,587,294 FCFAs (or 21,622,330,040) corresponding to the debt (made up of FF, GBP, USD and FCFAs) as drawn up between COMMISIMPEX and the REPUBLIC OF THE CONGO in Heads of Agreement n° 566. Furthermore, it will be observed that most of these documents were drawn up by CAISSE CONGOLAISE D'AMORTISSEMENT, that is to say by the public corporation specially put in charge of the management of the debt and the payment of the promissory notes; the credibility of these documents is therefore extremely strong, if not total, unless one suggests - which has not been done by the parties - hypotheses which would be an insult to the quality and the loyalty of the authors of these documents. It will be observed finally that the summarising statement of case of the defendants makes no express criticism concerning the part of the interim award mentioned above, nor concerning the "preliminary observations" reproduced hereabove, sub XI.B.1., 2°, pages 31-32.



384

iv)   The findings and conclusions of an independent, complete, decisive expert appraisal carried out at the initiative of the Arbitration Tribunal itself, has not turned up any information which could back up the hypotheses of substantial mistake.

Thus, where the REPUBLIC OF THE CONGO has not made any substantial mistake determining for its consent to Heads of Agreement n° 566, there is no need to examine whether the alleged mistake was or was not of an inexcusable nature, or indeed whether said inexcusable nature should, if applicable, be set aside for mistake caused or encouraged by the other party[17].

Further adding to detail, the Arbitration Tribunal will, however, point out that the REPUBLIC OF THE CONGO was, in 1992, in the same situation as an informed professional acting in its field of activity : the COMMISIMPEX files, both from the point of view of public contracts and the financial point of view, were managed on the one hand by a competent, equipped Ministerial department and, on the other hand by CAISSE CONGOLAISE D'AMORTISSEMENT, an institution specialising in the management and payment of Congolese debt; the items of evidence handed into Court illustrate the continuity and the seriousness of the management of these files, generally under the supervision and signature of, on the one hand the highest civil servants in the hierarchy and, on the other hand of one or several Ministers; the clauses of Heads of Agreement n° 566 itself (for example the one concerning the return of all of the former promissory notes) show that negotiations were carried out seriously from the Congolese side by serious, competent persons concerned for the protection of the State's interests; finally, no situation of civil war, destruction of archives or perturbation of the State machinery has been asserted - with respect to 1992 or before - by the defendants.

The Arbitration Tribunal consequently decides that consent given by the REPUBLIC OF THE CONGO concerning Heads of Agreement n° 566 was not affected by substantial mistake.

c)   Was there fraud ?

1°/ Reminder of the principles

The principles are unchanging with respect to the various aspects relevant to the examination of the accusation made in the case at hand (cf. Enc. Dalloz, Droit civil, V° Dol - (Fraud) - by Chauvel) :

-   fraud is unlawful in nature and arises from "manoeuvring" generating a determining mistake; covered by article 1116 of the French Civil Code (n°s 12 and 15), such manoeuvring is of a diverse nature, but must reflect a certain degree of seriousness (n° 58), be intentional (n° 79) and be determining in nature (n° 84 : without said prior or concomitant manoeuvring, the victim of the fraud would not have entered into the contract);

---

[17] Without prejudice to an examination of the separate accusation of fraud (infra, e).

C ...rd DELA...   ...
Traducteur ...   ...
90, Av. des C....   ...ry3...
75C..3 F ...S
Tél. 01 42 ... 40 70

385

- all of these aspects are assessed in relation to facts (n° 90) and must be proven by the party asserting the fraud (cf. C. civ. art. 1116);

- controversy concerning incidental fraud is of no interest in the case at hand where the defendants are only claiming avoidance (therefore for principal fraud).

## 2°/ The defendants' arguments

The summarising statement of case (pages 79 to 83) of the defendants concerns (after mistake) the "fraudulent behaviour of COMMISIMPEX", synthesised as follows, i.e. "the mistake made by the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT, who believed that they were the debtors of COMMISIMPEX at the date of entering into Heads of Agreement n° 566, was knowingly caused by the plaintiff"[18] ... whereas "COMMISIMPEX cannot assert that it was unaware of the actual situation with respect to payments made ( ... and that) it knew that the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT owed them nothing more ..."

## 3°/ Discussion

The arbitration tribunal must therefore decide whether, in signing Heads of Agreement n° 566, the REPUBLIC OF THE CONGO was the victim of intentional manoeuvring, sufficiently serious and determining for its consent.

It will be observed first of all that the grounds on the basis of which the arbitration tribunal deemed that no substantial mistake determining for consent had been made by REPUBLIC OF THE CONGO are valid mutatis mutandis for appraisal of the accusation of fraud, a concept which also implies a mistake by the victim.

Next, it must be decided whether the manoeuvring was exercised by COMMISIMPEX against the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT.

If one examines the argument of the defendants as set out earlier, sub 2°, two remarks must be made immediately, i.e.

i)    the actual situation of payments, whether made or not, until October 1992, was also well known - indeed better known - by CAISSE CONGOLAISE D'AMORTISSEMENT, manager of the public debt and payments, than by COMMISIMPEX;

ii)   the argument of the defendants appears to be based on the hypothesis that COMMISIMPEX "knew that the REPUBLIC OF THE CONGO and CAISSE

---

[18] The defendants are referring here to the contractually agreed return of all of the former promissory notes (cf. in this respect infra, XI.B.5).



46

386

CONGOLAISE D'AMORTISSEMENT owed them nothing more", this hypothesis being rightly set aside by the expert's report.

It is necessary, moreover, to rule with respect to the other four aspects of the allegedly fraudulent behaviour mentioned in the defendants' summarising statement of case (pages 80 to 83) :

i)  In October 1992, COMMISIMPEX knew that the promissory notes which it held[19] only represented a fraction[20] of the alleged debt. However, on several occasions it has been pointed out that the promissory notes returned alone already represented, after updating, a total amount of debt relatively close to that set out in Heads of Agreement n° 566; this fact, failing any other proven information put forward by the defendants, does not make it possible to deem that, with respect to this point, there was an untruthful statement on the part of COMMISIMPEX.

ii) COMMISIMPEX, moreover, apparently acted in such a manner that it was difficult for the defendants to realise the fraudulent manoeuvring of which they were the victims. This allegation is all the less proven as the only detail given is presented in an uncertain manner ("it seems ...")[21].

iii) According to the defendants, COMMISIMPEX, in order to obtain signature of Heads of Agreement n° 566, apparently painted an enticing picture of the possibility that Mr Mohsen Hojeij would have subsequently of negotiating external financing in favour of the REPUBLIC OF THE CONGO. The cautious, normal, neutral terms used with respect to this point in the preamble to the heads of agreement do not make it possible, failing other information proven by the defendants, to describe this behaviour as fraudulent.

iv) With respect to the clause in the heads of agreement concerning the return of the former promissory notes, see infra XI.B.5.

Consequently, the arbitration tribunal decides that the consent of the REPUBLIC OF THE CONGO concerning Heads of Agreement n° 566 did not result from fraudulent manoeuvring by the plaintiff.

---

[19] Among those "allegedly (sic) issued by CAISSE CONGOLAISE D'AMORTISSEMENT".

[20] On the other hand, on page 79 of the summarising statement of case, it says that COMMISIMPEX "knew that the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT owed it nothing more".

[21] On page 82 of their summarising statement of case, the defendants use the same uncertain term ("seem") to back up the following accusation despite the serious nature of the latter, i.e. "COMMISIMPEX and its managers, among whom chiefly Mr Mohsen Hojeij, seem in fact to have made fraud a real operating rule in their relations with the REPUBLIC OF THE CONGO".



f)  Overall conclusion concerning alleged nullity

The claim to obtain avoidance of Heads of Agreement n° 566 of 14 October 1992 is hereby dismissed, both from the point of view of absence of cause, and mistake and fraud.  Consequently[22], there is no need either to avoid the promissory notes issued under Heads of Agreement n° 566 or the letters of commitment and of pledge of 3 March 1993 linked to the issue of said promissory notes.  Finally, and consequently, the claim made by the REPUBLIC OF THE CONGO to obtain an adverse decision against COMMISIMPEX ordering it to pay it the sum of 203,523,810 FF is groundless.

With respect to the time bars asserted by the defendants, they were only asserted insofar as Heads of Agreement n° 566 would be avoided; an examination of these grounds, consequently, is now pointless, it being even unnecessary, moreover, to examine the consequences of the novatory effect of Heads of Agreement n° 566.

XI.B.5  Execution of Heads of Agreement n° 566

a)  Heads of Agreement n° 566 of 14 October 1992 being valid, it is the law of the parties with respect to all of its provisions; in accordance with its article 7, it came into force on the date of signature thereof[23], but execution thereof was subject to two conditions, each one of them depending on one of the parties, i.e.

"Execution of the present agreement shall only take place after reception and acceptance both with respect to their content and their form within SIXTY (60) days as of the coming into force of the present agreement ,of the following documents, i.e.

- By the Republic, all of the promissory notes made by CAISSE CONGOLAISE D'AMORTISSEMENT in favour of COMMISIMPEX, under the contracts appended;

- By COMMISIMPEX, all of the promissory notes made under article 5 of the present agreement."

The defendants, should the heads of agreement not be avoided by the arbitration tribunal, subsidiarily claim (summarising statement of case, pages 87 and 88) a reduction of the amount of Heads of Agreement n° 566 "to the amount of the promissory notes returned by COMMISIMPEX in accordance with article 7 abovementioned (letter of 24 November 1992)[24], i.e. FF 241,803,686.5 before application of the two discounts, corresponding to FF 126,946,935.4, after application of the two discounts".

---

[22] This is consequently without prejudice to an examination of other accusations of nullity made by the defendants with respect to the promissory notes and letters.

[23] The defendants wrongfully on page 88 of their summarising statement of case state that the coming into force of the heads of agreement was subject to the terms and conditions set out hereafter.

[24] Consequently including the unpaid promissory notes originally made in favour of APV Hall.


Gérard DELAUNAY
Traducteur assermenté
90, Av. des Champs-Elysées
75008 Paris
Tél. 01 42 89 40 70

48

388

These amounts immediately call for three observations :

- the figures calculated by the defendants sometimes differ slightly from those calculated by the expert and/or by the Tribunal;

- these amounts take no account of updating;

- contrary to the 25% discount applied in 1992, there is, on the other hand no need to take account of the first discount, first because neither the expert nor the arbitration tribunal have been able to identify it with certainty, and secondly because it was apparently applied prior to preparation of the Heads of Agreement of October 1992.

The defendants, although they have given the economic justification which, in their opinion, underlays the first abovementioned condition ("said promissory notes had, of course, to represent the entire claim alleged at the time by the defendant ... ") refrained from describing it legally.

The arbitration tribunal shall successively examine the scope of the disputed clause (infra b), actual execution thereof (infra c) and any consequences on the execution of the heads of agreement and the new promissory notes issued (infra d).  On the other hand, the arbitration tribunal shall not examine the very large number of disputes between the parties concerning the non-returned promissory notes (figures, issuing payment, proof, etc. cf. expert's report, in particular pages 27 to 45 and the summarising statements of case of the parties) where these disputes concern the situation prior to Heads of Agreement n° 566; they have in fact no longer any object or interest as the validity of this novatory, global agreement has been acknowledged (supra XI.B.4).

b)     The exact complete scope of the disputed clause does not result from its text itself, although said text is clear prima facie (COMMISIMPEX had to return "all of the promissory notes made by CAISSE CONGOLAISE D'AMORTISSEMENT in favour of COMMISIMPEX under the contracts appended").  Consequently, it is necessary to determine the intention of the parties and, if necessary, to interpret the clause applying the usual rules of interpretation of French private law.

In principle, a paid promissory note is immediately returned to the maker of the note (or to its payment representative) and a non-returned promissory note (whether matured or not) is not yet paid; it is in accordance with this reasoning that the very important rule in accordance with which "voluntary handing over of the bill of exchange[25] to the debtor is irrevocable proof of payment by the latter" exists (Cass. com. sec. 30 June 1980 Bull., IV n° 280, p.226; 6 May 1991, Bull., IV n° 158, p. 154).

The scope - logical, normal and, above all, equitable - of the disputed clause is thus as follows : on the one hand, to prevent the former unpaid promissory notes from remaining in the possession of COMMISIMPEX (or, if applicable, third parties) and, on the other hand to ensure or check, naturally after taking account of updating - that the returned,

---

[25] Or to the maker of a promissory note (cf. Commercial Code, art 185 and 136).



389

unpaid notes correspond to the FF, GBP and USD debts set out in article 1 of Heads of Agreement n° 566, increased by the 25%[26] discount.

It is obvious that said scope was explained to COMMISIMPEX by the defendants during the negotiations which preceded Heads of Agreement n° 566, and then discussed and agreed; consequently, the disputed clause fulfilled the common intention of the parties. In the case, however, where any doubt might subsist in this respect, it is the interpretation which favours the debtor - the REPUBLIC OF THE CONGO - which should prevail, consequently the scope as set out hereabove, implementing article 1162 of the French Civil Code concerning the interpretation of agreements.

It is also necessary to determine the legal nature of the disputed clause, i.e. is it a condition precedent for the coming into being of the agreement or of one or several of its obligations ? Is it a condition subsequent ? Is it a precondition indispensable for the total or partial execution of the agreement ? The latter description is not only the only one which does not give rise to any criticism concerning its validity but, above all, is the one which is closest to the text of the disputed clause, while perfectly complying with the abovementioned scope and the clearly substantial nature of the clause for the REPUBLIC OF THE CONGO : the heads of agreement will only be executed if all of the unpaid promissory notes are returned within the agreed time limit or, should the returned promissory notes be of an amount less than the debts agreed under the heads of agreement (irrespective, moreover, of the reason for non restitution)[27], execution of the heads of agreement shall only take place partially, for the amounts in question, the contracting party in this case being discharged for the surplus from execution of its own obligations. Here also, implementation of article 1162 of the Civil Code necessarily leads to said interpretation in favour of the debtor.

From the foregoing, it may be deduced that Heads of Agreement n° 566 placed an obligation on COMMISIMPEX to return the unpaid promissory notes for the following amounts, i.e.

1) Heads of agreement article 1

| | | |
|---|---|---|
| FF | 50,592,081 | |
| GBP | 21,201,872 | (FF 173,293,501) |
| USD | 34,521,293 | (FF 180,028,543) |
| total in FF | | 403,914,125 |

---

[26] Reminder : The 1,426,623,801 FCFA debt set out in article 1 of the heads of agreement had not previously given rise to the making of promissory notes; furthermore, it apparently was not the subject of any updating or discount.

[27] Checking and comparison to be carried out, of course, i) separating debt and promissory notes in FF, GBP and USD ii) after taking account of updating iii) without taking account of the 25% discount and iv) without prejudice to the 1,426,623,801 FCFA debt.



2)    Add the 25% discount to 1

| | | | | | |
|---|---|---|---|---|---|
| FF | 50,592,081 | + 16,864,027 | = | 67,456,108 | |
| GBP | 21,201,872 | + 7,067,290 | = | 28,269,162 | (FF 231,057,996) |
| USD | 34,521,293 | + 11,507,095 | = | 46,028,388 | (FF 240,038,043) |
| total in FF | | | | 538,552,147 | |

3)    Unpaid promissory note to be returned

| | updated |
|---|---|
| FF | 67,456,108 |
| GBP | 28,269,162 |
| USD | 46,028,388 |
| total in FF | 538,552,147 |

c)    Actual execution of the disputed clause with respect to several points is uncertain and, sometimes, causes the parties to differ. The arbitration tribunal, on the basis of the items of evidence produced, sums it up as follows :

i)    The list of the former promissory notes returned is set out in a letter of 24 November 1992 sent by COMMISIMPEX to the Minister of Finance and the Budget and the date on which said letter was actually received and the circumstances in which it was handed over, do not appear with certainty from the document or the stamps, annotations and signatures which are shown on the copy produced. On the other hand, it is not contested

- that the promissory notes mentioned in the list correspond to those which were actually returned;

- that, contrary to article 7 of Heads of Agreement n° 566, the promissory notes mentioned are not "all promissory notes made by CAISSE CONGOLAISE D'AMORTISSEMENT in favour of COMMISIMPEX under the appended contracts", but only "all former promissory notes which were still in our possession";

- that the notes mentioned and returned represented the following total amounts :

| | not updated | | updated |
|---|---|---|---|
| FF | 17,216,381 | FF | 29,489,637 |
| GBP | 15,521,332 (FF 126,863,607 | GBP | 18,939,772 (FF 154,804,127) |
| USD | 18,798,388 (FF 98,035,418) | USD | 31,161,701 (FF 162,508,272) |
| total in FF | 242,115,406 | total in FF | 346,802,137 |

51



EXPERT PRÈS LA COUR
Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70

391

ii)  Return of the abovementioned notes was carried out at a date and in a place which remain uncertain (in Paris on 3 March 1993 according to the defendants). The exhibit produced mentions reception (not dated) and a visa by the Minister, dated 3 March 1993, sealed. In any case, there is no doubt that if restitution took place on 3 March 1993, the REPUBLIC OF THE CONGO did not complain to COMMISIMPEX about the overshooting of the sixty-day time-limit as provided for in article 7.

iii) The new promissory notes were also all to be handed over to COMMISIMPEX within sixty days of the coming into force of the heads of agreement. They were issued on (and dated on) 20 November 1992; although the exact date of their effective handling over is not shown in the file, the parties have not handed in any precise item of proof (or made any precise allegation) which makes it possible to doubt that said handing over was prior to return of the former promissory notes.

iv)  The letters of commitment and of pledge are dated 3 March 1993, in Brazzaville. The date on which they were actually handed over to COMMISIMPEX is not shown in the file[28].

v)   The plaintiff claims that, subsequent to the heads of agreement, it returned at some date, other promissory notes than those mentioned in the letter of 24 November 1992; for this purpose it asserts a letter which it sent on 11 March 1993 to CAISSE CONGOLAISE D'AMORTISSEMENT, informing it of the handing over very shortly of two promissory notes ("two bills returned unpaid concerning additional clause n° 127/84 to contract n° 353/83" - P 6/299 due date at 1.5.85 for 1,409,500 £ and P 7/299 due date at 1.11.85 for 1,409,500 £. The arbitration tribunal must, however, record

- that the accomplishment of the intention stated by COMMISIMPEX in its letter is not proven;

- that the plaintiff has not proven, nor even asserted with sufficient precision, that other promissory notes, not mentioned in its letter of 24 November 1992, were returned subsequently;

- that almost eight years after entering into Heads of Agreement n° 566, no other promissory note has been returned, not even within the framework of the arbitration proceedings and the expert's appraisal;

- that consequently it is unnecessary to modify the amounts of the promissory notes returned as set out hereabove, sub i.

---

[28] This also applies to the legal consultations of 5 and 15 March 1993.



392

d)   The <u>consequences</u> of returning former promissory notes for amounts lower than those provided for under Heads of Agreement n° 566 must now be brought to light (of course only as updated ones).

| Notes to be returned | | Notes returned | Missing in former B/O | |
|---|---|---|---|---|
| FF | 67,456,108 | 29,489,637 | 37,966,471 | |
| GBP | 28,269,162 | 18,939,772 | 9 329 390 | (FF 76,253,769) |
| USD | 46,028,388 | 31,161,701 | 14,866,687 | (FF 77,529,772) |
| total in FF | 538,552,147 | 346,802,137 | 191,750,012 | |

Execution of the heads of agreement must therefore only be carried out partially (both from the negotiable instruments and non-negotiable instruments points of view) by deducting amounts equivalent to the abovementioned missing amounts (reduced, obviously, by the 25% discount in order to ensure consistency of the deduction) thus giving the following results :

| Heads of agreement, article 1 | | To be deducted | Enforceable balances due |
|---|---|---|---|
| FF | 50,592,081 | 28,474,853 | 22,117,228 |
| GBP | 21,201,872 | 6,997,043 | 14,204,829 |
| USD | 34,521,293 | 11,150,015 | 23,371,278 |
| FCFA | 1,426,623,801 | ----------- | 1,426,623,801 |
| FF total | 432,446,601 | 143,812,523 | 288,634,078 |

The result of this is that a part of the new promissory notes handed over in advance by the defendants to COMMISIMPEX were so by mistake and consequently no longer have any purpose.

The arbitration tribunal has determined these notes on the basis of the following methodology, applied to each one of the three currencies (FF, GBP and USD) concerned, i.e.

a)   <u>For the principal</u>

- enforceable balance due applied to the P notes with the oldest due dates : in fact this option respects the payment schedule agreed (thus as of end of January 1993), is in conformity with the rules for charging payments and is capable of being realised in practice;

- special case of the three P promissory notes (n° 1663 in FF, n° 1931 in GBP and n° 1812 in USD), only a part of the face value of which corresponds to an enforceable due balance : these notes have not been accepted considering the legal, negotiable instrument law, or practicable impossibility of splitting them up, splitting up their effects, or indeed of replacing them; the three remainders shall of course be taken into consideration hereafter, but not as promissory notes;

b)   <u>Concerning interest</u>



393

- calculation at 10% on the basis of the total claim in FF, GBP or USD and of the capital remaining due at the due date for each one of the promissory notes accepted for the principal;

- application of the amount thus obtained to the I notes, with the oldest due dates (concerning this latter aspect, same justification mutatis mutandis as supra a);

- special case of the three I promissory notes (n° 1109 in FF, n° 1366 in GBP and n° 1248 in USD) only a part of the face value of which corresponds to an enforceable due balance in interest (same solution mutatis mutandis as supra a).

Application of these rules leads to the following results, pursuant to the detailed calculation set out in an appendix to the present award.

i)   With respect to the notes in FF

- enforceable due balance of 22,117,228 FF

- notes of the P series : the promissory notes n°s 1611 to 1662 - for a total of 21,923,235.36 FF - were properly and validly handed over, whereas promissory notes n°s 1663 to 1730 - for a total of 28,668,845.64 FF - were handed over by mistake;

- notes of the I series : the promissory notes n°s 1098 to 1108 - for a total of 4,405,727.10 FF - were properly and validly handed over, whereas notes n°s 1109 to 1216 must be set aside;

- there are remainders in FF of 193,992.64 in capital at 1 May 1997 and FF 335,406.90 in interest at 1 December 1993;

ii)   With respect to the notes in GBP

- enforceable due balance of 14,204,829 GBP

- notes of the P series : the promissory notes n°s 1851 to 1930 - for a total of 14,134,581.60 GBP - were properly and validly handed over, whereas promissory notes n°s 1931 to 1970 - for a total of 7,067,290.40 GBP - were handed over by mistake;

- notes of the I series : the promissory notes n°s 1336 to 1365 - for a total of 4,615,824.38 GBP - were properly and validly handed over, whereas notes n°s 1366 to 1454 must be set aside;

- there are remainders in GBP of 70,247.40 in capital at 1 September 1999 and GBP 83,054.94 in interest at 1 August 1995;

iii)   With respect to the notes in USD



54

394

- enforceable due balance of 23,371,278 USD

- notes of the P series : the promissory notes n°s 1731 to 1811 - for a total of 23,301,872.64 USD - were properly and validly handed over, whereas promissory notes n°s 1812 to 1850- for a total of 11,219,420.36 - were handed over by mistake;

- notes of the I series : the promissory notes n°s 1217 to 1247 - for a total of 7,728,933.99.10 USD - were properly and validly handed over, whereas notes n°s 1248 to 1335 must be set aside;

- there are remainders in USD of 69,403.36 in capital at 1 October 1999 and USD 84,625.80 in interest at 1 September 1995.

### X.B.6  Reply to question XI.B

a)      The arbitration tribunal is now able to respond to the question as to whether the defendants are the debtors in principal of COMMISIMPEX (infra f) after, however, examining the five special problems brought up by both parties, i.e. possible time bar affecting the new promissory notes (infra b), joint and several liability (infra c), the alleged nullity of the letters of pledge (infra d), what becomes of the letters of commitment (infra e), and promissory notes not yet at maturity (infra f).

b)      Possible time-barring of the promissory notes ?

The defendants assert on the basis of articles 179 and 185 of the French Commercial Code, the three-year prescription rule (three years as of the date of maturity) as set out in negotiable-instruments law.

This prescription may, however, be interrupted by an acknowledgement of debt, attachment, demand for payment or summons to appear before the Courts (cf. Civil Code article 2244). Notice, on the other hand, is not sufficient as the list set out in article 2244 of the Civil Code is exhaustive (steady case law of the French Supreme Court : cf. , in particular, Civ. 26 June 1991, Bull., II, n° 195, p. 104 and Com. Sec. 16 June 1998, Bull. IV, n° 194 p. 161).

In the case at hand, the only act interrupting prescription which may be taken into consideration is the request for arbitration of 13 March 1998.  No other has been asserted.

Consequently, the defendants are justified in asking the arbitration tribunal to officially acknowledge prescription of the promissory notes which reached maturity before 13 March 1995, that is to say

- in FF, promissory notes P 1611 to P 1636 and I 1098 to I 1122 (i.e. a total of 20,359,799 FF);
- in GBP, promissory notes P 1851 to P 1876 and I 1336to I 1360 (i.e. a total of 8,532,281 GBP);

Gérard DELAUNAY
Traducteur Assermenté
30, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70

- in USD, promissory notes P 1731 to P 1756 and I 1217 to I 1241 (i.e. a total of 13,892,423 USD);
- in FCFA, promissory notes P 1971 to P 1996 and I 979 to I 1003 (i.e. a total of 574,117,017 FCFA)[29].

The time bar thus acknowledged for the abovementioned promissory notes and amounts is only valid with respect to action taken on the basis of negotiable-instruments, but on the other hand has no effect on non-negotiable-instruments claims, action and requests.

c)    Is there joint and several liability between the defendants ?

Joint and several liability between the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT was not in any way whatsoever contested in their statements of case of 1998 and1999, but, on the other hand it is in their summarising statement of case of June 2000, from two points of view, i.e.

1°/   Joint and several liability and, more generally, a "joint adverse decision" is contested (page 98) in the event of the arbitration tribunal avoiding Heads of Agreement n° 566 and, consequently, the new promissory notes; considering the dismissal of the claims for avoidance (supra f page 48) this defence argument is now without purpose.

2°/   Joint and several liability is also contested (pages 99 and 105) - except for those promissory notes not set aside pursuant to reduction and for promissory notes which are not time-barred (joint and several liability is automatic, in fact, between the maker and the endorser of a promissory note) - on the grounds that CAISSE CONGOLAISE D'AMORTISSEMENT was not a party to Heads of Agreement n° 566.

This latter defence argument cannot be accepted considering the role of CAISSE CONGOLAISE D'AMORTISSEMENT in the general organisation of Congolese finances, considering the total interweaving in the case at hand between CAISSE CONGOLAISE D'AMORTISSEMENT and the REPUBLIC OF THE CONGO, not only well before Heads of Agreement n° 566, but indeed with respect to the entire negotiation of the latter (cf. "background" of pages 27 and following of the present award; cf. also joint and several temporary adverse decision, not contested on these grounds).
It is, moreover, acknowledged that the Congolese State, just like CAISSE, intended to give their undertaking a commercial nature; as joint and several liability is presumed ("ipso jure") in this area, it is also necessary on these grounds to hold that any adverse decisions handed down (whether or not they be based on negotiable-instruments law) must carry joint and several liability.

Finally, it arises from article 1200 of the Civil Code that "there is joint and several liability between the debtors where they are obliged, with respect to the same thing,

---

[29] For information purposes, the equivalent in FF of these four amounts (excluding decimals) at 31 October 1992 was 174,029,728 FF.



Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70
396

in such a manner that each one of them may be held liable for the whole debt and that payment made by one of them discharges the others with respect to the creditor"; it is not necessary that the expression joint and several liability be used if the foregoing terms and conditions are fulfilled.

d)    Alleged nullity of the letters of pledge

The defendants request the arbitration tribunal to hold, in any case, the letters of pledge issued on 3 March 1993 by the REPUBLIC OF THE CONGO under the signature of its Minister of Finance and the Budget null and void.

Each one of these letters - one per year and per currency - refers to the P and I promissory notes issued for execution of Heads of Agreement n° 566 and contains a pledge drawn up in the following terms, i.e.

"2°  To guarantee unconditional payment of any promissory note made in favour of COMMISIMPEX S.A. and any promissory note made in favour of COMMISIMPEX S.A. and which has been endorsed in favour of another firm, bank or endorsee organisation or delegate, we hereby pledge and hand over as pledge, without dispossession, in favour of any and all beneficiary or endorsee or discounting place of business, the promissory notes set out above, and all of our resources which can be legally used to serve as a basis for a pledge, for the nominal amount concerned, costs and incidentals of the abovementioned promissory notes.

It is hereby specified that, taking account of the fact that it is not possible materially for us to hand over the abovementioned pledged resources to the abovementioned beneficiary of the pledge, and that it is no more possible for the beneficiary of said pledge to take possession of the pledged resources, we hereby declare that the abovementioned pledge shall be valid notwithstanding this absence of relinquishment.   Consequently, we acknowledge that the handing over of the subject of said pledge, that is to say the abovementioned resources, is not a term or condition for the validity of said pledge, but shall at the most, if applicable, be deemed to be a simple measure of publicity."

The letters of pledge designate French law as the law applying to these sureties. According to point n°4 of the abovementioned legal consultation made on 15 March 1993, all of the letters of pledge "constitute an irrevocable act of the Congolese State which binds it in conformity with these (sic) terms and " ... " does not breach in any way whatsoever the laws and regulations applying to the Congolese State, nor its contractual undertakings"; the scope of this consultation is therefore limited to the right of the REPUBLIC OF THE CONGO (in particular with respect to legal capacity and powers) and does not concern the legality or the validity of the pledges in French law.

The defendants (summarising statement of case, pp. 91 to 95), after describing the disputed surety as "a general pledge without dispossession" assert, in order to back up their request for avoidance, the breach of the three conditions of validity of a pledge, i.e. its exclusively personal, i.e. moveable property nature, material dispossession (real contract) and the specifically determined nature of the property which is the subject of the pledge.   The plaintiff contests these three alleged breaches; furthermore, it has pleaded (reference n° 137) that the law of general pledge was not concerned, but rather the "handing over as a pledge of the real property (capable of being individualised) resources of the country".



397

The arbitration tribunal deems first of all that in public international law, it is permissible to doubt the validity of a pledge which is so general and future as the one concerning the resources (and therefore the reserves) of a State.

Whatever the case may be, however, with respect to this question, in the present state of French law, the three conditions of validity as set out hereabove - on the one hand linked to each other and, on the other hand, linked to the very nature of the real contract which the pledge is - are undeniable. The setting up of the pledge (and even the promise of pledge which may precede it) must specify the personal property object (tangible or intangible) which it concerns. Furthermore, despite the existence of controversy among legal writers, the pledge of a future thing is with respect to tangible personal property null and void considering "the absolutely indispensable requirement of dispossession" (Cabrillac and Mouly, "Droit des sûretés", Litec, publishers 1990, P. 526); dispossession lies at the very heart of pledge and the parties cannot contractually exempt themselves from it (cf. in particular the words "in all cases" in article 2076 of the Civil Code and article 92 of the Commercial Code) since, failing which, the contract is not formed and the lien cannot come into existence[30]. Said dispossession (even, moreover, if - quod non - it were to be reduced to a conditions binding on third parties) must be effective, apparent and permanent (cf. Enc. Dalloz, "Droit civil", v° "Gage" - Pledge - by Groslière, n°s 63 to 65 and 69). Finally, the existence of special laws allowing for the setting up of special pledges without dispossession confirms a contrario the necessity of dispossession in all other cases.

In the case at hand, pledging of "all of our resources which can legally be used as a basis for pledge" does not satisfy the requirements of the specificity of the object of the pledge (no more, moreover, than it does the general rule of sufficient determination in ordinary law), even if the subject of the pledge is restricted - which appears to have been the intention of the parties - to any and all tangible personal property resources (oil once extracted, etc.).

Furthermore, this pledge does not satisfy either the legal requirement of dispossession, which the parties (who manifestly drew up the text of the letters of pledge together) were perfectly aware of at the time, when they wrote on the one hand, contrary to the truth "we pledge and hand over as pledge", and on the other hand when the REPUBLIC OF THE CONGO states "that handing over of said pledge, that is to say the abovementioned resources, is not a condition of validity of said pledge ..." (contractual exemption, furthermore, not valid in French law of sureties). Finally, even if it is supposed that these letters were mere promises of pledge, running counter to the text itself of the letters of pledge and the legal description given to them by the parties, they would in this case not have been followed by actual deeds constituting valid pledges with respect to French law[31].

---

[30] Concerning justification of the principle, in particular by the protection of the contracting parties, cf. the study by Jobard-Bachellier, "Existe-t-il encore des contrats réels en droit français ?" - Do real contracts still exist in French law ? - or the value of the promises of real contracts in substantive law (R.T.D.C. 1985 pp.1-62); compare the much more progressive view of Stranart-Thilly, "Le gage, contrat réel, une fiction ? - The pledge, a real contract, a fiction ? - ("Journal des Tribunaux", Brussels, 1976, pp 237-243).

[31] Adde : no more, moreover, than of the "simple measure of publicity" mentioned above in the text of the letters of pledge.

G___d DELAU__Y
T_____t ___ __ __
90, Av. des Ch___s-Elysées
75008 PARIS
Tél. 01 42 89 40 70

398

The letters of pledge also contain the following paragraphs concerning the amounts paid into the bank accounts of the Congolese State "coming from the abovementioned resources, used as a basis for the abovementioned pledge".

"Furthermore, we shall refrain from making use in any way whatsoever of the amounts paid into our bank accounts coming from the abovementioned resources used as a basis for the abovementioned pledge as stated above.

It is hereby specified that said amounts shall continue to be allocated to the guarantee of our commitment under the abovementioned promissory notes and that COMMISIMPEX S.A. or any other endorsee or delegate firm may at any time, if it sees fit, take any and all appropriate measures for the purpose of preserving the abovementioned pledge.

COMMISIMPEX S.A. or any other firm, bank or organism, designated as beneficiary or endorsee of the abovementioned promissory notes may exercise all of the rights and liens arising under the law and custom over the abovementioned amounts covered by a pledge without dispossession."

These therefore are incidental terms and conditions linked to the pledge relating to resources; these terms and conditions - unless obviously insofar as they refer to ordinary law - are also null and void as a consequence of the nullity of the pledge over resources.

To further add to detail, it should be noted that these terms and conditions do not contain any transfer of claim or delegation or the setting up or promise of a valid binding pledge distinct from the pledge over resources.

To sum up, the arbitration tribunal hereby decides to cancel all of the letters of pledge signed on 3 March 1993 by the REPUBLIC OF THE CONGO.

e)      <u>What happens to the letters of commitment</u> ?

The defendants assert that no obligation arising from the letters of commitment thus signed by the Minister of Finance and the Budget on 3 March 1993 (one letter per annual series of promissory notes in each one of the four currencies) subsists for the reason that the sole purpose of these letters was to reiterate the negotiable-instrument commitments and that the promissory notes thus made are, depending on the case, null and void and/or time-barred.

The arbitration tribunal will restrict itself to officially recording that the letters of commitment remain valid insofar as they concern those promissory notes with respect to which it has decided that they were neither null and void nor time-barred, and, on the other hand, no longer have any purpose insofar as they concern the following promissory notes with respect to which it decided that they were handed over by mistake or are time-barred (cf. hereabove, pages 54-55 and 55-56) :



399

- notes in FF of the P series n°s 1663 to 1730 and the I series n°s 1109 to 1216
- notes in FF of the P series n°s 1611 to 1636 and the I series n°s 1098 to 1122
- notes in GBP of the P series n°s 1931to 1970 and the I series n°s 1366 to 1454
- notes in GBP of the P series n°s 1851 to 1876 and the I series n°s 1336 to 1360
- notes in USD of the P series n°s 1812 to 1850 and the I series n°s 1248 to 1335
- notes in USD of the P series n°s 1731 to 1756 and the I series n°s 1217 to 1241
- notes in FCFA of the P series n°s 1971 to 1996 and the I series n°s 979 to 1003.

f)   <u>Promissory notes not yet matured</u>

COMMISIMPEX requests the arbitration tribunal to "rule for default of event for the claim represented by the aggregate amount of all of the promissory notes of the P series maturing subsequently to 30 June 2000" with a correlative claim to have it ordered to pay it the aggregate amount of these promissory notes.

Notes P in FF, GBP and USD maturing subsequently to 30 June 2000 were all returned by mistake (supra pages 54 and 55) in such a manner that the claim has no purpose as far as they are concerned.  On the other hand, the claim preserves its purpose for notes P in FCFA n°s 1581 to 1610 (total amount : 356,655,960 FCFA).

Default of term, according to article 1188 of the Civil Code, is decided by the court where the debtor has decreased the sureties which it gave; the sureties concerned by this legislation are those given by the debtor in the contract and not the general surety granted to all unsecured creditors over all of the debtors' assets (Planiol and Ripert, Traité, VII, n° 1015; Cass. civ. sec., 9 May 1994, Bull. I, N) 171, p.127).

The judges on the merits, just like the arbitrators, have sovereign power to determine whether prejudice has been caused to the sureties (constant case law since the French Supreme Court decision in the Civil Section of 21 April 1852, D.P. 1854.5.538).

If the setting up of the sureties is null and void, default of term obviously can no longer apply.

In the case at hand, the letters of pledge - the only sureties asserted by COMMISIMPEX to back up its claim for default of term and the only sureties given in the contract (Heads of Agreement n° 566) or in direct relation to it - have been avoided by the arbitration tribunal (supra pages 58 to 60); article 1188 of the Civil Code consequently cannot apply.

Concerning the bad faith asserted by the plaintiff, this accusation will not be examined as it is not of a nature to enlarge the scope or the terms and conditions of implementation of article 1188 of the Civil Code.



400

The claim for default of event is thus set aside by the arbitration tribunal, the promissory notes of the P series abovementioned, not matured in FCFA continuing therefore to be valid (the same, moreover, as the promissory notes of the I series not matured in FCFA, n°s 1068 to 1097).

The conclusion of the foregoing is that COMMISIMPEX's claim for damages must be dismissed (summarising statement of case, pages 49 to 52; Terms of Reference, III.D), the motivation for which, in its various aspects is directly or indirectly linked (both with respect to the alleged financial and commercial prejudice) to the hypothesis in accordance with which the arbitration tribunal would decide to rule in favour of event of default concerning the promissory notes maturing subsequently to 30 June 2000. Nor is it necessary to thus order the defendants to pay the promissory notes P and I abovementioned in FCFA; COMMISIMPEX may demand payment thereof by the maker and the endorser at the respective maturity dates of these notes, that is to say at the end of each month until December 2002.

g)   <u>Response to question XI.B</u>

<u>The defendants are jointly and severally debtors of COMMISIMPEX for the following amounts</u>

i)   enforceable balance due as determined on page 53

that is to say
- FF        22,117,228
- GBP      14,204,829
- USD      23,371,278
- FCFA   1,426,623,801

ii)   increased by interest at 10% calculated on these amounts (pages 54-55), in conformity with article 2 of Heads of Agreement n° 566

that is to say
- FF         4,741,134
- GBP       4,698,879
- USD       7,813,559
- FCFA    707,367,634



401

<u>These claims are partly and validly represented by the following promissory notes (supra, pages 54-55 : promissory notes accepted, and pages 55-56 : promissory notes time-barred)</u> :

| | | | | | |
|---|---|---|---|---|---|
| • | in FF | P | 1637 to 1662 | 10,961,617.68 | FF |
| • | in GBP | P | 1877 to 1930 | 9,540,842.58 | GBP |
| | | I | 1361 to 1365 | 677,282.04 | GBP |
| • | in USD | P | 1757 to 1811 | 15,822,259.20 | USD |
| | | I | 1292 to 1247 | 1,316,124.30 | USD |
| • | in FCFA | P | 1999 to 1610 | 1,117,522,008.00 | FCFA |
| | | I | 1004 to 1097 | 442,352,449.00 | FCFA |

The <u>differences</u> between the claims (supra, i and ii) and the part of these claims represented by the foregoing promissory notes work out at the following amounts

| | | |
|---|---|---|
| i) in principal | FF | 11,155,610 |
| | GBP | 4,663,986 |
| | USD | 7,549,016 |
| | FCFA | 309,101,793 |

| | | |
|---|---|---|
| ii) in interest | FF | 4,741,134 |
| | GBP | 4,021,597 |
| | USD | 6,497,435 |
| | FCFA | 65,015,185 |



62

402

## XI.C   Other questions to be resolved

### XI.C.1   Claim for damages

In accordance with the terms of reference (III.C), the Tribunal, if it replies in the affirmative - which it did - to question B, must decide for what amounts the defendants are - jointly and severally (cf. supra, page 56) - the debtors of COMMISIMPEX in interest.

COMMISIMPEX claims, for each one of the promissory notes reaching maturity at the date of 1 July 2000, interest at the contractual rate of 10.50%, since the due date, with annual capitalisation as of 13 March 1998 (date on which arbitration was requested).

a)   The claim is founded

    i)   with respect to the unpaid promissory notes, which have not been set aside or time-barred (supra, page 62), i.e. in FF promissory notes P 1637 to 1662, in GBP promissory notes P 1877 to 1930 and I 1361 to 1365, in USD promissory notes P 1757 to 1811 and I 1242 to 1247, and in FCFA promissory notes P 1997 to 1610 and I 1004 to 1097;

    ii)   at the rate of 10.5% provided for under article 4 (lateness interest) of Heads of Agreement n° 566, applied on a pro rata temporis basis for each note since its date of maturity until actual payment, reduced however to the usury thresholds for the reasons and in accordance with the terms and conditions set out subsequently;

    iii)   with annual capitalisation since 13 March 1998, date on which the request for arbitration was made, under article 1154 of the Civil Code.

b)   The request is also founded, (with implementation of the terms and conditions set out in sub ii) and iii) hereabove) concerning the following claims

    -   the claims underlying the promissory notes time-barred (supra, pages 55-56)[32];

    -   the remainder in capital and interest (supra, pages 54-55) not represented by promissory notes (FF 193,992, since 30 April 1997; FF 335,406 since 30 November 1993; GBP 70,247 since 30 August 1999; GBP 83,054 since 30 July 1995; USD 69,403 since 30 September 1999; USD 84,635 since 30 August 1995).

---

[32] In FF, notes P 1611 to P 1636 and I 1098 to I 1122 for a total of FF 20,359,799; in GBP, notes P 1851 to P 1876 and I 1336 to I 1360 for a total of GBP 8,532,281; in USD, notes P 1731 to P 1756 and I 1217 to I 1241 for a total of USD 13,892,423; in FCFA, notes P 1971 to P 1996 and I 979 to I 1003 for a total of FCFA 574,117,017.

Gérard DELAUME
Traducteur Assermenté
90, Av. des Champs Élysées
75008 PARIS
Tél. 01 42 89 40 70

403

This solution, in its two separate parts a) and b) hereabove, is the only one which is in conformity with the intention of the parties (article 4 abovementioned of Heads of Agreement n° 566) and French law.  In particular, the application of the statutory rate alone (at present 2.74%) must be set aside.

However, the arbitrators officially record that the contractual rate of 10.5% has been particularly high for several years pursuant to the general evolution (mainly down) of interest rates and, consequently, gives rise - in strong currencies and for the account of a particularly poor country - to unreasonable interest arrears (without even taking into consideration the lack of action which the plaintiff demonstrated sometimes between 1993 and 1998, during certain periods).

A certain number of legal writers and arbitration case law (cf. ref. quoted by Derains, "Intérêts moratoires, dommages-intérêts compensatoires et dommages punitifs devant l'arbitre international", Etudes Pierre Bellet, Litec publisher 1991, p. 102 et sequitur) acknowledges a large scope of freedom to the arbitrators, or at the very least, a large scope of assessment, taking into account, in particular, all of the relevant circumstances, the nature of the facts, the rates in force on the market, the currencies concerned and inflation rates, etc. (cf. ICC award in re n° 6219, JDI 1990, p. 1047, observations by Derains).  This approach, however, has been criticised, mainly on the grounds of respect for the intention of the parties (cf. Derains study abovementioned, n° 6).

In any case, the rate allowed cannot run contrary to the law applying to the setting of the rate for arrears interest (cf. abovementioned Derains study, n° 7 et sequitur), in the case at hand French law.

On the basis of article 313-6 of the French Consumer Code (text taken up by the Act of 28 December 1966 concerning usury and Decree n° 90-506 of 25 June 1990), the usury threshold, which is obviously imperative, is calculated quarterly by the Banque de France and published in the "Journal Officiel" - French State Newspaper - by the Minister responsible for economy and finance.  This usury threshold was, for example, 7.53% as of 1 July 1999, for loans to businesses at a fixed rate for an initial period exceeding two years, which is the nearest case to the contractual moratory set up by Heads of Agreement n° 566 (deferral agreement, deemed to be covered by the scope of implementation of the abovementioned law : cf. Gavalda and Stoufflet, "La limitation des taux d'intérêts conventionnels par la loi n° 66-1010 du 28 décembre 1966 sur l'usure" - Limitation of contractual interest rates by Act n° 66-1010 of 28 December 1966 concerning usury - Sem. jur., 1968, I, 2171; for the scope of implementation cf. also Rives-Lange et Contamine-Raynaud, Droit bancaire, Dalloz, 6th publication 1995, n° 435).

Even if one supposes that in October 1992, the 10.5% rate did not exceed the usury threshold in force at the time, the arbitration tribunal deems that, pursuant to an overall assessment of the issue and respecting the intention of the parties (who, in 1992, took account of the market conditions but certainly did not desire that the interest arrears, many years later, should be calculated on the basis of a rate which had become unreasonable and taken on a speculative or wrongful aspect) calculation of the interest

404

rate cannot be carried out on the basis of a rate which, in particular, exceeds, for certain periods, the usury threshold mandatorily set by French law.

Consequently, the arbitration tribunal decides that the interest rate shall be calculated at the contractual rate of 10.5%, except where, for such or such a quarter, said 10.5% rate exceeds the statutory usury threshold in force; in such a case, for the quarter in question, the usury threshold (for loans to businesses at a fixed rate of an initial term exceeding two years) shall alone be used for the calculation of lateness interest.

### X.I.C.2   Request for temporary enforcement

COMMISIMPEX requests the Tribunal to order "temporary enforcement of any and all future arbitration award notwithstanding any legal action and/or appeal, no guarantee being required for (sic) the COMMISIMPEX company".

Temporary enforcement may, under French law of arbitration (NCPC, articles 1479 and 1500), be ordered under a arbitration award; it is up to the arbitrators to take this decision on a sovereign basis, taking account of all of the circumstances specific to the case at hand (facts, time-limits, behaviour, proceedings).

The arbitration tribunal deems in the case at hand that there is no need to order temporary enforcement of the present award, without prejudice, however, to article 28.6 of the arbitration rules of the ICC[33].

### X.I.C.3   What becomes of the temporary payment

In accordance with the interim award made on 28 June 1999 (supra, VIII, pages 22-23), the arbitrators must rule with respect to what becomes of the temporary payment of USD 15,000,000 allocated to COMMISIMPEX under said award.

The arbitration tribunal hereby decides that any amount which may have been actually paid to COMMISIMPEX by the defendants or one of them pursuant to the interim award shall be deducted from the principal amount set out in the present award.

---

[33] "All arbitration awards shall be obligatorily binding on the parties. By the fact that they submitted their dispute to the present Rules, the parties hereby undertake to immediately execute the forthcoming award and shall be deemed to have waived any and all possibilities of legal action and/or appeal, which they may properly and validly waive.

405

**XI.D   Procedural compensation and arbitration fees**

XI.D.1  Point E of the Terms of Reference : procedural compensation

COMMISIMPEX, on the one hand, and the defendants on the other, request the Tribunal to order the other party to pay 1,000,000 USD in compensation for fees, costs and disbursements committed for the requirements of the arbitration proceedings (and, with regard to COMMISIMPEX, precautionary measures).

It appears, however, not unequitable to leave each of the parties the responsibility of paying fees and disbursements which they have committed.

XI.D.2  Point F of the Terms of Reference : arbitration fees

In accordance with the Terms of Reference "it is in the end necessary, in conformity with article 31.3 of the arbitration rules of the ICC, to quantify the arbitration fees and to decide on which of the parties payment is incumbent, or in what proportion it shall be shared out amongst them".

COMMISIMPEX on the one hand, and the defendants on the other, request the Tribunal to order the other party to pay all of the arbitration fees (fees and costs of the arbitrators and administrative fees).

a)      Quantifying of the arbitration fees as defined under article 31.1 of the Arbitration Rules of the ICC

The cost of arbitration, as set out and determined by the International Court of Arbitration, comes to 590,000 USD.

The expert's fees come to 600,000 FF.

Reasonable fees committed by the parties for their defence in the arbitration proceedings must not be paid, pursuant to what was decided sub XI.D.1 hereabove and sub (b) hereafter.

b)      Determining the parties who shall pay the arbitration fees

In conformity with article 31.3 of the Arbitration Rules of the ICC, the arbitration tribunal hereby decides that the arbitration fees as quantified sub (a) (the first four items) shall be shared out among the parties in the following manner :

- the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT, jointly and severally, shall pay two thirds of the abovementioned fees;
- COMMISIMPEX shall pay one third of the abovementioned fees;



406

- each one of the parties shall be responsible for paying all other fees including all fees committed for their defence.

The foregoing breakdown results from an overall assessment in which two principal reasons have been taken into consideration, i.e.

- the adverse decisions handed down and the extent to which the claims and defence arguments were accepted;
- the assessment made by the arbitration tribunal concerned the entire file and the behaviour of the parties.

**ON THESE GROUNDS**

The undersigned arbitrators, ruling in adversary proceedings, no appeal being possible, hereby setting aside any and all other extra and/or contrary pleadings.

1) <u>Concerning the principal claim,</u>

    a) Hereby rule in law that the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT are jointly and severally the debtors of the COMMISIMPEX "société anonyme" for the following amounts, i.e.

        i) the enforceable due balances in accordance with Heads of Agreement n° 566, that is to say

| | |
|---|---|
| • FF | 22,117,228 |
| • GBP | 14,204,829 |
| • USD | 23,371,278 |
| • FCFA | 1,426,623,801 |

        ii) increased by interest at 10% calculated on these amounts, in conformity with article 2 of said heads of agreement, that is to say

| | |
|---|---|
| • FF | 4,741,134 |
| • GBP | 4,698,879 |
| • USD | 7,813,559 |
| • FCFA | 707,367,634 |



407

b) Consequently, hereby orders the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT jointly and severally to pay the plaintiff the amounts set out sub a), that is to say

    i) on the one hand, the amounts partly and validly represented by the following matured promissory notes, i.e.

- FF series P n°s 1637 to 1662 for a total of FF 10,961,671.68;
- GBP series P n°s 1877 to 1930 (total of GBP 9,540,842.58 and series I n°s 1361 to 1365 (total of GBP 677,282,04) for a general total of GBP 10,218,124.62;
- USD series P n°s 1757 to 1811 (total of USD 15,822,259.20) and series I n°s 1242 to 1247 (total of USD 1,316,124.30) for a general total of USD 17,138,383.5;
- XAF (FCFA) series P n°s 1997 to 1580 (total of XAF 760,866,048), and series I n°s 1004 to 1067 (total of XAF 396,284,389) for a general total of XAF 1,157,150,437;

    ii) and, on the other hand, the following amounts

- FF 11,155,610 and 4,741,134 for a total of FF 15,896,744;
- GBP 4,663,986 and 4,021,597 for a total of GBP 8,685,583;
- USD 7,549,016 and 6,497,435 for a total of USD 14,046,451;
- XAF (FCFA) 309,101,793 and 265,015,185 for a total of XAF 574,116,978.

2) <u>Concerning lateness interest</u>

Orders the REPUBLIC OF THE CONGO and CAISSE CONGOLAISE D'AMORTISSEMENT jointly and severally to pay the plaintiff lateness interest calculated at the contractual rate of 10.5%, reduced, however, to the quarterly usury threshold applied in French law, each time that for any quarter in question, the 10.5% rate is greater than the usury threshold (category of loans to businesses at more than two years at a fixed rate) published in the "Journal Officiel" - Official Newspaper of the French State - pursuant to Decree n° 90-506 of 25 June 1990 and article 313-6 of the French Consumer Code, with annual capitalisation as of 13 March 1998 on the following amounts :

Gérard DELAUN...
Traducteur As...
90, Av. des Champs-Elysées
75008 PARIS
Tél. 01 42 89 40 70

408

a) amounts of the promissory notes

- in FF series P n°s 1637 to 1662;
- in GBP series P n°s 1877 to 1930 and series I n°s 1361 to 1365;
- in USD series P n°s 1757 to 1811 and series I n°s 1242 to 1247;
- in XAF (FCFA) series P n°s 1997 to 1580 and series I n°s 1004 to 1067:

pro rata temporis for each abovementioned promissory note, since its date of maturity until actual payment;

b) amounts of the claims underlying the time-barred promissory notes (list set out hereafter, sub 5);

pro rata temporis for each abovementioned claim, since the date of maturity of the time-barred claim until actual payment;

c) amount of the remainder in capital and in interest

- FF 193,992 since 30 April 1997;
- FF 335,406 since 30December 1993;
- GBP 70,247 since 30 August 1999;
- GBP 83,054 since 30 July 1995;
- USD 69,403 since 30 September 1999;
- USD 84,625 since 30 August 1995;

until actual payment.

3) Dismisses COMMISIMPEX's claim to obtain event of default for the claim represented by the aggregate amount of all of the promissory notes of the P series maturing subsequently to 30 June 2000, and its correlative claim to have the defendants ordered to pay it the aggregate amount of these promissory notes and consequently its claim for damages. COMMISIMPEX shall be entitled to demand payment of the promissory notes in XAF (FCFA) series P n°s 1581 to 1610 and series I n°s 1068 to 1097 at the respective due dates for these notes.

4) Without any prejudice whatsoever to the validity of Heads of Agreement n° 566, hereby decides to avoid all of the letters of pledge signed on 3 March 1993 for the REPUBLIC OF THE CONGO and officially records that those of the letters of commitment signed on 3 March 1993 for the REPUBLIC OF THE CONGO referring to the following promissory notes, no longer have any purpose, i.e.

- FF series P n°s 1663 to 1730 and series I n°s 1109 to 1216; FF series P n°s 1611 to 1636 and series I n°s 1098 to 1122;
- GBP series P n°s 1931 to 1970 and series I n°s 1366 to 1454; GBP series P n°s 1851 to 1876 and series I n°s 1336 to 1360;



- USD series P n°s 1812 to 1850 and series I n°s 1248 to 1335; USD series P n°s 1731 to 1756 and series I n°s 1217 to 1241;
- XAF (FCFA) series P n°s 1971 to 1996 and series I n°s 979 to 1003; and

5) Officially records that the following promissory notes are time-barred, i.e. those maturing before 13 March 1995 :

- FF series P n°s 1611 to 1636 and series I n°s 1098 to 1122, for a total of FF 20,359,799;
- GBP series P n°s 1851 to 1876 and series I n°s 1336 to 1360, for a total of GBP 8,532,281;
- USD series P n°s 1731 to 1756 and series I n°s 1217 to 1241, for a total of USD 13,892,423;
- XAF (FCFA) series P n°s 1971 to 1996 and series I n°s 979 to 1003 for a total of XAF (FCFA) 574,117,017; and

6) Holds that there is no reason to order temporary enforcement of the present final arbitration award, without prejudice, however, to article 28.6 of the Arbitration Rules of the ICC; and

7) Decides that any amount which may have been actually paid to COMMISIMPEX by the defendants or one of them for the execution of the interim arbitration award of 28 June 1999, shall be deducted from the principal award (supra, sub I.b); and

8) Hereby dismisses the claims for procedural compensation and orders each of the parties to pay any and all fees, costs and disbursements which they have committed, without prejudice to the decision (infra sub 10) concerning payment of arbitration fees; and

9) Sets the arbitration fees as follows

a) cost of arbitration USD 590,000
b) expert's fees FF 600,000; and

10) Decides that the defendants shall pay, jointly and severally, two thirds of the arbitration fees as set out hereabove sub 9, and that the plaintiff shall pay one third of this cost; and

11) Consequently, orders payment by the defendants to COMMISIMPEX of USD 393,333 and FF 150,000 under the decision set out sub 10.



410

Signed in Paris, 3 December 2000

(s) Charles CHOUCROY                              (s) Jean-Michel DARROIS
Arbitrator                                        Arbitrator

(s) André BRUYNEEL
President of the Arbitration Tribunal

COURT ORDER FOR ACKNOWLEDGEMENT OF
THE ENFORCEABILITY OF A FOREIGN DECISION

I, the undersigned, Francine (illegible) GUERIN, Vice-
President
Acting by delegation from the President of the High Court
of Paris, assisted by the Clerk of the Court, hereby
officially recording that the abovementioned arbitration
award does not contain any provision which runs counter
to public law and order, hereby declares that it is
enforceable.

Paris, France, 12 December 2000

The Clerk of the Court                         The President

Appendices    1)   table of contents
              2)   detailed calculations (pages 54 to 55)

PRÈS LA COUR D'...
Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70

411

Appendix 1 to the award

## TABLE OF CONTENTS

Parties - Visas - Arbitrators

| | | |
|---|---|---|
| I | The main point of the dispute: arbitration clause (I.1 and I.2) | 1 |
| II. | Claims and allegations of the parties (II.1 and II.2) | 3 |
| III. | Assignment of the arbitration tribunal (III.1 and III.2) | 4 |
| IV. | Place, language and procedure of the arbitration | 10 |
| V. | Law applying to the merits | 11 |
| VI. | Procedural pleas (VI.1 and VI.2) | 12 |
| VII. | Request for stay of decision (VII.1 and VII.2) | 17 |
| VIII. | Temporary order | 22 |
| IX. | Expert's report | 23 |
| X. | Subsequent procedure | 24 |
| XI. | On the merits | 25 |

| | | | |
|---|---|---|---|
| XI.A | **Prior question; plan** | | 25 |
| XI.B | **Are the defendants (Terms of Reference III.1, B) the debtors of Commisimpex** | | |
| | **for the principal ?** | | 26 |
| | XI.B.1 | First approach on the basis of the items of evidence | 26 |
| | XI.B.2. | Claims and defence arguments concerning | |
| | | the alleged claims in principal of COMMISIMPEX | 32 |
| | XI.B.3 | Public contracts at the origin of the alleged Congolese | |
| | | debts underlying Heads of Agreement n° 566 | 33 |
| | XI.B.4 | Are Heads of Agreement n° 566 and its subsequent | |
| | | deeds null and void ? | 39 |
| | XI.B.5 | Execution of Heads of Agreement n° 566 | 48 |
| | X.B.6 | Reply to question XI.B | 55 |
| XI.C | **Other questions to be resolved** | | 63 |
| | XI.C.1. Claim for damages | | 63 |
| | X.I.C.2 | Request for temporary enforcement | 65 |
| | X.I.C.3 | What becomes of the temporary payment ? | 65 |
| XI.D | **Procedural compensation (XI.D.1) and arbitration fees (XI.D.2)** | | 66 |



412

I – FF

APPENDIX 2

| Currency | Claim number | | Promissory note due date | amount | Interest (10%) | | CRD |
|---|---|---|---|---|---|---|---|
| FF | 22 117 228 | P  1611 | 30/01/93 | 421.600,68 | | | 21.695 627 |
| | | 1612 | 28/02/93 | 421.600,68 | 28/02/93 | 180 797 | 21 374.027 |
| | | 1613 | 30/03/93 | 421.600,68 | 30/03/93 | 177 284 | 20 852.426 |
| | | 1614 | 30/04/93 | 421.600,68 | 30/04/93 | 173 770 | 20 430 825 |
| | | 1615 | 30/05/93 | 421.600,68 | 30/05/93 | 170.257 | 20.009 225 |
| | | 1616 | 30/06/93 | 421.600,68 | 30/06/93 | 166 744 | 19.587.624 |
| | | 1617 | 30/07/93 | 421.600,68 | 30/07/93 | 163.230 | 19.166.023 |
| | | 1618 | 30/08/93 | 421.600,68 | 30/08/93 | 159.717 | 18.744.423 |
| | | 1619 | 30/09/93 | 421.600,68 | 30/09/93 | 156.204 | 18.322.822 |
| | | 1620 | 30/10/93 | 421.600,68 | 30/10/93 | 152.690 | 17.901.221 |
| | | 1621 | 30/11/93 | 421.600,68 | 30/11/93 | 149.177 | 17.479.621 |
| | | 1622 | 30/12/93 | 421.600,68 | 30/12/93 | 145.664 | 17.058.020 |
| | | 1623 | 30/01/94 | 421.600,68 | 30/01/94 | 142.150 | 16.636.419 |
| | | 1624 | 28/02/94 | 421.600,68 | 28/02/94 | 138.637 | 16.214.818 |
| | | 1625 | 30/03/94 | 421.600,68 | 30/03/94 | 135.123 | 15.793.218 |
| | | 1626 | 30/04/94 | 421.600,68 | 30/04/94 | 131.610 | 15.371.617 |
| | | 1627 | 30/05/94 | 421.600,68 | 30/05/94 | 128.097 | 14.950.016 |
| | | 1628 | 30/06/94 | 421.600,68 | 30/06/94 | 124.583 | 14.528.416 |
| | | 1629 | 30/07/94 | 421.600,68 | 30/07/94 | 121.070 | 14.106.815 |
| | | 1630 | 30/08/94 | 421.600,68 | 30/08/94 | 117.557 | 13.685.214 |
| | | 1631 | 30/09/94 | 421.600,68 | 30/09/94 | 114.043 | 13.263.614 |
| | | 1632 | 30/10/94 | 421.600,68 | 30/10/94 | 110.530 | 12.842.013 |
| | | 1633 | 30/11/94 | 421.600,68 | 30/11/94 | 107.017 | 12.420.412 |
| | | 1634 | 30/12/94 | 421.600,68 | 30/12/94 | 103.503 | 11.998.812 |
| | | 1635 | 30/01/95 | 421.600,68 | 30/01/95 | 99.990 | 11.577.211 |
| | | 1636 | 28/02/95 | 421.600,68 | 28/02/95 | 96 477 | 11.155.610 |
| | | 1637 | 30/03/95 | 421.600,68 | 30/03/95 | 92.963 | 10.734.010 |
| | | 1638 | 30/04/95 | 421.600,68 | 30/04/95 | 89 450 | 10.312.409 |
| | | 1639 | 30/05/95 | 421.600,68 | 30/05/95 | 85 937 | 9.890.808 |
| | | 1640 | 30/06/95 | 421.600,68 | 30/06/95 | 82.423 | 9.469.208 |
| | | 1641 | 30/07/95 | 421.600,68 | 30/07/95 | 78.910 | 9.047 607 |
| | | 1642 | 30/08/95 | 421.600,68 | 30/08/95 | 75.397 | 8.626.006 |
| | | 1643 | 30/09/95 | 421.600,65 | 30/09/95 | 71.883 | 8.204.406 |
| | | 1644 | 30/10/95 | 421.600,68 | 30/10/95 | 68 370 | 7.782.805 |
| | | 1645 | 30/11/95 | 421.600,68 | 30/11/95 | 64.857 | 7 361.204 |
| | | 1646 | 30/12/95 | 421.600,68 | 30/12/95 | 61 343 | 6.939.604 |
| | | 1647 | 30/01/96 | 421.600,68 | 30/01/96 | 57.830 | 6.518.003 |
| | | 1648 | 28/02/96 | 421.600,68 | 28/02/96 | 54.317 | 6.096.402 |
| | | 1649 | 30/03/96 | 421.600,68 | 30/03/96 | 50.803 | 5.674.801 |
| | | 1650 | 30/04/96 | 421.600,68 | 30/04/96 | 47.290 | 5.253.201 |
| | | 1651 | 30/05/96 | 421.600,68 | 30/05/96 | 43.777 | 4.831.600 |
| | | 1652 | 30/06/96 | 421.600,68 | 30/06/96 | 40.263 | 4.409.999 |
| | | 1653 | 30/07/96 | 421.600,68 | 30/07/96 | 36.750 | 3.988.399 |
| | | 1654 | 30/08/96 | 421.600,68 | 30/08/96 | 33.237 | 3.566.798 |
| | | 1655 | 30/09/96 | 421.600,68 | 30/09/96 | 29.723 | 3.145.197 |
| | | 1656 | 30/10/96 | 421.600,68 | 30/10/96 | 26 210 | 2.723.597 |
| | | 1657 | 30/11/96 | 421.600,68 | 30/11/96 | 22.697 | 2.301.996 |
| | | 1658 | 30/12/96 | 421.600,68 | 30/12/96 | 19.183 | 1.880.395 |
| | | 1659 | 30/01/97 | 421.600,68 | 30/01/97 | 15.670 | 1.458.795 |
| | | 1660 | 28/02/97 | 421.600,68 | 28/02/97 | 12.157 | 1.037.193 |
| | | 1661 | 30/03/97 | 421.600,68 | 30/03/97 | 8 643 | 615.593 |
| | | 1662 | 30/04/97 | 421.600,68 | 30/04/97 | 5 130 | 193.993 |

Total capital    21.923 235,36    4 741 134

Capital remaining    193 992,64

The PNs in principle of series P n° 1663 to 1730 have not therefore been accepted

CRD   capital outstanding
IRD   interest outstanding



Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 74

413

| Currency | Claim | Promissory note | | | | |
|----------|-------|-----------------|---|---|---|---|
| | | Number | due date | amount | interest | IRD |
| FF | 4.741.134 | I    1098 | 28/02/93 | 418.087,34 | | 4.323.046,66 |
| | | 1099 | 30/03/93 | 414.574,00 | | 3.908.472,66 |
| | | 1100 | 30/04/93 | 411.060,66 | | 3.497.412,00 |
| | | 1101 | 30/05/93 | 407.547,32 | | 3.089.864,68 |
| | | 1102 | 30/06/93 | 404.033,98 | | 2.685.830,70 |
| | | 1103 | 30/07/93 | 400.520,65 | | 2.285.310,05 |
| | | 1104 | 30/08/93 | 397.007,31 | | 1.888.302,74 |
| | | 1105 | 30/09/93 | 393.493,97 | | 1.494.808,77 |
| | | 1106 | 30/10/93 | 389.980,63 | | 1.104.828,14 |
| | | 1107 | 30/11/93 | 386.467,29 | | 718.360,85 |
| | | 1108 | 30/12/93 | 382.953,95 | | 335.406,90 |

|  | |
|---|---|
| Total interest | 4.405.727,10 |
| Remaining | 335.406,90 |

The PNs in interest of series I n° 1109 to 1216 have not therefore been accepted

CRD : capital outstanding
IRD : interest outstanding

Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Elysées
75008 PARIS
Tél. 01 42 89 40 70

414

II - GBP

EXPERT PRÈS LA COUR D...
Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70
... DE P...

| Currency | Claim | Promissory note Number | due date | amount | | interest(10%) | IRD |
|---|---|---|---|---|---|---|---|
| GBP | 14 204 329 | P  1351 | 30/01/93 | 176.682,27 | | | 14.028.147 |
| | | 1352 | 28/02/93 | 176.682,27 | 28/02/93 | 116.901 | 13.851.464 |
| | | 1353 | 30/03/93 | 176.682,27 | 30/03/93 | 115.429 | 13.674.782 |
| | | 1354 | 30/04/93 | 176.682,27 | 30/04/93 | 113.957 | 13.498.100 |
| | | 1355 | 30/05/93 | 176.682,27 | 30/05/93 | 112.484 | 13.321.418 |
| | | 1356 | 30/06/93 | 176.682,27 | 30/06/93 | 111.012 | 13.144.735 |
| | | 1357 | 30/07/93 | 176.682,27 | 30/07/93 | 109.539 | 12.968.053 |
| | | 1358 | 30/08/93 | 176.682,27 | 30/08/93 | 108.067 | 12.791.371 |
| | | 1359 | 30/09/93 | 176.682,27 | 30/09/93 | 106.595 | 12.614.689 |
| | | 1860 | 30/10/93 | 176.682,27 | 30/10/93 | 105.122 | 12.438.006 |
| | | 1861 | 30/11/93 | 176.682,27 | 30/11/93 | 103.650 | 12.261.324 |
| | | 1862 | 30/12/93 | 176.682,27 | 30/12/93 | 102.178 | 12.084.642 |
| | | 1863 | 30/01/94 | 176.682,27 | 30/01/94 | 100.705 | 11.907.959 |
| | | 1864 | 28/02/94 | 176.682,27 | 28/02/94 | 99.233 | 11.731.277 |
| | | 1865 | 30/03/94 | 176.682,27 | 30/03/94 | 97.761 | 11.554.595 |
| | | 1866 | 30/04/94 | 176.682,27 | 30/04/94 | 96.288 | 11.377.913 |
| | | 1867 | 30/05/94 | 176.682,27 | 30/05/94 | 94.816 | 11.201.230 |
| | | 1868 | 30/06/94 | 176.682,27 | 30/06/94 | 93.344 | 11.024.548 |
| | | 1869 | 30/07/94 | 176.682,27 | 30/07/94 | 91.871 | 10.847.866 |
| | | 1870 | 30/08/94 | 176.682,27 | 30/08/94 | 90.399 | 10.671.184 |
| | | 1871 | 30/09/94 | 176.682,27 | 30/09/94 | 88.927 | 10.494.501 |
| | | 1872 | 30/10/94 | 176.682,27 | 30/10/94 | 87.454 | 10.317.819 |
| | | 1873 | 30/11/94 | 176.682,27 | 30/11/94 | 85.982 | 10.141.137 |
| | | 1874 | 30/12/94 | 176.682,27 | 30/12/94 | 84.509 | 9.964.455 |
| | | 1875 | 30/01/95 | 176.682,27 | 30/01/95 | 83.037 | 9.787.772 |
| | | 1876 | 28/02/95 | 176.682,27 | 28/02/95 | 81.565 | 9.611.090 |
| | | 1877 | 30/03/95 | 176.682,27 | 30/03/95 | 80.092 | 9.434.408 |
| | | 1878 | 30/04/95 | 176.682,27 | 30/04/95 | 78.620 | 9.257.725 |
| | | 1879 | 30/05/95 | 176.682,27 | 30/05/95 | 77.148 | 9.081.043 |
| | | 1880 | 30/06/95 | 176.682,27 | 30/06/95 | 75.675 | 8.904.361 |
| | | 1881 | 30/07/95 | 176.682,27 | 30/07/95 | 74.203 | 8.727.679 |
| | | 1882 | 30/08/95 | 176.682,27 | 30/08/95 | 72.731 | 8.550.996 |
| | | 1883 | 30/09/95 | 176.682,27 | 30/09/95 | 71.258 | 8.374.314 |
| | | 1884 | 30/10/95 | 176.682,27 | 30/10/95 | 69.786 | 8.197.632 |
| | | 1885 | 30/11/95 | 176.682,27 | 30/11/95 | 68.314 | 8.020.950 |
| | | 1886 | 30/12/95 | 176.682,27 | 30/12/95 | 66.841 | 7.844.267 |
| | | 1887 | 30/01/96 | 176.682,27 | 30/01/96 | 65.369 | 7.667.585 |
| | | 1888 | 28/02/96 | 176.682,27 | 28/02/96 | 63.897 | 7.490.903 |
| | | 1889 | 30/03/96 | 176.682,27 | 30/03/96 | 62.424 | 7.314.220 |
| | | 1890 | 30/04/96 | 176.682,27 | 30/04/96 | 60.952 | 7.137.538 |
| | | 1891 | 30/05/96 | 176.682,27 | 30/05/96 | 59.479 | 6.960.856 |
| | | 1892 | 30/06/96 | 176.682,27 | 30/06/96 | 58.007 | 6.784.174 |
| | | 1893 | 30/07/96 | 176.682,27 | 30/07/96 | 56.535 | 6.607.491 |
| | | 1894 | 30/08/96 | 176.682,27 | 30/08/96 | 55.062 | 6.430.809 |
| | | 1895 | 30/09/96 | 176.682,27 | 30/09/96 | 53.590 | 6.254.127 |
| | | 1896 | 30/10/96 | 176.682,27 | 30/10/96 | 52.118 | 6.077.445 |
| | | 1897 | 30/11/96 | 176.682,27 | 30/11/96 | 50.645 | 5.900.762 |
| | | 1898 | 30/12/96 | 176.682,27 | 30/12/96 | 49.173 | 5.724.080 |
| | | 1899 | 30/01/97 | 176.682,27 | 30/01/97 | 47.701 | 5.547.398 |
| | | 1900 | 28/02/97 | 176.682,27 | 28/02/97 | 46.228 | 5.370.716 |
| | | 1901 | 30/03/97 | 176.682,27 | 30/03/97 | 44.756 | 5.194.033 |
| | | 1902 | 30/04/97 | 176.682,27 | 30/04/97 | 43.284 | 5.017.351 |
| | | 1903 | 30/05/97 | 176.682,27 | 30/04/97 | 41.811 | 4.840.669 |
| | | 1904 | 30/06/97 | 176.682,27 | 30/04/97 | 40.339 | 4.663.986 |
| | | 1905 | 30/07/97 | 176.682,27 | 30/04/97 | 38.867 | 4.487.304 |
| | | 1906 | 30/08/97 | 176.682,27 | 30/04/97 | 37.394 | 4.310.622 |
| | | 1907 | 30/09/97 | 176.682,27 | 30/04/97 | 35.922 | 4.133.940 |
| | | 1908 | 30/10/97 | 176.682,27 | 30/04/97 | 34.449 | 3.957.257 |
| | | 1909 | 30/11/97 | 176.682,27 | 30/04/97 | 32.977 | 3.780.575 |
| | | 1910 | 30/12/97 | 176.682,27 | 30/04/97 | | 3.603.893 |

CRD : capital outstanding
IRD : interest outstanding

| | | | | | |
|---|---|---|---|---|---|
| 1911 | 30/01/98 | 176.682,27 | 30/01/98 | 30.032 | 3.422.211 |
| 1912 | 28/02/98 | 176.682,27 | 28/02/98 | 28.560 | 3.250.528 |
| 1913 | 30/03/98 | 176.682,27 | 30/03/98 | 27.088 | 3.073.846 |
| 1914 | 30/04/98 | 176.682,27 | 30/04/98 | 25.615 | 2.897.164 |
| 1915 | 30/05/97 | 176.682,27 | 30/05/97 | 24.143 | 2.720.481 |
| 1916 | 30/06/98 | 176.682,27 | 30/06/98 | 22.671 | 2.543.799 |
| 1917 | 30/07/98 | 176.682,27 | 30/07/98 | 21.198 | 2.367.117 |
| 1918 | 30/08/98 | 176.682,27 | 30/08/98 | 19.726 | 2.190.435 |
| 1919 | 30/09/98 | 176.682,27 | 30/09/98 | 18.254 | 2.013.752 |
| 1920 | 30/10/98 | 176.682,27 | 30/10/98 | 16.781 | 1.837.070 |
| 1921 | 30/11/98 | 176.682,27 | 30/11/98 | 15.309 | 1.660.388 |
| 1922 | 30/12/98 | 176.682,27 | 30/12/98 | 13.837 | 1.483.706 |
| | | | | | |
| 1923 | 30/01/99 | 176.682,27 | 30/01/99 | 12.364 | 1.307.023 |
| 1924 | 28/02/99 | 176.682,27 | 28/02/99 | 10.892 | 1.130.341 |
| 1925 | 30/03/99 | 176.682,27 | 30/03/99 | 9.420 | 953.659 |
| 1926 | 30/04/99 | 176.682,27 | 30/04/99 | 7.947 | 776.976 |
| 1927 | 30/05/99 | 176.682,27 | 30/05/99 | 6.475 | 600.294 |
| 1928 | 30/06/99 | 176.682,27 | 30/06/99 | 5.002 | 423.612 |
| 1929 | 30/07/99 | 176.682,27 | 30/07/99 | 3.530 | 246.930 |
| 1930 | 30/08/99 | 176.682,27 | 30/08/99 | 2.058 | 70.247 |

Total                    14.134.581,60                    1.698.879,32

Capital remaining        70.247,40

The PNs in principle of series P n° 1931 to 1970 have not therefore been accepted

CRD   capital outstanding
IRD   interest outstanding


Gérard DELAUNAY
Translateur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70

416

| Currency | Claim | Promissory note | | | |
|---|---|---|---|---|---|
| | | Number | due date | amount | IRD |
| GBP | 4 698 879 | I    1336 | 28/02/93 | 175 209,97 | 4 523.669,40 |
| | | 1337 | 30/03/93 | 173 737,57 | 4.349.931,83 |
| | | 1338 | 30/04/93 | 172 265,22 | 4 177 666,61 |
| | | 1339 | 30/05/93 | 170 792,86 | 4 006.873,75 |
| | | 1340 | 30/06/93 | 169 320,51 | 3.837.553,24 |
| | | 1341 | 30/07/93 | 167.848,16 | 3.669.705,08 |
| | | 1342 | 30/08/93 | 166.375,81 | 3.503.329,27 |
| | | 1343 | 30/09/93 | 164.903,45 | 3.338.425,82 |
| | | 1344 | 30/10/93 | 163.431,10 | 3.174.994,72 |
| | | 1345 | 30/11/93 | 161.958,75 | 3.013.035,97 |
| | | 1346 | 30/12/93 | 160.486,40 | 2.852.549,57 |
| | | 1347 | 30/01/94 | 159.014,05 | 2.693.535,52 |
| | | 1348 | 28/02/94 | 157.541,69 | 2.535.993,83 |
| | | 1349 | 30/03/94 | 156.069,34 | 2.379.924,49 |
| | | 1350 | 30/04/94 | 154.596,99 | 2.225.327,50 |
| | | 1351 | 30/05/94 | 153.124,64 | 2.072.202,86 |
| | | 1352 | 30/06/94 | 151.652,28 | 1.920.550,58 |
| | | 1353 | 30/07/94 | 150.179,93 | 1.770.370,65 |
| | | 1354 | 30/08/94 | 148.707,58 | 1.621.663,07 |
| | | 1355 | 30/09/94 | 147.235,23 | 1.474.427,84 |
| | | 1356 | 30/10/94 | 145.762,88 | 1.328.664,96 |
| | | 1357 | 30/11/94 | 144.290,52 | 1.184.374,44 |
| | | 1358 | 30/12/94 | 142.818,17 | 1.041.556,27 |
| | | 1359 | 30/01/95 | 141.345,82 | 900.210,45 |
| | | 1360 | 28/02/95 | 139.873,47 | 760.336,98 |
| | | 1561 | 30/03/95 | 138.401,11 | 621.935,87 |
| | | 1362 | 30/04/95 | 136 928,76 | 485.007,11 |
| | | 1363 | 30/05/95 | 135 456,41 | 349.550,70 |
| | | 1364 | 30/06/95 | 133.984,06 | 215.566,64 |
| | | 1365 | 30/07/95 | 132.511,70 | 83.054,94 |

Total                     4 615 824,36

Remaining interest        83 054,94

The PNs in interest of series I n° 1366 to 1454 have not therefore been accepted

CRD   capital outstanding
IRD   interest outstanding



417

III- USD

Currency    Claim   Promissory note

Géard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70

| | | Number | due date | amount | | interest(10%) | CRD |
|---|---|---|---|---|---|---|---|
| USD | 25 371 274 | P 1731 | 30/01/93 | 287.677,44 | | | 23 083.599 |
| | | 1732 | 28/02/93 | 287.677,44 | 28/02/93 | 192.363 | 22.795.921 |
| | | 1733 | 30/03/93 | 287.677,44 | 30/03/93 | 189.966 | 22.508.244 |
| | | 1734 | 30/04/93 | 287.677,44 | 30/04/93 | 137.549 | 22.220.566 |
| | | 1735 | 30/05/93 | 287.677,44 | 30/05/93 | 185.171 | 21.932.889 |
| | | 1736 | 30/06/93 | 287.677,44 | 30/06/93 | 182.774 | 21.645.211 |
| | | 1737 | 30/07/93 | 287.677,44 | 30/07/93 | 180.377 | 21.357.534 |
| | | 1738 | 30/08/93 | 287.677,44 | 30/08/93 | 177.979 | 21.069.856 |
| | | 1739 | 30/09/93 | 287.677,44 | 30/09/93 | 175.582 | 20.782.179 |
| | | 1740 | 30/10/93 | 287.677,44 | 30/10/93 | 173.185 | 20.494.502 |
| | | 1741 | 30/11/93 | 287.677,44 | 30/11/93 | 170.788 | 20.206.824 |
| | | 1742 | 30/12/93 | 287.677,44 | 30/12/93 | 168.390 | 19.919.147 |
| | | 1743 | 30/01/94 | 287.677,44 | 30/01/94 | 165.993 | 19.631.469 |
| | | 1744 | 28/02/94 | 287.677,44 | 28/02/94 | 163.596 | 19.343.792 |
| | | 1745 | 30/03/94 | 287.677,44 | 30/03/94 | 161.198 | 19.056.114 |
| | | 1746 | 30/04/94 | 287.677,44 | 30/04/94 | 158.801 | 18.768.437 |
| | | 1747 | 30/05/94 | 287.677,44 | 30/05/94 | 156.404 | 18.480.760 |
| | | 1748 | 30/06/94 | 287.677,44 | 30/06/94 | 154.006 | 18.193.082 |
| | | 1749 | 30/07/94 | 287.677,44 | 30/07/94 | 151.609 | 17.905.405 |
| | | 1750 | 30/08/94 | 287.677,44 | 30/08/94 | 149.212 | 17.617.727 |
| | | 1751 | 30/09/94 | 287.677,44 | 30/09/94 | 146.814 | 17.330.050 |
| | | 1752 | 30/10/94 | 287.677,44 | 30/10/94 | 144.417 | 17.042.372 |
| | | 1753 | 30/11/94 | 287.677,44 | 30/11/94 | 142.020 | 16.754.695 |
| | | 1754 | 30/12/94 | 287.677,44 | 30/12/94 | 139.622 | 16.467.017 |
| | | 1755 | 30/01/95 | 287.677,44 | 30/01/95 | 137.225 | 16.179.340 |
| | | 1756 | 28/02/95 | 287.677,44 | 28/02/95 | 134.828 | 15.891.663 |
| | | 1757 | 30/03/95 | 287.677,44 | 30/03/95 | 132.431 | 15.603.985 |
| | | 1758 | 30/04/95 | 287.677,44 | 30/04/95 | 130.033 | 15.316.308 |
| | | 1759 | 30/05/95 | 287.677,44 | 30/05/95 | 127.636 | 15.028.630 |
| | | 1760 | 30/06/95 | 287.677,44 | 30/06/95 | 125.239 | 14.740.953 |
| | | 1761 | 30/07/95 | 287.677,44 | 30/07/95 | 122.841 | 14.453.275 |
| | | 1762 | 30/08/95 | 287.677,44 | 30/08/95 | 120.444 | 14.165.598 |
| | | 1763 | 30/09/95 | 287.677,44 | 30/09/95 | 118.047 | 13.877.920 |
| | | 1764 | 30/10/95 | 287.677,44 | 30/10/95 | 115.649 | 13.590.243 |
| | | 1765 | 30/11/95 | 287.677,44 | 30/11/95 | 113.252 | 13.302.566 |
| | | 1766 | 30/12/95 | 287.677,44 | 30/12/95 | 110.855 | 13.014.888 |
| | | 1767 | 30/01/96 | 287.677,44 | 30/01/96 | 108.457 | 12.727.211 |
| | | 1768 | 28/02/96 | 287.677,44 | 28/02/96 | 106.060 | 12.439.533 |
| | | 1769 | 30/03/96 | 287.677,44 | 30/03/96 | 103.663 | 12.151.856 |
| | | 1770 | 30/04/96 | 287.677,44 | 30/04/96 | 101.265 | 11.864.178 |
| | | 1771 | 30/05/96 | 287.677,44 | 30/05/96 | 98.868 | 11.576.501 |
| | | 1772 | 30/06/96 | 287.677,44 | 30/06/96 | 96.471 | 11.288.824 |
| | | 1773 | 30/07/96 | 287.677,44 | 30/07/96 | 94.074 | 11.001.146 |
| | | 1774 | 30/08/96 | 287.677,44 | 30/08/96 | 91.676 | 10.713.469 |
| | | 1775 | 30/09/96 | 287.677,44 | 30/09/96 | 89.279 | 10.425.791 |
| | | 1776 | 30/10/96 | 287.677,44 | 30/10/96 | 86.882 | 10.138.114 |
| | | 1777 | 30/11/96 | 287.677,44 | 30/11/96 | 84.484 | 9.850.436 |
| | | 1778 | 30/12/96 | 287.677,44 | 30/12/96 | 82.087 | 9.562.759 |
| | | 1779 | 30/01/97 | 287.677,44 | 30/01/97 | 79.690 | 9.275.081 |
| | | 1780 | 28/02/97 | 287.677,44 | 28/02/97 | 77.292 | 8.987.404 |
| | | 1781 | 30/03/97 | 287.677,44 | 30/03/97 | 74.895 | 8.699.727 |
| | | 1782 | 30/04/97 | 287.677,44 | 30/04/97 | 72.498 | 8.412.049 |
| | | 1783 | 30/05/97 | 287.677,44 | 30/04/97 | 70.100 | 8.124.372 |
| | | 1784 | 30/06/97 | 287.677,44 | 30/04/97 | 67.703 | 7.836.694 |
| | | 1785 | 30/07/97 | 287.677,44 | 30/04/97 | 65.306 | 7.549.017 |
| | | 1786 | 30/08/97 | 287.677,44 | 30/04/97 | 62.908 | 7.261.339 |
| | | 1787 | 30/09/97 | 287.677,44 | 30/04/97 | 60.511 | 6.973.662 |
| | | 1788 | 30/10/97 | 287.677,44 | 30/04/97 | 58.114 | 6.685.984 |
| | | 1789 | 30/11/97 | 287.677,44 | 30/04/97 | 55.717 | 6.398.307 |
| | | 1790 | 30/12/97 | 287.677,44 | 30/04/97 | 53.319 | 6.110.630 |

CRD   capital outstanding
IRD   interest outstanding

418

| | | | | | |
|---|---|---|---|---|---|
| 1791 | 30/01/98 | 287.677,44 | 30/01/98 | 50 922 | 5.822.952 |
| 1792 | 28/02/98 | 287.677,44 | 28/02/98 | 48 525 | 5.535.275 |
| 1793 | 30/03/98 | 287.677,44 | 30/03/98 | 46.127 | 5 247 597 |
| 1794 | 30/04/98 | 287.677,44 | 30/04/98 | 43 730 | 4 959.920 |
| 1795 | 30/05/97 | 287.677,44 | 30/05/97 | 41 333 | 4 672.242 |
| 1796 | 30/06/98 | 287.677,44 | 30/06/98 | 38 935 | 4 384.565 |
| 1797 | 30/07/98 | 287.677,44 | 30/07/98 | 36 538 | 4 096 888 |
| 1798 | 30/08/98 | 287.677,44 | 30/08/98 | 34 141 | 3 809 210 |
| 1799 | 30/09/98 | 287.677,44 | 30/09/98 | 31 743 | 3 521 533 |
| 1800 | 30/10/98 | 287.677,44 | 30/10/98 | 29 346 | 3 233 855 |
| 1801 | 30/11/98 | 287.677,44 | 30/11/98 | 26 949 | 2 946.178 |
| 1802 | 30/12/98 | 287.677,44 | 30/12/98 | 24 551 | 2.658 500 |
| | | | | | |
| 1803 | 30/01/99 | 287.677,44 | 30/01/99 | 22.154 | 2.370.823 |
| 1804 | 28/02/99 | 287.677,44 | 28/02/99 | 19.757 | 2.083.145 |
| 1805 | 30/03/99 | 287.677,44 | 30/03/99 | 17.360 | 1.795.468 |
| 1806 | 30/04/99 | 287.677,44 | 30/04/99 | 14.962 | 1.507.791 |
| 1807 | 30/05/99 | 287.677,44 | 30/05/99 | 12.565 | 1 220.113 |
| 1808 | 30/06/99 | 287.677,44 | 30/06/99 | 10.168 | 932.436 |
| 1809 | 30/07/99 | 287.677,44 | 30/07/99 | 7.770 | 644.758 |
| 1810 | 30/08/99 | 287.677,44 | 30/08/99 | 5.373 | 357.081 |
| 1811 | 30/09/99 | 287.677,44 | 30/08/99 | 2.976 | 69.403 |

Total        23.301.872,64                7.813.559,79

69.403,36

Capital remaining

The PNs in principle of series P n° 1812 to 1850 have not therefore been used

CRD   capital outstanding
IRD   interest outstanding


Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70

419

| Currency | Claim | Promissory note | | | |
|---|---|---|---|---|---|
| | | Number | due date | amount | IRD |
| USD | | | | | |
| | 7.813.560 | 1   1217 | 28/02/93 | 285.280,13 | 7.528.279,66 |
| | | 1218 | 30/03/93 | 282.882,82 | 7.245.396,84 |
| | | 1219 | 30/04/93 | 280.485,51 | 6.964.911,33 |
| | | 1220 | 30/05/93 | 278.088,20 | 6.686.823,13 |
| | | 1221 | 30/06/93 | 275.690,88 | 6.411.132,25 |
| | | 1222 | 30/07/93 | 273.293,57 | 6.137.838,68 |
| | | 1223 | 30/08/93 | 270.896,26 | 5.866.942,42 |
| | | 1224 | 30/09/93 | 268.498,95 | 5.598.443,47 |
| | | 1225 | 30/10/93 | 266.101,64 | 5.332.341,83 |
| | | 1226 | 30/11/93 | 263.704,32 | 5.068.637,51 |
| | | 1227 | 30/12/93 | 261.307,01 | 4.807.330,50 |
| | | 1228 | 30/01/94 | 258.909,70 | 4.548.420,80 |
| | | 1229 | 28/02/94 | 256.512,39 | 4.291.908,41 |
| | | 1230 | 30/03/94 | 254.115,08 | 4.037.793,33 |
| | | 1231 | 30/04/94 | 251.717,76 | 3.786.075,57 |
| | | 1232 | 30/05/94 | 249.320,45 | 3.536.755,12 |
| | | 1233 | 30/06/94 | 246.923,14 | 3.289.831,98 |
| | | 1234 | 30/07/94 | 244.525,83 | 3.045.306,15 |
| | | 1235 | 30/08/94 | 242.128,52 | 2.803.177,63 |
| | | 1236 | 30/09/94 | 239.731,20 | 2.563.446,43 |
| | | 1237 | 30/10/94 | 237.333,89 | 2.326.112,54 |
| | | 1238 | 30/11/94 | 234.936,58 | 2.091.175,96 |
| | | 1239 | 30/12/94 | 232.539,27 | 1.858.636,69 |
| | | 1240 | 30/01/95 | 230.141,95 | 1.628.494,74 |
| | | 1241 | 28/02/95 | 227.744,64 | 1.400.750,10 |
| | | 1242 | 30/03/95 | 225.347,33 | 1.175.402,77 |
| | | 1243 | 30/04/95 | 222.950,02 | 952.452,75 |
| | | 1244 | 30/05/95 | 220.552,71 | 731.900,04 |
| | | 1245 | 30/06/95 | 218.155,39 | 513.744,65 |
| | | 1246 | 30/07/95 | 215.758,08 | 297.986,57 |
| | | 1247 | 30/08/95 | 213.360,77 | 84.625,80 |

| | | |
|---|---|---|
| Total | | 7.728.933,99 |
| | | 84.625,80 |
| Remaining interest | | |

The PNs in interest of series 1 n° 1248 to 1335 vave not therefore been accepted

stamp  certified true copy

Paris, France, 6/12/2000

Horacio A GRIGERA NAON
General Secretary of the
The ICC International Court of Arbitration

CRD   capital outstanding
IRD   interest outstanding



PRES LA COUR D...
Gérard DELAUNAY
Traducteur Assermenté
90, Av. des Champs-Élysées
75008 PARIS
Tél. 01 42 89 40 70
DEP...

420