**EXHIBIT C**

# CREDIT FACILITY AGREEMENT

(Ministry of Finance)

THIS CREDIT FACILITY AGREEMENT dated the 13ᵗʰ day of December 1983 is made between THE PEOPLE'S REPUBLIC OF THE CONGO acting by and through the Directeur Général de la Caisse Congolaise d' Amortissement (the "Borrower")/and MERIDIEN INTERNATIONAL BANK LIMITED ("Meridien"), as Manager and Agent.  Upon the formation of a contract with the Lender as provided herein, this agreement will be the Loan Agreement between the Borrower, the Manager, the Agent and the Lender.

WHEREAS the Borrower wishes to obtain financing or refinancing on a medium term basis for the development and completion of projects in its forestry sector, including the importation or provision of capital equipment, spare parts, technical assistance, freight, insurance and other services and costs related thereto;

WHEREAS the Borrower wishes, to the extent practicable and advisable in the opinion of the Manager in obtaining such financing, to draw upon the institutional and other resources of the United States capital markets;

WHEREAS the Borrower accepts that funding from such sources may require the obtaining of export credit guarantees and other forms of credit insurance and financing structures for successful placement, and the Borrower is willing to take such measures as the Manager may determine are necessary or advisable to effect the same;

WHEREAS the Borrower confirms that the financing is backed by the full faith and credit of the People's Republic of the Congo and that repayment of the amounts financed is not related to the generation of income by equipment purchased or projects financed with the proceeds thereof;

WHEREAS, in view of the commitment of the Borrower that the financing, as a capital markets financing which may not be limited to bank and other institutional sources, shall not be included in any re-scheduling or other arrangement delaying payment of the Borrower's debts generally, Meridien is prepared to use its best efforts to arrange such financing up to an aggregate amount of $30,000,000 and otherwise to act as Manager of the Loan (in such capacity, the "Manager") in full cooperation with the Borrower; and

WHEREAS Meridien is prepared to act as Agent for lenders under the Credit Facility on the terms set out herein (in such capacity, the "Agent");

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I

### APPLICATION OF LOAN AGREEMENT, USE
### OF PROCEEDS, DEFINITIONS AND GENERAL

Section 1.1  Application of Loan Agreement

The representations, warranties, undertakings, covenants and other terms and conditions set forth in this agreement are made, given and agreed by the Borrower for the benefit of the Manager, the Agent, and the Lender, and each such party shall be entitled to rely upon and enforce this agreement and each of its provisions against the Borrower.

Section 1.2  Defined Terms

Unless otherwise defined herein or in another relevant Agreement, the following terms shall have the following respective meanings when used in any Agreement and in notices and other communications between the parties relating to the Credit Facility:

(a) "Advance" means the amount advanced by the Lender to the Borrower at a Drawing.

(b) "Agreement" or "Agreements" means any or all, depending on the context, of this agreement, each Note, the Foreign Exchange Undertaking, and each other document, instrument or agreement signed, accepted, delivered or otherwise agreed by the Borrower and accepted or agreed by the Lender in connection with this agreement. The term "this agreement" means, depending on the context, the Loan Agreement or the arrangements set forth herein between the Borrower and the Manager with respect to the establishment of the Credit Facility.

(c) "Business Day" means a day on which transactions in dollars are conducted in the London interbank market and on which commercial banks and foreign exchange markets are open for business in London and, in any case where a payment is required to be made, New York.

(d) "Commitment" means the obligation of the Lender to make one or more Advances under the Credit Facility up to the aggregate amount specified in the Notice of Commitment.

(a) "Commitment Period" means the period from the date when the Commitment becomes effective until the date when it expires, or any period specified to be a Commitment Period in the Agreement.

(b) "Congo" means the People's Republic of the Congo, including when appropriate, its various ministries, departments, courts and other governmental agencies and subdivisions.

(c) "Credit Facility" means the arrangements pursuant to which the Manager will use its best efforts to establish financing as contemplated in this agreement.

(f) "Default" means the occurrence or non-occurrence of any event which constitutes or, with the giving of notice or the passage of time or both, would constitute an Event of Default.

(i) "$" or "dollars" means the lawful and freely transferable currency of the United States of America.

(j) "Drawing" means each occasion on which the Lender makes an Advance.

(k) "Effective Date" means the date on which this agreement becomes effective as provided in Section 8.16.

(l) "Encumbrance" means any mortgage, pledge, lien, charge (whether fixed or floating), hypothecation, or any title retention or other security interest of any kind.

(m) "Event of Default" means any of the events specified in Section 6.1.

(n) "Fixed Rate Loan" means a Loan which bears interest at a fixed rate per annum as provided in the Notice of Commitment.

(o) "Fixed Rate Note" means a Note in substantially the form of Exhibit C-1.

(p) "Floating Rate Loan" means a Loan which bears interest as provided in clause 2.5(a)(ii).

(q) "Floating Rate Note" means a Note in substantially the form of Exhibit C-2.

(r) "Foreign Exchange Undertaking" means an irrevocable and unconditional commitment in substantially the form of Exhibit D that adequate foreign exchange for the Borrower to make all payments which will become due under or in connection with the Credit Facility will be

budgeted for and made available in sufficient time for each such payment to be made promptly when and as due hereunder.

(s) "Government Agency" means any agency, instrumentality, organ, political subdivision, statutory body or other entity, whether or not a separate legal Person, which is owned or otherwise controlled by the Borrower.

(t) "Interest Payment Date" means August 1, 1984 and each February 1 and August 1 after that, except that whenever an Interest Payment Date would fall on a day which is not a Business Day that Interest Payment Date shall instead be the next succeeding Business Day.

(u) "Interest Period" means the period from the date of the first Drawing until the first Interest Payment Date and each consecutive semi-annual period ending on an Interest Payment Date after that, except that the first Interest Period for any subsequent Advance shall commence on the date that Advance is made.

(v) "Indebtedness" means any indebtedness, guarantee or other liability or obligation (whether direct or contingent) evidenced by a promissory note, billet a ordre, draft, bill of exchange or other instrument or incurred in respect of borrowed money or pursuant to any agreement providing for deferred payment for property, goods or services which (i) provides for, or confers on any Person the right to receive, payment in any currency other than the lawful currency of the Congo or (ii) is payable to a Person resident or having its head office or chief place of business outside the Congo.

(w) "Lender" means the particular Person (i) which offers or has offered or agreed to make or has made a Loan to the Borrower under the Credit Facility, or which subsequently becomes a holder of all or any portion of a loan made under the Credit Facility or any Note, any interest therein, or any other amount payable under any Agreement in respect thereof and (ii) with respect to which the provisions hereof or of any other relevant Agreement are being read at the time of reference; and may include Meridien or any of it affiliates.

(x) "Lending Branch" means the branch of the Lender located at its address as specified in the Notice of Commitment or Note, or any other branch, office or affiliate of the Lender selected by the Lender in its discretion from time to time as provided in Section 2.12.

(y) "LIBOR" means, as to each Interest Period and each one month or other period referred to in subclause 2.5(b)(ii)(B), a rate per annum (rounded up to the nearest 1/8th of 1 percent) equal to the rate at which

dollar deposits are offered by any prime bank in the London interbank market to the Reference Bank, at its request as at 11:00 a.m. (London time) two Business Days prior to the first day of that Interest Period or one-month or other period, for a period equal to that Interest Period or one-month or other period and in amounts equal to the Advance to be made, the Loan, or the overdue instalment, as the case may be.

(z) "Loan" means the aggregate of the Advances outstanding at any time.

(aa) "Loan Agreement" means the contract formed between the Borrower, the Manager, the Agent and the Lender by the Borrower's acceptance of the Lender's offer to make the Loan contained in the Notice of Commitment as provided in paragraph 2.1(c).

(bb) "Margin" means two per cent (2%) per annum.

(cc) "Note" means each promissory note issued to evidence an Advance or portion of the Loan as provided in paragraph 2.2(b).

(dd) "Notice of Commitment" means the offer sent by the Manager to the Borrower on behalf of the Lender as provided in paragraph 2.1(a)

(ee) "Notice of Drawing" means the acceptance given by the Borrower to the Manager of the Lender's offer to form the Loan Agreement.

(ff) "Reference Bank" means the London office of Irving Trust Company.

## Section 1.3   General

The headings in this agreement are used for convenience only and shall be ignored in construing this agreement or any of its provisions.  Each reference in an Agreement to an exhibit or subdivision (e.g., a Section, paragraph or clause) refers to an exhibit or subdivision of that Agreement unless otherwise speci-fied.

## ARTICLE II

## PROVISIONS RELATING TO ADVANCES AND LOANS

Section 2.1   Formation of the Loan Agreement

(a)  Until March 31, 1984, the Manager will use its best efforts to arrange Commitments by prospective lenders under the Credit Facility.  The Manager shall inform the Borrower (with a copy to the Lender) of each Commitment arranged under the Credit Facility by means of a Notice of Commitment given by letter or telex in substantially the form of Exhibit A specifying (i) the amount of the Commitment, (ii) the name and address of the Lender, (iii) the date of the Drawing, (iv) the purpose or purposes for which the Lender has agreed to make the Loan and the manner of application of proceeds, (v) any terms or conditions of the proposed Loan Agreement not reflected in this agreement and (vi) such other information relating to the proposed Commitment as may be necessary or appropriate or which may enable or assist the parties to complete the Drawing.

(b)  As soon as practicable after receipt of a Notice of Commitment (but in any event not less than five (5) Business Days prior to the date specified therein for the Drawing), the Borrower shall confirm its acceptance of the terms specified for the Advance referred to in the Notice of Commitment by delivering to the Manager by letter or telex a Notice of Drawing in substantially the form of Exhibit B.  The Notice of Drawing shall be irrevocable when received by the Manager, and the Manager shall promptly notify the Lender of its receipt of the Notice of Drawing.

(c)  The sending by the Manager of the Notice of Commitment pursuant to paragraph (a) of this section shall have been authorized by the Lender and shall constitute the Lender's offer to make the Advance specified therein pursuant to the terms set out in this agreement and in the Notice of Commitment and the offer of Meridien to act as Manager and Agent under the Loan Agreement proposed thereby.  The giving of the Notice of Drawing by the Borrower pursuant to paragraph (b) of this section shall constitute acceptance of such offer.  Thereafter such Agreements taken together shall constitute the Loan Agreement.  By authorizing the sending of the Notice of Commitment, the Lender represents, warrants, adopts, and otherwise agrees to each and all of the provisions to be observed and performed by the Lender herein or otherwise applicable to it hereunder.  In interpreting and construing the Loan Agreement, to the extent that the terms of the Notice of Commitment may conflict with any term of this agreement the terms of the Notice of Commitment shall prevail.

Agreement.  In the event there are insufficient funds to make all such payments in full, the Agent is irrevocably authorized in its sole discretion to postpone deducting from the proceeds of the Advance credited to such account any amount payable or reimbursable to the Agent or to the Manager or otherwise then payable by the Borrower under any Agreement or in connection with the Credit Facility, and alternatively each of the Manager, the Agent and the Lender is hereby irrevocably authorized and, if requested by the Manager, instructed from time to time to debit any or all such amounts (together with interest which shall accrue on them from the date they are due until the date actually so paid at the applicable rate specified in Section 2.5) to such account or accounts as may be maintained with it from time to time by the Borrower.  The Manager, the Agent and the Lender shall each be entitled to rely upon the certificate of the other as to each amount which may be deducted as provided in the preceding sentence.  Neither the Manager nor the Agent shall be liable in any respect for the failure of the Lender to make an Advance for whatever reason (or lack thereof).

(b)  Each of the Agent and the Lender shall open and maintain on its books in the name of the Borrower a loan account with respect to the Loan and interest from time to time accrued thereon.  The Agent and the Lender shall debit such loan account for each Advance and accrued interest thereon, and shall credit such account for each payment on account of the principal of or interest on the Loan.  Principal amounts debited to such account shall bear interest at the applicable rate determined in accordance with Section 2.5.  The records of the Lender with respect to this loan account shall be prima facie evidence of the Loan and accrued interest thereon.

(c)  Upon the request of the Agent or the Lender made from time to time the Borrower agrees, and hereby irrevocably authorizes the Manager on its behalf, to sign and deliver in exchange for any Note previously issued to the Agent or the Lender, a new Note or Notes in such denomination or denominations and payable to the order of such Person or Persons as the Agent or the Lender, as the case may be, may specify.  The new Note or Notes so issued shall be (i) of the same type (Fixed Rate or Floating Rate) and in substantially the same form as the Note surrendered, (ii) in an aggregate principal amount equal to the principal amount of the Note surrendered, (iii) dated the last date to which interest on the Note surrendered had been paid in full, and (iv) duly signed for and on behalf of the Borrower.  The Agent shall make a notation on any Note or Notes issued in exchange for a Note which has been partly paid of the aggregate amount paid.  The issuance and replacement of any Note (whether under this paragraph or in any other manner) shall not create any novation of the Loan.

Section 2.4   Promise to Repay Loans; Manner of Payment;
Payments Due on Non-Business Days;
Computation; Full Payment

(a)   The Borrower hereby agrees to repay each Loan
in ten (10) equal semi-annual instalments payable on the ten (10)
consecutive Interest Payment Dates commencing with the first
Interest Payment Date.

(b)   The payment of each amount owed by the Bor-
rower under any Agreement shall be made in such fashion that
dollar funds in that amount will be available to the account
specified by the Agent not later than 10:00 a.m. (New York time)
on the date on which the amount is due and payable as provided in
the applicable Agreement.

(c)   If any payment hereunder shall be specified
to be made on a day which is not a Business Day, it shall be made
on the next succeeding Business Day and such extension of time
shall in such case be included in computing interest, if any, in
connection with that payment, provided that, if such extension of
time would cause payment of any amount due hereunder to be made
in the next calendar month, that payment shall instead be made on
the next preceding Business Day.

(d)   All interest shall be computed on the basis
of a year of 360 days and the actual number of days elapsed.

(e)   All payments by the Borrower under any Agree-
ment, whether of principal, interest or any other amount, shall
be made without set-off, counterclaim or any other deduction
whatsoever.

(f)   Each payment of the principal of the Loan
shall be deemed to be an equivalent payment of the principal of
the related Note or Notes and each payment of the principal of a
Note shall be deemed to be an equivalent payment of the principal
of the Loan.

Section 2.5   Interest

(a)   The Borrower shall pay interest for each day
on the unpaid principal amount of the Loan from the date
of the Drawing until such principal amount shall be due and
payable (whether at stated maturity, by acceleration or other-
wise):

(i)   in the case of a Fixed Rate Loan, at the
rate per annum specified in the Notice of Commitment, or

(ii)   in the case of a Floating Rate Loan, a
rate per annum during each Interest Period equal to the sum
of LIBOR plus the Margin.   The Agent shall notify the Bor-
rower of the interest rate applicable during each Interest
Period promptly upon determination thereof.

Interest accruing under this paragraph shall be payable on each Interest Payment Date and at maturity.

(b)  If the Borrower shall fail to pay when due all or any portion of the principal amount of or interest on the Loan or any other amount due under any Agreement, such unpaid amount shall, to the extent permitted by applicable law, bear interest, payable upon demand, for each day from the date it was due until actually paid, at a rate per annum equal to the sum of (i) one per cent (1%) per annum plus (ii) the higher of:

(A)  in the case of a Fixed Rate Loan, the rate per annum applicable to the Loan as provided in clause (a)(i) of this section or, in the case of a Floating Rate Loan, the sum of the LIBOR for the Interest Period in effect when such amount became due plus the Margin, or

(B)  the sum of LIBOR for each successive one month or other period chosen by the Agent in its discretion from time to time after the due date of such amount plus the Margin.

If the Agent (after consultation with the Lender and the Reference Bank) determines that (x) by reason of circumstances affecting the London interbank market for dollar deposits, adequate and reasonable means do not exist for ascertaining LIBOR, or (y) deposits of dollars are not available to the Lender in such market in the ordinary course of business in sufficient amounts to enable it to continue to fund such overdue amount, or (z) LIBOR does not represent the effective cost of funding such overdue amount, then the interest rate with respect to such overdue amount shall be a rate per annum which is the sum of (A) the effective cost of maintaining or funding that amount from such sources and for such periods as the Lender may from time to time determine, (B) the Margin and (C) one per cent (1%) per annum.

Section 2.6  **Prepayments**

The Borrower shall have the right to prepay the Loan and the Notes prior to maturity only (i) with the written agreement of the Lender, (ii) upon payment by the Borrower of such premium as the Agent shall determine to be necessary to compensate the Agent and the Lender for all costs, losses and out-of-pocket expenses which the Agent and the Lender may incur in connection with such prepayment, including any prepayment premium payable to Persons providing funding for the Loan, and losses and expenses of the nature described in paragraph 2.11(b), and (iii) upon at least 60 Business Days prior notice to the Agent stating the date of the prepayment and the amount to be prepaid, provided that any partial prepayment shall be in a minimum amount mutually agreed by the Borrower, the Lender and the Agent.  Partial prepayments shall be applied to instalments of principal in the inverse order

of their maturity. Any notice of prepayment given under this section shall be irrevocable and, once such notice is given, the amount to be prepaid shall be due and payable on the date designated therein.

## Section 2.7   Fees

The Borrower agrees to pay to the Agent, for the account of the Manager, the Agent or the Lender, as the Manager in its discretion may determine, such management, commitment and other fees with respect to the Credit Facility and the Loan in such amounts and on such terms as the Borrower and the Manager have agreed or shall from time to time agree.

## Section 2.8   Taxes and Other Charges

(a)   The Borrower agrees to pay principal, interest, fees and all other amounts payable under the Agreements free and clear of and without deduction for, and to reimburse the Lender upon its demand for any payment made by it with respect to, any and all present and future taxes, levies, imposts, deductions, charges, withholdings, duties and fees (excluding, however, income and franchise taxes imposed upon the Lender by the jurisdictions and political subdivisions in which it is located or under the laws of which it is organized) imposed on or in connection with the payment of any amount required to be paid to the Lender pursuant to any Agreement or imposed with respect to the preparation, execution, delivery, registration, performance, amendment or enforcement of any Agreement (hereinafter referred to as "Taxes"), and any taxes, withholdings or fees which shall be due with respect to the payment of or reimbursement for any Taxes by the Borrower.

(b)   If the Borrower is prevented by law from paying, causing to be paid or remitting any Taxes, the interest, fees and other amounts payable under the Agreements shall, to the extent permitted by applicable law, be increased to such amount as is necessary to yield and remit to the Lender effective interest, fees and other amounts at the applicable rate or rates specified in Section 2.5, after provision for payment of such Taxes. The Borrower shall, at the request of the Lender, execute and deliver to the Lender such further instruments as may be necessary or desirable to give full force and effect to such increase in the rate of interest.

(c)   In the event that the Borrower shall pay any Taxes at any time, within 30 days after the date of each such payment the Borrower will furnish to the Agent or the Lender the original or a certified copy of a receipt for the payment of such Taxes.



Section 2.9   Change in Law; Increased Costs

If, due to either (i) the introduction of or any change in or in the interpretation of any law, regulation or guideline or (ii) the compliance with any request from any central bank or other governmental authority (whether or not having the force of law, but only if compliance therewith is in accordance with normal banking or financial practice in the jurisdiction involved),

(i)   it shall be unlawful or contrary to any such law, regulation, guideline or request for the Lender to maintain or give effect to all or any part of its obligations under any Agreement, or to make its Advance or maintain all or any part of the Loan, then the Commitment shall be reduced to such extent, and the Borrower shall, upon demand by the Lender, within 15 days of demand or such longer period as the Lender may determine that such law, regulation or guideline or such governmental authority permits, repay the Loan in full or, if the Lender so specifies, in part in the principal amount requested by the Lender, together with accrued interest thereon; or

(ii)   there shall be any increase in the cost (including, but not limited to, any decrease in the amount of principal, premium, if any, or interest receivable) to the Lender of agreeing to make or making, funding or maintaining its Loan, then the Borrower shall from time to time, upon demand by the Lender (with a copy of such demand to the Agent), pay to the Agent for account of the Lender additional amounts sufficient to indemnify the Lender against such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower and the Agent by the Lender, shall be conclusive and binding for all purposes, absent manifest error.

Section 2.10   Alternative Interest Rates

In the case of a Floating Rate Loan:

(a)   if on or before any date on which an interest rate is to be determined for purposes of clause 2.5(a)(ii) either (1) the Agent determines that deposits in dollars are not being offered by the Reference Bank to the Lender in the London interbank market for the applicable Interest Period or in the applicable amounts, or (ii) the Agent determines that LIBOR will not adequately reflect the cost to the Lender of making, funding, or maintaining the Loan for the applicable Interest Period, the Agent shall forthwith give notice of such event to the Borrower, stating the                    at any following the date of any such notice, the Agent (after consultation with the Lender) and the Borrower shall enter into negotiations in good faith with a view to agreeing to an alternative basis (the "Substitute Rate") acceptable to the Borrower and the Lender for determining the interest rate which shall be applicable to the Loan and the

-12-

Note during the Interest Period and which shall reflect the cost
to the Lender of funding the Loan for that Interest Period plus
the Margin. If, at the expiration of 30 days from the giving of
such notice by the Agent, the Agent and the Borrower have agreed
to a Substitute Rate, the Substitute Rate shall apply to the Loan
and the Note with effect from the beginning of that Interest
Period.

(b)  If, at the expiration of 30 days from the
date of any notice given by the Agent provided in the preceding
paragraph (a), the Agent and the Borrower shall not have agreed
to a Substitute Rate, the Agent shall (after consultation with
the Lender) give notice to the Borrower of the rate of interest
for the applicable Interest Period at which the Lender is pre-
pared to lend an amount equal to the then unpaid amount of the
Loan. The Borrower may, within 15 days after the giving of any
such notice by the Agent, give notice (the giving of which shall
be irrevocable) to the Agent stating its election to prepay the
Loan in full and the date the prepayment shall be made. Such
prepayment may be made on a Business Day which shall be not less
than seven nor more than 40 days after the date of such notice of
election but shall otherwise comply with the requirements of
Section 2.6 and, for purposes of Section 2.6, interest on the
Loan and the Note for the period from the last Interest Payment
Date until the the date on which the Loan is so prepaid shall
equal the sum of (i) the cost to the Lender of funding the Loan
for that period plus the Margin and (ii) any other amounts re-
quired hereunder (all such amounts being determined by the Agent
and the Lender and stated in a notice given by the Agent to the
Borrower). If the Borrower does not so elect to prepay, the rate
of interest applicable to the Loan in respect of such Interest
Period shall be the rate as determined pursuant to the first
sentence of this paragraph (b), and the Agent shall then promptly
confirm this to the Borrower and the Lender.

Section 2.11  <u>Reimbursement of Certain Costs</u>

(a)  The Borrower agrees to reimburse the Agent
and the Lender upon demand for all losses and out-of-pocket
expenses which they may sustain or incur in connection with the
Borrower's (i) failure to borrow pursuant to a Notice of Drawing
(whether by reason of the Borrower's election not to proceed or
the non-fulfilment of any of the conditions set forth in any
Agreement or otherwise), (ii) repayment of overdue amounts, (iii)
repayment upon acceleration, (iv) repayment pursuant to Section
2.9 or 2.10, or (v) failure to make any payment of principal when
due (whether at stated maturity, by notice of prepayment or
acceleration or otherwise).

(b)  The losses and expenses referred to in
clauses (i) through (iv) of the preceding paragraph (a) shall
include, but not be limited to, expenses incurred by the Lender
in connection with the re-employment of funds repaid or not
borrowed, as the case may be, in an amount equal to the excess of
(i) the interest that would have been received from the Borrower

on the amounts to be re-employed during the period in question
had the Borrower not failed to borrow or not repaid such amounts,
as the case may be, over (ii) the return actually obtained upon
re-employment of such amounts from the date of such failure to
borrow or repayment, as the case may be, until the end of the
relevant period.

## Section 2.12    Lending Branch

        The Lender shall have the right to make and book the
Loan from any lending Branch and to transfer the Loan from time
to time to any Lending Branch for whose account all payments of
principal, interest and other amounts payable to the Lender will
thereafter be made.  Any such change or transfer shall become
effective upon giving notice to the Agent and the Borrower of the
address of the new Lending Branch.

## Section 2.13    Funding by Lender

        The Borrower hereby requests, approves and consents
that, as an alternative to the London interbank market, to the
extent that the Manager and the Lender deem practicable and
advisable in the circumstances (but nevertheless in their sole
discretion) loans under the Credit Facility should be funded with
dollars available from the institutional and other resources of
the United States capital markets or from other appropriate
sources.  In consequence, the Borrower hereby (i) authorizes the
Manager, the Agent and the Lender to develop, structure and
implement any reasonable method for accomplishing such funding,
and (ii) agrees to (A) accept all reasonable methods of funding,
(B) give all reasonable assistance which any of the Manager, the
Agent or the Lender may request in establishing any such funding
or method thereof and (C) indemnify and hold the Manager, the
Agent and the Lender harmless from and against, and to reimburse
each of them on demand in the amount of, all losses, costs,
damages, expenses, disbursements, liabilities, penalties, suits,
actions, judgments, claims or other obligations whatsoever (col-
lectively called "Damages" herein) which may be incurred or
sustained by or made against any of them as a consequence of
utilizing any such funding, except for Damages caused by the
gross negligence or wilful misconduct of the party claiming such
indemnification.

(d)  (i) Neither the Constitution of the Borrower, nor any law, decree, regulation or similar enactment of the Borrower, and (ii) no provision of any treaty or of any other instrument, agreement or other obligation made with another nation or with the International Monetary Fund ("IMF") the International Bank for Reconstruction and Development or any other supranational organization or agency (herein called an "International Agreement") or of any judgment, injunction, order or award of any judicial, administrative, governmental, arbitration or other authority or body by which the Borrower or any of its assets is bound, will be contravened by the execution and delivery of any Agreement, by the consummation of any of the transactions contemplated thereby, or by the performance or observance of any of the obligations expressed to be assumed by the Borrower in or pursuant to any such Agreement or transaction.  The borrowing of the maximum principal amount of the Credit Facility will not place any limitation on the Borrower or on the right or ability of its officers to exercise its powers or exceed their power or authority to act on the Borrower's behalf.

(e)  The Minister of Finance and each other officer of the Borrower who shall execute and deliver any Agreement, including any Notice of Drawing, any Note and any other notice, letter or other communication required under or otherwise related to any Agreement or any transaction contemplated hereby, are and will be fully authorized to execute the same for and on behalf of the Borrower.

(f)  All laws, decrees, authorizations, approvals, licences, registrations, consents or declarations from all legislative bodies of government, ministries, agencies or other authorities required by the laws of the Congo or otherwise appropriate in order for the Borrower (i) to borrow the maximum principal amount of the Credit Facility, to incur the obligations expressed to be assumed by it in or pursuant to any Agreement and to engage in the transactions contemplated thereby, (ii) to execute and deliver all other documents and instruments to be delivered by it pursuant to any Agreement, (iii) to perform and observe the terms and provisions of each Agreement and (iv) to render each Agreement the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms and admissible in evidence, have been duly obtained or effected and are in full force and effect.

(g)  The Borrower is not in breach of any of the terms, covenants, conditions and provisions of, or in default under, and has not done or omitted to do anything which constitutes or, with the giving of notice or lapse of time or both, might constitute a breach of or default under any law, decree, regulation or similar enactment, any International Agreement or any judgment, injunction, order or award of any judicial, administrative, governmental or other authority or of any arbitrator by which it or any of its assets is bound.

h) No litigation, arbitration or administrative or other proceeding before or of any judicial, administrative, governmental or other authority or arbitrator is taking place, pending or, to the best of the Borrower's knowledge and belief, threatened against the Borrower or any of its assets.

(i) No Default has occurred and is continuing.

(j) No Agreement nor any of the arrangements contemplated by any Agreement is or will be subject to any registration or stamp or other similar tax or duty levied by or on behalf of the Congo or any political sub-division or taxing authority thereof or therein.

(k) All accounts, reports and other information supplied by or on behalf of the Borrower to the Manager, the Agent, the Lender or any of them relating to the Borrower or otherwise relevant to the matters contemplated by any Agreement are and will be true and complete in all respects and the Borrower (having made all reasonable enquiries) is not aware of any facts or matters not disclosed the disclosure of which might adversely affect the decision of any Person considering whether or not to extend credit to the Borrower.  The proceeds of the Loan will be and have been applied to the purposes stated in the preamble of this agreement and elsewhere herein.

(l) All payments to be made by the Borrower under any Agreement or in connection with any transaction contemplated thereby may be made in full, free and clear of and without any deductions of or on account of any taxes, levies, imposts, duties, charges, fees, deductions or withholdings, restrictions or conditions of any nature imposed by or on behalf of the Congo or any political sub-division or taxing authority thereof or therein.

(m) The choice of New York law as the law by which the Agreements shall be governed and construed is a valid choice of law, and in any proceedings taken in the Congo for the enforcement of any Agreement such choice of New York law and any judgment obtained in a court of competent jurisdiction will be recognized, and the Borrower undertakes to take all necessary steps to ensure the enforcement of the Agreements in any such proceedings.

(n) The Borrower is a member in good standing of the IMF and no event or condition has occurred which would enable the IMF to suspend or limit the Borrower's use of the general resources of the IMF or to declare the Borrower ineligible to use such resources or suspend its quota of Special Drawing Rights, and the IMF has not advised the Borrower that it is currently considering taking any such action.

## Section 3.2   Statements Deemed Representations

All statements contained in any report, financial statement, legal opinion or other document delivered by or on behalf of the Borrower to the Manager, the Agent, or the Lender in connection with any Agreement shall be deemed to be representations made by the Borrower in connection with this agreement.

## Section 3.3   Warranty of Representations; Renewal
## of Representations and Warranties

The Borrower warrants to each of the Manager, the Agent and the Lender that (i) all representations made by the Borrower in or in connection with any Agreement shall be true and correct when communicated to the Manager, the Agent and/or the Lender, as the case may be, and (ii) all representations made by the Borrower in any Agreement shall be true and correct (A) on the date that Agreement, signed by the Borrower, is delivered to the Manager, the Agent and/or the Lender, as the case may be, on behalf of the Borrower, and (B) with the exception of any representation as to financial data, on, and as of, the first day of each Interest Period.

## Section 3.4   Survival of Representations and
## Warranties

All representations and warranties by the Borrower made in or in connection with each Agreement shall survive the signing and delivery of that and each other Agreement and any investigation by or on behalf of the Manager, the Agent or the Lender.

## ARTICLE IV

## CONDITIONS PRECEDENT

## Section 4.1   Conditions

The obligations of the Manager under the Credit Facility, and the Commitment of the Lender, are subject to the fulfilment of each of the following conditions:

(a)  At least 5 Business Days prior to the first Drawing under the Credit Facility the Agent shall have received, in form and substance satisfactory to it, each of the following:

(i)  Complete and correct copies, certified by an appropriate official of the Borrower, of all laws, decrees, regulations, enactments, declarations, consents, authorizations and other approvals necessary to the imple-

mentation and performance of this agreement and the Credit
Facility and to the carrying out of the transactions contemplated hereby.

(ii)   The Foreign Exchange Undertaking, duly
signed and endorsed by each appropriate financial, bugetary
and other authority of the Congo.

(iii)   Evidence satisfactory to the Agent
that all other acts and things (if any) required to be done
in or under the laws of the Congo have been done for the due
execution, delivery and performance by the Borrower of this
agreement, the Notes and the Foreign Exchange Undertaking,
for the borrowing and repayment of the maximum principal
amount of the Credit Facility, for the payment of all sums
stipulated in this agreement, for any other matter or thing
contemplated by this agreement and to render this and each
other Agreement legal, valid, binding, enforceable and
admissible in evidence.

(iv)   Specimen signatures (authenticated to
the satisfaction of the Agent) of the individual or individuals who signed this agreement, the Notes and the
Foreign Exchange Undertaking on behalf of the Borrower, and
of each other individual authorized to sign and deliver
Notices of Drawing and other Agreements, notices and other
communications on behalf of the Borrower.

(v)   The written opinion *or his authorized representative* of the President of
the Supreme Court of the Congo, substantially in the form
set out in Exhibit E and covering such other matters as
the Agent may reasonably request.

(vi)   The written opinion of John C.
Stotsenburg, Esq., special counsel to the Manager, the Agent
and the Lender in New York, in form and substance satisfactory to the Agent.

(vii)   Letters or endorsements in form and
substance satisfactory to the Agent from each of the Persons
appointed by the Borrower as its agent for service of process as provided in paragraph 8.6(b) duly accepting their
appointments.

(b)   At the time of each Drawing, the Borrower
shall have complied with all of its obligations under the Agreements referred to in paragraph 2.2(b), and each of the following
other conditions shall have been fulfilled:

(i)  All of the representations and warranties of the Borrower in or in connection with each Agreement shall be true and correct at the time of the Drawing as though made at and as of such time.

(ii)  All legal matters incident to the transactions contemplated by the Agreements shall be satisfactory to the various counsel for the Agent and the Lender.

(iii)  There shall have been no material adverse change in the business, operations, revenues, assets, liabilities or financial condition of the Borrower, the revenues, foreign exchange reserves or economic condition of the Congo generally, or the ability of the Congo to pay the principal of or interest on any Indebtedness, and neither the Congo nor any Government Agency shall have declared any moratorium of or suspended payments on any of its Indebtedness.

(iv)  The Agent shall have received in form and substance satisfactory to it, all such other certificates, opinions, documents, governmental decrees and information as it may reasonably request.

(c)  The Agent may, without waiving any condition, consider the conditions set forth in clauses (i) and (iii) of paragraph 4.1(b) fulfilled if written notice to the contrary is not received by the Agent from the Borrower.

## ARTICLE V

### COVENANTS AND UNDERTAKINGS

### Section 5.1   Covenants of the Borrower

So long as any Loan or other obligation of the Borrower under the Agreements is outstanding or unpaid or the Lender shall have any Commitment, the Borrower covenants, agrees and undertakes that:

(a)  All the obligations and liabilities expressed to be assumed by the Borrower in or pursuant to any Agreement will rank ~~either~~ pari passu with ~~or in priority to~~ all other Indebtedness of the Borrower.

(b)  Immediately upon becoming aware of any Default, the Borrower shall notify the Agent and the Lender by telex stating any action taken or proposed to be taken in connection therewith.

(c)  The Borrower shall obtain and maintain in full force and effect and comply with the terms of all authorizations, approvals, licences, registrations, consents and declarations from all legislative bodies of the government, ministries, agencies and other authorities from time to time required by the laws of the Congo or otherwise appropriate in order (i) for the Borrower (A) to borrow the maximum principal amount of the Credit Facility and to incur the obligations and liabilities expressed to be assumed by it in or pursuant to this Agreement, (B) to execute and deliver all other documents and instruments to be delivered by it pursuant to any Agreement, and (C) to perform and observe the terms and provisions of any Agreement and (ii) to render this Agreement the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms and admissible in evidence.

(d) The Borrower will promptly give written notice to the Agent and the Lender of any litigation or arbitration or administrative or other proceeding before or of any judicial, administrative, governmental or other authority or arbitrator, of any dispute with any governmental or regulatory body or law enforcement authority, ~~of any labor dispute~~ or of any other event which has or may have a material adverse effect upon the business or assets of the Borrower.

(e)  The Borrower shall maintain its membership in good standing in the IMF, and shall comply with the requirements of its Constitution and with all International Agreements and with all applicable judgments, injunctions and other orders or awards of judicial, administrative, governmental and other authorities and arbitrators, non-compliance with which might adversely affect the credit of the Borrower or its ability duly to perform and observe the obligations and liabilities expressed

to be assumed by the Borrower in or pursuant to any Agreement or
to repay any other Indebtedness at its stated maturity.

(f)  The Borrower shall promptly furnish to the
Agent such opinions of counsel, evidence of authority, authenti-
cated specimen signatures and other documents and information
as the Agent may request and shall perform at the request of the
Agent all such other acts as may be necessary or appropriate to
carry out the intent of this Agreement.

(g)  The Borrower shall not create or permit to
subsist any Encumbrance over all or any material portion of the
present or future revenues or assets of the Borrower.

## ARTICLE VI

## DEFAULT

### Section 6.1  Events of Default

Each of the following shall constitute an Event of
Default whatever the reason for such event and whether it shall
be voluntary or involuntary or be effected by operation of law or
pursuant to any judgment, decree or order of any court or any
order, rule, or regulation of any administrative or governmental
body:

(a)  The Borrower shall fail to pay any sum ex-
pressed to be payable by it in or pursuant to any Agreement at
the time and otherwise in the manner specified in that Agreement.

(b)  The Borrower shall for any reason fail duly
and promptly to perform or observe any of the other obligations
or undertakings expressed to be binding on or undertaken by it in
or pursuant to any Agreement.

(c)  Any representation or warranty given or made
by the Borrower in or in connection with any Agreement shall
prove to be or would, if given or made at any time after the date
of that Agreement by reference to the facts subsisting at that
time, be incorrect or untrue in any respect.

(d)  Any Indebtedness of the Borrower shall not be
paid on its due date (or within any applicable period of grace
allowed by the terms of the agreement or instrument constituting
or evidencing the same) or, if payable or repayable on demand,
shall not be paid or repaid when demanded or shall become due or
capable of being declared due prior to its stated maturity.

(e)   A moratorium shall be declared on the payment of any Indebtedness of the Borrower or the Borrower shall become unable to pay its debts as they become due or shall propose or enter into any arrangement or composition for the benefit of one or more of its creditors or shall commence negotiations with one or more if its creditors with a view to a re-adjustment or re-scheduling of any of its Indebtedness.

(f)   The Congo shall cease to be a member in good standing of the International Monetary Fund, the International Bank for Reconstruction and Development (or any successors of either of them) or the CFA Franc zone.

(g)   Any action or proceeding of or before any judicial, administrative, governmental or other authority or arbitrator shall be commenced (and shall not be stayed or dis-charged within 30 days thereafter) to enjoin or restrain the performance or observance by the Borrower of the terms of any Agreement or in any manner to question the right and power of the Borrower to enter into, exercise its rights under and perform and observe the terms of any Agreement or the legality, validity, enforceability, binding nature or admissibility in evidence of any Agreement.

(h)   It shall become or prove to be unlawful or impossible for the Borrower duly and promptly to perform or observe any of the obligations or undertakings expressed to be binding on or undertaken by it in or pursuant to any Agreement or for any other reason whatsoever any Agreement shall cease to be in full force and effect and be binding and enforceable in accor-dance with its terms.

(i)   Any statement in any of the opinions de-livered pursuant to Section 4.1 shall prove to be or would, if given at any time after the date of such opinion by reference to the facts and laws subsisting at that time be incorrect or untrue in any respect.

(j)   Any Encumbrance shall be created or shall arise over all or any material portion of the present or future revenues or assets of the Borrower.

(k)   Any adverse circumstances shall arise which, in the opinion of the Lender communicated by notice given to the Borrower, gives reasonable grounds for belief that the Borrower may not (or may be unable to) perform any of its obligations under or in connection with any Agreement.

(l)   Any other event shall occur or any legisla-tion shall be enacted or decree adopted in the Congo which, in the opinion of the Lender communicated by notice given to the Borrower, would or might materially and adversely affect the interests of the Lender under any Agreement.

## Section 6.2   Acceleration of Maturity

Upon the occurrence of any Event of Default the Lender may, by notice to the Borrower, declare the entire unpaid principal amount of the Loan and the Note or Notes, all interest accrued and unpaid thereon, and all other amounts payable under the Agreements to be forthwith due and payable, whereupon the Loan and the Notes, all such accrued interest and all such other amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained in any Agreement to the contrary notwithstanding.

# ARTICLE VII

## THE AGENT

### Section 7.1  Appointment of Agent

The Lender hereby appoints the Agent to act as its lawful attorney and agent under the Agreements and in connection with the Loan Agreement and irrevocably authorizes the Agent to take such action and to exercise such rights, powers and discretions as are specifically delegated to the Agent therein, together with all rights, powers and discretions as are reasonably incidental thereto and to the transactions contemplated thereby and related thereto.  The Agent may perform any of its functions and duties by or through its directors, officers, employees or agents.  In performing its functions and duties the Agent shall be deemed not to be acting as a trustee for the Lender or to have assumed any relationship of trust or partnership with or for the Lender or the Borrower.

### Section 7.2  Agent's Liability

Neither the Agent nor any of its directors, officers, employees or agents shall be liable for any action taken or omitted hereunder or under any Agreement, except for gross negligence or wilful misconduct; or be responsible for any covenants or other obligations of the Borrower or the Lender under any Agreement or any recitals, representations or warranties contained or provided for in any Agreement, for the execution or validity of any Agreement or the failure of any party to any Agreement to receive any telegram or telex sent or any notice, report, instrument or paper entrusted to the mails; or be required to made any inquiry concerning or to take any action to enforce performance of any Agreement by the Borrower or the Lender.

### Section 7.3  Interest Holders

The Agent may treat the Lender, or the Person designated in the last notice filed with it under this section, as the holder of all of the interests of the Lender or that Person in its Loan and in the Note(s) until written notice of transfer, signed by such Lender (or the Person designated in the last such notice filed with the Agent) and by the Person designated as transferee in such a notice, and in form and substance satisfactory to the Agent, shall have been filed with the Agent.

### Section 7.4   Consultation with Counsel

The Agent may consult with legal counsel selected by it and shall not be liable for any action taken or suffered by it in good faith in accordance with the advice or opinion of such counsel.

### Section 7.5   Documents

The Agent shall not be under a duty to examine into or pass upon the validity, effectiveness or genuineness of any Agreement, and the Agent shall be entitled to assume that the same are valid, effective and genuine, have been signed or sent by the proper parties and are what they purport to be.

### Section 7.6   Agent and Affiliates

With respect to any participation in the Loan, the Agent shall have the same rights and powers hereunder as the Lender and may exercise the same as though it were not the Agent, and the Agent and its affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower, including arrangements relating to the custody and disbursement of funds held by it for the Borrower's account, as if it were not the Agent and without any obligation to account therefor.

### Section 7.7   Responsibility of Agent

The duties and obligations of the Agent are only those expressly set forth in this agreement. The Agent shall be entitled to assume that no Default has occurred and is continuing, unless the Agent has been notified by the Borrower of such fact, or has been notified by the Lender that the Lender considers that a Default (specifying in detail the nature thereof) has occurred and is continuing. The Agent shall have no duty to investigate whether a Default has occurred.

### Section 7.8   Action by Agent

(a)   The Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights which may be vested in it by, and with respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, any Agreement, unless the Agent shall have been instructed by the Lender to exercise such rights or to take or refrain from taking such action; provided that the Agent shall not exercise any rights under Article VI of this agreement without the request of the Lender. The Agent shall incur no liability under or in respect of any Agreement

with respect to anything which it may do or refrain from doing in the reasonable exercise of its judgment or which may seem to it to be necessary or desirable in the premises, except for its gross negligence or wilful misconduct.

(b)   The Agent shall in all cases be fully protected in acting or refraining from acting under any Agreement in accordance with the instructions of the Lender, and any action taken or failure to act pursuant to such instructions shall be binding on the Lender.

### Section 7.9   Notice of Default

The Lender shall give to the Agent a copy of any notice given to the Borrower under Section 6.2, not later than the time when it gives such notice to the Borrower.  In the event that the Agent shall have been notified of any Default, the Agent shall promptly notify the Lender and shall take such action and assert such rights under this Agreement as the Lender may reasonably request in writing, and the Agent shall not be subject to any liability by reason of its acting pursuant to any such request. If the Lender shall fail for ten days after receipt of the notice of any Default to request the Agent to take action or to assert rights under any Agreement in respect of such Default, the Agent may, but shall not be required to, take such action and assert such rights (other than rights under Article VI hereof) as it deems in its discretion to be advisable for the protection of the Lender.

### Section 7.10   Responsibility Disclaimed

The Agent shall be under no liability or responsibility whatsoever:

(a)   To the Borrower or any other Person as a consequence of any failure or delay in performance by, or any breach by, the Lender of any of its obligations under any Agreement;

(b)   To the Lender as a consequence of any failure or delay in performance by, or any breach by, the Borrower of any of its obligations under any Agreement; or

(c)   To the Lender, for any statements, representations or warranties in any Agreement or for the validity, effectiveness, enforceability or sufficiency of any Agreement.

### Section 7.11   Indemnification

The Lender will indemnify the Agent (to the extent not reimbursed by the Borrower) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or

nature whatsoever which may be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of any Agreement or any action taken or omitted by the Agent under any Agreement, including expenses incurred by the Agent in taking any steps to enforce any Agreement, except that the Lender shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements resulting from the Agent's gross negligence or wilful misconduct.

## Section 7.12   Credit Decision

The Lender represent and warrant to the Agent and the Manager that:

(a)   In making its decision to enter into this agreement and to make the Loan it has independently taken whatever steps it considers necessary to evaluate the financial condition and affairs of the Borrower, it has made an independent credit judgment and, to the extent it has relied to any degree whatsoever upon any information furnished by the Manager or the Agent, it has done so at its own risk and in the full knowledge that neither the Manager nor the Agent is able to or does warrant the accuracy or completeness of any such information; and

(b)   So long as any portion of the Loan remains outstanding, the Lender will continue to make its own independent evaluation of the financial condition and affairs of the Borrower.

## Section 7.13   Successor Agent

Subject to the appointment and acceptance of a successor Agent as provided below, the Agent may resign at any time by giving written notice thereof to the Lender and the Borrower. Upon any such resignation, the Lender shall have the right to appoint a successor Agent acceptable to the Borrower (whose consent shall not be unreasonably withheld). If no such successor Agent shall have been so appointed within 30 days after the retiring Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the Lender appoint a successor Agent which shall be a commercial Lender acceptable to the Borrower (whose consent shall not be unreasonably withheld). Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges, duties and obligations of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. After any retiring Agent's resignation hereunder as Agent, the provisions of this Article VII shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Agent.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1   **Reimbursement of Expenses**

(a)   All statements, reports, certificates, opinions and other documents or information furnished by or on behalf of the Borrower under any Agreement shall be supplied without cost to the Manager, the Agent or the Lender.

(b)   The Borrower agrees to reimburse the Manager and the Agent on demand (and in the currency of the invoice therefor) for all costs and expenses, including the cost of any Eximbank or other credit insurance/guarantee fees incurred for the benefit of the Lender, legal fees and printing, communications, translation and travel expenses, incurred in connection with the establishment and management of the Credit Facility, the structuring, arrangement and negotiation of loans made thereunder, and the preparation, execution, delivery, administration, performance and enforcement of the Agreements, any waiver or consent given or sought thereunder, and the protection or preservation of any right or claim of the Manager, the Agent or the Lender under any Agreement.

Section 8.2   **No Waiver of Rights**

No failure or delay on the part of the Agent or the Lender in exercising any right, power or remedy under any Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy under any Agreement preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The rights, powers and remedies provided in the Agreement are cumulative and not exclusive of any rights, powers or remedies provided by law or equity.

Section 8.3   **Disposition of Indebtedness**

(a)   The Borrower agrees not to assign or transfer any of its rights or delegate any of its obligations under any Agreement without the prior written consent of the Lender.

(b)   The Lender may at any time sell, assign, transfer, negotiate, grant participations in or otherwise transfer or dispose of all or any portion of the Loan and any Note. The Borrower shall, at the request of the Lender or any transferee

or assignee of the Lender's interest in the Loan, any Note or any other amount owed to the Lender by the Borrower under any Agreement (each of which is hereafter referred to as an "Assignee"), execute and deliver to the Lender or such Assignee any and all further instruments as may be necessary or desirable to give full force and effect to such disposition.

(c)  Any Assignee shall be entitled to the benefits of the provisions of the Agreements as fully as though it were an original party to the Agreements and the Lender thereunder, and for such purpose the term "Lender", whenever used in the Agreements, shall, unless the context otherwise requires, include and refer to each Assignee.

(d)  In addition to any right which the Lender or any participant may have at law, the Borrower hereby authorizes the Lender and each participant at any time and from time to time after the occurrence of any Event of Default to set-off and to appropriate and apply any and all deposits and any other indebtedness owing to or for the account of the Borrower held or owing by the Lender or such participant, as the case may be, against and on account of the aggregate amount of principal, interest, commitment fees and any other amounts payable to the Lender or such participant under any Agreement, whether or not the same shall be due and payable.

(e)  Except as specifically set forth in paragraph 8.3(d), nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the parties to the Loan Agreement, their successors and their assignees permitted hereunder any benefit or any legal or equitable right, remedy or other claim hereunder.

Section 8.4  Notices

(a)  Except as provided in the following paragraph, all notices and other communications under the Agreements shall be deemed to have been duly given when (i) delivered in person to the party to be notified or (ii) deposited in the mails (by registered air mail, postage prepaid), transmitted by telex or delivered to the telegraph office with transmittal charges prepaid, in each case properly addressed.  For purposes of clause (ii) of the preceding sentence, the addresses of the parties, unless changed as provided herein, shall be as follows:  (i) in the case of notices to the Borrower, the Manager and the Agent,

at their respective addresses specified below and (ii) in the
case of notices to the Lender, to the Lender at its address as
given in the Notice of Commitment.

The Borrower:
                              Caisse Congolaise d'Amortissement

                              ~~Ministere des Finances~~

                              Ministere des Finances
                              Brazzaville , B.P. 2090
                              People's Republic of
                                  the Congo

                              Telex No. 5299 KG

The Manager and
    the Agent:
                              Meridien International Bank
                                    Limited
                              West Bay Street
                              P.O. Box N3902
                              Nassau, N.P. BAHAMAS

                              Attn:  Mr. Douglas L. Montgomery
                                      President

                            Telex No.  NS  111

      (b)  Notices to the Agent under Article II or VII
and any notices so designated in any Agreement shall be deemed to
have been duly given only when actually received by the Agent
or, in the case of any such other notice, the party to whom the
notice is given.

      (c)  The address for notice of any party may be
changed by notice given by that party to each other party which
it wishes to use the changed address.

## Section 8.5   Governing Law

    The Agreements shall be deemed to be contracts under,
and shall be governed by and construed in accordance with, the
internal substantive law, excluding the choice of law rules,
of the State of New York, United States of America.

## Section 8.6   Jurisdiction and Venue

      (a)  The Borrower hereby irrevocably agrees that
any legal action or proceeding against the Borrower with respect
to any Agreement may be brought in any court of competent
jurisdiction of the United States of America or of the State of
New York, located in the City of New York, State of New York,
United States of America or at the Lender's option in the courts
of England, and by execution of this agreement the Borrower
hereby accepts (for itself and for each agency or entity owned or
otherwise controlled by the Borrower and all Government Property
(as defined in paragraph 8.8(a)), generally, unconditionally and

irrevocably, the non-exclusive jurisdiction of such courts and hereby irrevocably agrees to be bound by any judgment rendered in any such action or proceeding.

(b) The Borrower hereby appoints (i) the Permanent Representative of the Congo to the United Nations at 14 East 65th Street, New York, NY 10021, U.S.A., as its duly authorized agent to receive on its behalf service of all process in any proceeding in any court located in New York, and (ii) The Law Debenture Corporation p.l.c., Estates House, 66 Gresham Street, London EC2V 7HX, England, as its duly authorized agent to receive on its behalf service of all process in any proceeding in the courts of England, and acknowledges service of any such process on any such agent to be effective and binding service on them in every respect. This appointment shall be irrevocable so long as the Lender has any commitment or other obligation under any Agreement and any portion of the Loan or any Note or any other amount payable under any Agreement remains outstanding and unpaid, and during such time the Borrower will take any and all reasonable action, including the execution and filing of any and all further agreements, instruments and other documents, as may be necessary to fully effect such appointments or to continue them in full force and effect.

(c) A copy of any process served as aforesaid shall also be mailed by registered air mail, postage prepaid, to the Borrower at its address set forth in Section 8.4, but any failure to mail any such copy shall not affect the validity of service on the authorized agent so appointed. The Borrower hereby irrevocably undertakes to enter its unconditional appearance within 60 days after the completion of service on the authorized agent as provided in this section.

(d) Nothing herein shall affect the right of the Lender to bring any proceeding against the Borrower in any other court or in any other manner permitted by law. Any legal proceedings brought against the Lender by the Borrower with respect to any Agreement shall be brought only in the court or courts specified in this agreement.

(e) The Borrower hereby irrevocably waives, to the fullest extent permitted by law, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding with respect to any Agreement brought in any court specified in this agreement, (ii) any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum, and (iii) any right it may have, however arising, to remove or transfer any suit, action or proceeding brought against it in connection with any Agreement in a state court of the United States of America to the Federal court of the United States of America if such Federal court would not have or accept jurisdiction thereof.

## Section 8.7  Judgment Currency Indemnity

If for the purposes of obtaining judgment in any court it becomes necessary to convert any sum due hereunder in one currency (the "Currency of Account") into another currency (the "Judgment Currency"), such conversion shall be made at the rate of exchange prevailing on the Business Day preceding the day on which such judgment is given.  For this purpose "rate of exchange" means the rate at which the creditor is able on the relevant date to purchase the Currency of Account in New York for the Judgment Currency.  In the event that there is a change in the rate of exchange prevailing between the Business Day on which the conversion for the purposes of obtaining judgment is made and the date on which payument of the amount due is in fact made, or if any premium or other charge is incurred under exchange control or any other legislation or regulation on the conversion, the Borrower will pay such additional amount (if any) as may be necessary to ensure that the amount paid is on the date of payment the amount in the Judgment Currency which, when converted at the rate of exchange prevailing on the date of payment, equals the amount in the Currency of Account with respect to which judgment is given.  Any amount due from the Borrower under this section will be due as a separate debt and will not be affected by judgment being obtained for any other sums due under or in respect of any Agreement.

## Section 8.8  Waiver of Immunity

(a)  As used in the Agreements, the term "Government Property" means all revenues, assets and properties of the Congo (including but not limited to the gold and foreign exchange reserves and natural resources of the Congo and each Government Agency) and all deposits of and indebtedness owing to the Congo and each Government Agency held for the credit or account of the Congo or that Government Agency, as the case may be, by any central bank or monetary authority of, or acting for or on behalf of, the Congo.

(b)  To the extent that the Borrower may be or become entitled, in any jurisdiction in which proceedings may at any time be commenced with respect to any Agreement, to claim for itself or any Government Property located outside of the Congo, sovereign immunity from suit, from the jurisdiction of any court (including but not limited to any court to whose jurisdiction the Borrower has consented in this agreement), from the attachment of Government Property prior to judgment or from any other legal process, and to the extent that in any such jurisdiction there may be attributed such a sovereign immunity (whether or not claimed), the Borrower (for itself, and for all such Government Property), hereby irrevocably agrees not to claim and hereby irrevocably waives such sovereign immunity in respect of suit, jurisdiction of any court, attachment prior to judgment, attachment in aid of execution of a judgment, set-off of such property, execution of a judgment and other legal process.

-33-

## Section 8.9   Counterparts

Any Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties thereto may execute any Agreement by signing a counterpart thereof.

## Section 8.10   Amendment and Waivers

No provision of any Agreement may be changed, or its performance or observance waived or discharged, except in writing signed by each party against whom the enforcement of the change, waiver or discharge is sought.

## Section 8.11   Obligations Absolute

The obligations of the Borrower to pay the principal of and interest on the Loan and the Note(s) and all other amounts due under any Agreement are absolute, irrevocable and unconditional obligations of the Borrower and are not to any extent whatsoever dependent or contingent on the performance by any Person of its obligations under any contract or agreement. The Borrower agrees that it will not reduce in any way any amount due to the Lender under any Agreement by reason of any product dispute or any other claim which it may have against any Person or entity in connection with goods, services or indebtedness paid by the proceeds of the Advances.

## Section 8.12   Severability

Any provision of any Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

## Section 8.13   Stamp Taxes and Registration Fees

The Borrower shall pay any and all Congolese stamp, registration and similar taxes, fees or charges and shall indemnify the Agent and the Lender against any and all liabilities with respect to or resulting from any delay in the payment or omission to pay any such taxes, fees or charges which may be payable or determined to be payable in connection with the execution, delivery, performance or enforcement of any Agreement.

## Section 8.14   Language

Each Agreement, and all notices and other communications necessary to the making of an Advance, shall be executed and/or made in the English language.  All other notices, communications, certificates, data, reports, statements, evidences, opinions, and other documents which the Borrower may be required to provide under or in connection with any Agreement may be submitted in either French or English, but if in French, the Agent may have an authoritative English translation made.  For the convenience of the Borrower, the Manager has arranged for a French translation of this agreement to be furnished to the Borrower, but neither the Manager, the Agent nor the Lender makes any representation as to the accuracy or completeness of such translation, and the executed English version of each Agreement shall be the authoritative and controlling version for all purposes.  The Borrower agrees to reimburse the Agent promptly and on demand for the expense of all such translations.

## Section 8.15   Obligations Several

The obligations of the Manager, the Lender and the Agent under the Agreement are several and not joint and neither the Manager nor the Agent shall be responsible for any failure by any Lender to meet all or any of its obligations under any Agreement or any other Agreement or document related hereto, nor shall any such failure relieve the Borrower, the Manager or the Agent of their respective obligations under the Agreements.  Further nothing contained in any Agreement and no action taken by the Manager, the Agent or the Lender pursuant to any Agreement shall be deemed to constitute them or any of them a partnership, association, joint venture or other entity.

## Section 8.16   Effective Date

This Agreement shall become effective between the Borrower and the Manager when a counterpart hereof, duly signed by each of such parties, has been delivered to the other, (the "first Effective Date") and shall become effective as the Loan Agreement between the Borrower, the Lender, the Agent and the Manager upon the sending by the Borrower of its Notice of Drawing as provided in paragraph 2.1(b) (the "second Effective Date").

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers and representative and to be delivered as of the day and year first above written.

The Borrower:

THE PEOPLE'S REPUBLIC OF THE CONGO

By _____ Etienne NOTE _____
Directeur General
Caisse Congolaise d'Amortissement
B P 2090
Telex 5294 BRAZZAVILLE

The Manager and Agent:

MERIDIEN INTERNATIONAL BANK LIMITED, as Manager and Agent

By _____
Douglas L. Montgomery
President

US $30,000,0   Credit Facility Agreement                    E*HIBIT A

Form of Notice of Commitment

DATE:

FROM:    M   DIEN INTERNATIONAL BANK LIMITED

TO:      M   ITER OF FINANCE
         M   STRY OF FINANCE
         P   LE'S REPUBLIC OF THE CONGO

RE:      U   PS 30,000,000 CREDIT FACILITY UNDER CREDIT
         F   ILITY AGREEMENT DATED        DECEMBER 1983
------------------------------------------------------------

NOTICE OF COMMITMENT
--------------------

1.  WE ARE PLEASED TO ADVISE YOU ON BEHALF OF
            [ name and address of Lender . ]         THAT WE
HAVE ARRANGED FOR THE MAKING OF A LOAN IN THE AMOUNT OF DLRS
       [ amount of Loan  ]        UNDER THE ABOVE REFERENCED
CREDIT FACILITY FOR THE FOLLOWING PURPOSE:          [ describe
purpose of Loan and manner of application of proceeds  ]


2.  THE INTEREST RATE OF THE LOAN SHALL BE   [  (A)  ]** A
FLOATING RATE DETERMINED AS PROVIDED IN THE CREDIT FACILITY
AGREEMENT [ OR (B) A FIXED RATE OF _____ PER CENT PER ANNUM ]**,
AND THE OT   TERMS OF THE LOAN WILL BE AS SET FORTH IN THE
CREDIT FAC   TY AGREEMENT [ insert "EXCEPT . . . ", and
describe any    nged terms, if applicable  ].


3.  THE DATE OF THE DRAWING FOR THIS LOAN HAS BEEN SCHEDULED FOR
           , 198 .  PLEASE ADVISE US NO LATER THAN      ,
198  OF YOUR ACCEPTANCE OF THE OFFER CONTAINED IN THIS NOTICE OF
COMMITMENT [ AND OF YOUR CHOICE OF INTEREST RATE  ]** BY NOTICE
OF DRAWING IN THE FORM SPECIFIED IN THE CREDIT FACILITY AGREEMENT.


4.     [ Name of Lender  ]   HAS AUTHORIZED US TO SEND THIS
NOTICE ON ITS BEHALF FOR PURPOSES OF PARAGRAPH 2.1(C) OF THE
CREDIT FACILITY AGREEMENT.

VERY TRULY YOURS,

[  Name   ]
[  Title  ]


--------------------
** This sentence will be applicable only if the Manager can
   arrange fixed rate financing.

US $30,000,0  Credit Facility Agreement                        EXHIBIT B

Form of Notice of Drawing

DATE:

FROM:      THE MINISTER OF FINANCE
           THE PEOPLE'S REPUBLIC OF THE CONGO

TO:        MERIDIEN INTERNATIONAL BANK LIMITED, MANAGER

           ATTN:  MR. DOUGLAS L. MONTGOMERY
                  PRESIDENT

RE:        US DLRS 30,000,000 CREDIT FACILITY UNDER
           CREDIT FACILITY AGREEMENT DATED
                  DECEMBER, 1983

                    NOTICE OF DRAWING
                    -----------------

WE REFER TO THE NOTICE OF COMMITMENT DATED [ insert date ]
GIVEN BY YOU UNDER THE ABOVE REFERENCED CREDIT FACILITY
AGREEMENT, AND CONFIRM OUR ACCEPTANCE OF THE PROPOSAL FOR THE
MAKING OF AN ADVANCE BY [ insert name of Bank ] TO THE PEOPLE'S
REPUBLIC OF THE CONGO FOR THE PURPOSES AND ON THE TERMS AND
CONDITIONS SPECIFIED IN THE NOTICE OF COMMITMENT AND CREDIT
FACILITY AGREEMENT.

[ WE HEREBY CONFIRM OUR ELECTION THAT THE LOAN SHALL BE MADE AT
THE [ insert "FIXED" or "FLOATING" ] INTEREST RATE SPECIFIED
IN THE NOTICE OF COMMITMENT ]**

PLEASE PROCEED WITH THE ADVANCE AS PROPOSED.

YOURS FAITHFULLY,

[ Name and Title of Minister of Finance
  or another Person authorized to sign
  Notices of Drawing         ]

--------------------
** This sentence will be applicable only if the Manager can
   arrange fixed rate financing.

US $30,000,000 Credit Facility Agreement                        EXHIBIT C-1

## PROMISSORY NOTE

US $[    1    ]*                                          [    2    ]*
                                                     New York, New York

          FOR VALUE RECEIVED, the undersigned, THE PEOPLE'S
REPUBLIC OF THE CONGO Acting by and through by its
                              HEREBY PROMISES TO PAY to the
order of                      [    3    ]*
          (the "Lender"), at the office of Irving Trust Company, One
Wall Street, New York, New York  10015, United States of America,
THE PRINCIPAL SUM OF          [    4    ]*
United States dollars (US $ [    1    ]* ) in ten (10) equal
consecutive semi-annual instalments of        [    5    ]*
United States dollars (US $ [    6    ]* ) each, payable on the
first day of each August and February, commencing August 1, 1984,
TOGETHER WITH INTEREST on the unpaid principal balance hereof,
payable on each such date specified for the payment of instal-
ments of principal, accruing each day from the date hereof until
the maturity date of that instalment at the rate of [  7  ]* per
centum ([ 8 ]%)* per annum. Any amount payable hereunder which
shall not be paid when due shall bear interest, payable on
demand, each day from the date it was due until it is actually
paid at an annual rate equal to the sum of the rate specified
herein for interest before maturity, plus one per cent (1%) per
annum.  Interest shall be calculated on the basis of a 360 day
year.

          Demand, presentment, protest and notice of dishonor are
hereby waived.

          This Note is one of the Notes issued in connection
with, and is entitled to the benefits of, a Loan Agreement be-
tween the undersigned, Meridien International Bank Limited, as
Manager and Agent, and the Lender, made pursuant to the Credit
Facility Agreement dated December, 1983 which Loan Agreement
provides, among other things, that this Note shall be freely
transferable (in whole or in part), that this Note may not be
prepaid without the consent of the Lender, that payment hereunder
shall be free and clear of all taxes, and that the maturity
hereof and of the obligations evidenced hereby may be accelerated
upon the happening of certain events.

          This Note shall be governed by and construed in
accordance with New York Law.

          . . . . . . . . . . . . . . . . . . . . . . . . .


--------------------
*  See  "Instructions to Manager for Completion of Fixed Rate
   Notes" on page C-1-2.

US $30,000,⬤  Credit Facility Agreement  ⬤              **EXHIBIT C-1**

### Instructions to Manager for Completion of Fixed Rate Notes

1.   Principal amount of Note, in figures.

2.   Date of Drawing (if Note is being issued pursuant to paragraph 2.2(b)) or last date to which interest has been paid (if Note is being issued pursuant to paragraph 2.3(c)).

3.   Name and address of Lender.

4.   Principal amount of Note, in words

5.   Amount of each instalment, in words.

6.   Amount of each instalment, in figures.

7.   Rate of interest, in words.

8.   Rate of interest, in figures.